USDC SCAN INDEX SHEET

















R1R 6/15/04 14:21

3:03-CR-03433 USA V. MOHAMED

*78*

*CRRESPM.*

ORIGINAL

CAROL C. LAM
United States Attorney
JOHN N. PARMLEY
Assistant U.S. Attorney
California State Bar No. 178885
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 557-6198

Attorneys for Plaintiff
United States of America

FILED
04 JUN 14 PM 4:12
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: [signature] DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA
(Honorable John A. Houston)

UNITED STATES OF AMERICA,
Plaintiff,
v.
OMAR ABDI MOHAMED,
Defendant.

Criminal Case No. 03cr3433-JAH

DATE: June 24, 2004
TIME: 2:30 p.m.

GOVERNMENT'S RESPONSE AND MOTIONS TO:

(1) SUPPRESS STATEMENTS; and
(2) SUPPRESS "SEARCH WARRANT"

TOGETHER WITH STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES

COMES NOW, the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, CAROL C. LAM, United States Attorney, and John N. Parmley, Assistant United States Attorney, and hereby files its response and opposition to defendant's above-referenced motions.

I

STATEMENT OF FACTS

A. Summary

OMAR ABDI MOHAMED is a Somali citizen who emigrated to San Diego from Canada in 1995 on a fraudulently obtained religious worker's visa. Through this religious worker's visa he was

//

JNP:hc:6/14/04
A#4:MOHAMED~RES

78

able to become a Legal Permanent Resident. In April of 2000, Defendant applied to become a United States Citizen.

In May 2002, Defendant was interviewed by United States immigration officials in connection with his written application. In his interview and application, Defendant made multiple material false statements and omissions, many of which are the subject of the superseding indictment.

The United States filed a more detailed statement of facts concerning those false statements in a motion response filed on March 15, 2004. That statement of facts is hereby incorporated by reference. What follows are additional facts related to Defendant's newly filed motions.

B. First Interview

In April 2000, Defendant applied with the INS to become a United States citizen. In April 2002, the INS mailed Defendant a letter informing of the time and place of his naturalization interview. On May 9, 2002, Defendant arrived for his interview at the Federal Building. This was not a custodial interrogation. Defendant was free to leave at any time. In fact, he did leave at the conclusion of the interview. Additionally, this interview was done at Defendant's request. Defendant had previously applied for citizenship. An interview with an immigration officer is a routine part of the naturalization process.

Special Agent Schultz introduced himself as an Immigration Officer as did Immigration Officer Kirt Klingerman. Officer Klingerman indicated to Defendant that "we randomly tape some interviews." Contrary to the declaration of Defendant, neither Klingerman nor Agent Schultz told Defendant that this taping was done for "educational and training purposes." Furthermore, the parties did not have a "three to four minute" discussion before the camera was turned on. Neither Agent Schultz nor Officer Klingerman told Defendant that failure to allow video-taping would result in a denial of his application for citizenship. Schultz and Klingerman will testify that Defendant appeared neither "reluctant" nor "confused" at the outset of the interview. He did not appear to be "highly intimidated." On the contrary, he was relaxed and smiling.[1]

[1] Something which is evident on the videotape. The United States will bring copies of the tapes of the two interviews to the motion hearing.

At the beginning of the interview, Officer Klingerman mistakenly told Defendant that his "attorney of record" was Kristy Cabral, of the International Rescue Committee. Ms. Cabral is listed on INS form G-28 (Notice of Entry of Appearance as Attorney or Representative), which is the form used by the INS to show who, if anyone, represents the Petitioner or who assisted in the preparation of the application. That form includes four boxes which can be checked to show whether the person is an attorney or a representative. In the present case, box 2 is checked which indicates that Kristy Cabral is an "accredited representative" of the International Rescue Committee. She is not an attorney. She merely assisted Defendant with the preparation of his application while she was an employee of that Agency.

Because she is not an attorney, Defendant may have been confused by this exchange as he did not have an attorney. In any event, Defendant was informed that he could continue the interview without her presence. He agreed to do so and signed a waiver to that effect. This portion, along with the entire interview, was videotaped.

Not surprisingly, Agent Schultz did not tell Defendant that he was being investigated for possible criminal activity.[2]

C. Defendant's Second Interview and Arrest

On December 19, 2003, Defendant was indicted in a two-count indictment.[3] Subsequent to his indictment, Defendant was invited down to the Federal Building for a January 22, 2004 interview. He was informed that the proceedings would be video-taped. When Defendant arrived, Agents took him into an interview room, turned on a video camera, and administered his Miranda rights. After waiving his rights, Defendant was interviewed for approximately forty-five minutes. At the end of the interview he was arrested and booked into custody.

//

//

//

[2] The two interviews are discussed in detail in the Government's opposition filed on March 15, 2004.

[3] The nine-count superseding indictment was filed on March 26, 2004.

D. Search Warrant at Defendant's Residence

While Defendant was sitting down for his interview, Federal agents executed a search warrant at his home. The search warrant had been previously approved by United States Magistrate Judge William McCurine.

## III

## RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS

A. SUMMARY

The defendant in this case applied to become a United States citizen. As part of the naturalization process, he participated in two video-taped interviews. These interviews were non-custodial in nature. They were not coercive. Agents did not promise anything, nor did they threaten anything. The defendant was free to leave at any time. Because the first interview was a non-custodial, voluntary interview, the agents were not constitutionally required to advise the defendant of his Miranda rights. They were not required to inform him that he was under investigation. They were not required to inform him as to the true purpose of their video-taping. In fact, at the first interview, Agents had no reason to believe that he would come in and lie. Defendant was not represented by an attorney so it was immaterial whether he knowingly waived his right to the presence of this non-existent attorney. At the time of the second interview, the defendant had already been indicted. Therefore, his right to counsel had attached. However, agents properly advised Defendant of his Miranda rights, which he waived. Therefore, the defendant waived his Sixth Amendment right to counsel. Finally, the search warrant in this case was not overbroad.

B. THE MAY 9, 2002 INTERVIEW WAS NON-CUSTODIAL, VOLUNTARY AND DEFENDANT'S STATEMENTS WERE NOT COERCED

Defendant argues that his "confession" was involuntary and should be suppressed.[4] He argues that Agent Schultz's alleged threats regarding the success of his naturalization application, and alleged

//

//

[4] Defendant routinely characterizes his statement as a "confession." In fact, the opposite is true. He lied. He is charged with lying to immigration officials during his interview.

false assertions regarding the nature of the interview rendered the encounter coercive.[5] He argues that the totality of the circumstances require suppression. Defendant fails to note the non-custodial nature of the interview. Furthermore, he makes much of the fact that agents failed to inform him of the true purposes of the interview, arguing that this renders the "confession" inadmissible. Tellingly, he cites no cases for this proposition.

Defendant correctly points out that a statement is admissible if a preponderance of the evidence indicates that the statement was not elicited by improper coercion. Colorado v. Connelly, 479 U.S. 157, 167-70 (1986) (preponderance of evidence standard governs voluntariness and Miranda determinations; valid waiver of Miranda rights should be found in the "absence of police overreaching"; "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'").

In assessing whether a statement was voluntary the court must ask whether, in the totality of the circumstances, the law enforcement officials obtained the statement by overbearing the will of the accused. Haynes v. Washington, 373 U.S. 503, 513 (1963).

Although the totality of circumstances, including characteristics of the defendant and details of the interview, should be considered, improper coercive activity is a necessary predicate to suppression of any statement. Id.; cf. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) ("Some of the factors taken into account have included the youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.") (citations omitted).

The location of the questioning is relevant. United States v. Fisher, 137 F.3d 1158, 1165 (9th Cir. 1998)(confession voluntary in part because interrogation took place in living room.) Similarly, it is important for the court to note whether the individual is in custody.

Furthermore, whether the defendant initiated contact with the law enforcement officials is also relevant. United States v. Michaud, 268 F.3d 728, 737-38 (9th Cir. 2001)(valid waiver despite previous invocation of Miranda rights when defendant initiated conversation with police.)

---

[5] As noted in the statement of facts above, Agent Schultz and Officer Klingerman will testify that they made no promises or threats regarding Defendant's application. They merely told him that some interview proceedings were randomly videotaped.

On the other hand, false or misleading statements by law enforcement officers to a suspect do not render a confession involuntary. United States v. Amaya-Ruiz 121 F.3d 486, 495 (9th Cir. 1997)(confession voluntary although officers falsely told defendant that an eyewitness had seen him.) United States v. Orso, 266 F.3d 1030, 1039 (9th Cir. 2001)(confession voluntary despite officer falsely telling defendant that eyewitness saw him with a gun during robbery.) Frazier v. Cupp, 394 U.S. 731, 737-39 (1969)(confession was voluntary even though the officer falsely told the suspect that his co-conspirator had confessed to the crime.)

The circumstances in the present case were simply not coercive. Defendant voluntarily applied for naturalization. He was informed by letter of the time and place of his interview. He was told that the proceedings would be taped. He voluntarily arrived and sat down with agents. He was not threatened with anything. He was not promised anything. He was not told that failure to allow video-taping would result in a denial of his naturalization application. He was not deprived of sleep, food or water. He was not beaten. He was not questioned for days on end. In fact, the total time of the interview was approximately 45 minutes. He was free to leave at any time. He left on his own at the end of the interview. Defendant is an adult with considerable experience. He is intelligent and well-educated. He is not mentally ill. He was not under the influence of alcohol or a controlled substance. The video shows that the defendant was relaxed and smiling at the beginning of the interview[6]. The sole "misrepresentation" in this case was that agents did not tell him that this was more than a random videotaping. The sole "omission" in this case was that agents did not tell him that they harbored suspicions about him.

Finally, it must be noted that this interview did not result in a "confession." The primary concern courts have with coercive interview techniques is that police misconduct may "overbear the will" of the accused, resulting in a false confession. Defendant is hard pressed to say how anything the officers did overbore his will. In response to questions, he lied. Those lies form the basis of the current charges.

//

//

//

[6] He becomes more nervous as he starts to lie.

C. DEFENDANT HAD NO RIGHT TO MIRANDA WARNINGS AT THE MAY 2002 INTERVIEW

Defendant engages in a significant distortion of the law and the facts claiming that at the May 2002 interview he was "deprived of his freedom by authorities in a significant way." He attempts to inflate this case into something it is not.

For example, he cites cases which outline the grave consequences of denaturalization. He fails to show how those cases are relevant. Defendant lied during his naturalization interview. Therefore, it is likely that he will not become a United States citizen. He is not being stripped of anything.

He cites cases outlining the fact that individuals have the right to obtain counsel at their own expense in immigration proceedings. No one is suggesting otherwise. However, in this case, defendant did not hire an attorney to assist him with naturalization.

He cites Lefkowitz v. Turley 414 U.S. 70 (1973) for the proposition that an "answer elicited upon the threat of the loss of employment" is compelled and thus inadmissible. He misses the holding of Lefkowitz entirely, which is that individuals cannot be compelled to testify against themselves in a Grand Jury proceeding. In other words, the testimony there was compelled. The naturalization proceeding here was undertaken at the defendant's request. He was not compelled to seek citizenship. Furthermore, there was no reason to believe that answers in a naturalization proceeding would tend to subject the defendant to criminal liability. In other words, agents had no reason to expect that he would lie to them, thereby incriminating himself.

This issue turns on a much simpler question. Was the defendant "in custody" at the time of the May 2002 interview? If he was not in custody, then no Miranda warnings were constitutionally required.

Miranda warnings are only required when a suspect is both in custody and subject to state interrogation. Illinois v. Perkins, 496 U.S. 292, 297 (1990)("It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation.")

Defendant was not in custody at the time of the May 2002 interview. Therefore, Miranda warnings were unnecessary. To determine whether a suspect is in custody, a court considers the circumstances objectively, not the subjective views of the defendant. Stansbury v. California, 511 U.S. 318, 323 (1994.)

The objective circumstances surrounding the "custody" issue in this case are that the defendant applied for citizenship, and received a notice to come for an interview. He was informed that the proceedings would be video-taped. He voluntarily made his way on his own to the Federal Building in order to keep his appointment, and answered questions regarding his application. He was not handcuffed. He was not detained. He was not held at gunpoint. At the end of the interview he left and went home.

Finally, Defendant makes much of the issue surrounding Kristy Cabral of the International Rescue Committee. This issue has no bearing on the case at hand. Because defendant had no right to Miranda warnings, it is immaterial whether the warnings given were knowing and voluntary. And because Defendant did not have an attorney, there was no need to waive his or her presence.

Defendant correctly opines that he has a right to counsel at his own expense in immigration proceedings. Nevertheless, he did not hire one. As Agent Klingerman will testify, he mistakenly believed that Kristy Cabral of the International Rescue Fund was an attorney. He misread the G-28 form. That form clearly states that Ms. Cabral is merely an "accredited representative" of her organization and not defendant's attorney. Agent Schultz will testify that he confirmed that Ms. Cabral was not an attorney prior to the indictment in this case.

Therefore, there is no need to conduct an inquiry into this issue. The defendant was not in custody. Therefore, there was no requirement that he be advised of his Miranda rights. It is immaterial whether any waivers were knowing or voluntary. The facts will show unmistakably that defendant was not represented by counsel. It is therefore immaterial whether he knowingly and voluntarily waived his right to the presence of his non-existent attorney.

### D. THE DEFENDANT KNOWINGLY AND VOLUNTARILY WAIVED HIS SIXTH AMENDMENT RIGHT TO COUNSEL AT THE JANUARY 2004 INTERVIEW

The first interview occurred in May 2002. On December 19, 2003, Defendant was indicted in a two-count indictment. Subsequently, on January 22, 2004, he was invited down to the Federal Building for another interview. Although he had been indicted, and an arrest warrant issued, Agents did not immediately advise him that he had been indicted. Rather, they advised defendant of his Miranda

rights. After defendant waived those rights, the Agents conducted a forty minute interview. At the conclusion of the interview they placed defendant under arrest.

Defendant does not contend that the Miranda warnings given in this case were incomplete, inappropriate or otherwise lacking at the second interview. Nor does he contend that Agents exerted improper coercion on him. Rather, his sole contention is that because he was not informed of the indictment, his waiver of his right to an attorney was not knowing or voluntary. As the following discussion will make clear, it was constitutionally unnecessary for agents to advise defendant that he had been indicted. It was sufficient to inform him of his right to attorney and the consequences of waiving that right, i.e. that his statements could later be used against him in a court of law. Therefore, defendant's waiver was knowing, intelligent and voluntary.

As explained above, under the Fifth Amendment, the Miranda right to counsel attaches only when a suspect invokes the right during a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). The right to counsel under the Sixth Amendment, however, is different. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." That right automatically attaches upon initiation of formal, adversarial proceedings. Brewer v. Williams, 430 U.S. 387, 404 (1977)("[T]he right to counsel does not depend upon a request by the defendant.")

The Supreme Court has noted that the "core purpose" of the Sixth Amendment right to counsel is to guarantee assistance at trial, "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor." United States v. Ash, 413 U.S. 300, 309 (1973). The Supreme Court has consistently held that an accused has the right to the effective assistance of counsel at the "critical stages" in the criminal justice process. United States v. Wade, 388 U.S. 218, (1967); see Maine v. Moulton, 474 U.S. 159, 170(1985).

Therefore, in the present case, defendant's right to counsel attached at the time he was indicted. However, attachment of the right alone does not guarantee a defendant the assistance of counsel. "A defendant also must invoke the Sixth Amendment right by hiring a lawyer or asking for appointed counsel." United States v. Harrison, 213 F.3d 1206, 1209-10 (9th Cir. 2000).

An individual may waive his Sixth Amendment right to counsel in the same way he would waive his Fifth Amendment right, through a Miranda waiver. In Patterson v. Illinois, 487 U.S. 285, (1988), the Supreme Court held that a defendant who has been indicted but who has not yet exercised his right to counsel may waive his Sixth Amendment right to counsel during questioning by executing a valid waiver of his Fifth Amendment right to counsel. "As a general matter, then, an accused who is admonished with the warnings prescribed by the Court in Miranda has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." Id. at 296.

Left unresolved by the Patterson court was the question whether failure to advise the person that they are under indictment could change the analysis. "An exception to this is the occasional suggestion that, in addition to the Miranda warnings, an accused should be informed that he has been indicted before a postindictment waiver is sought. See, e.g. United States v. Mohabir, 624, F.2d 1140, 1150 (2d Cir. 1980)" Patterson at 295 Fn 8.[7]

The Patterson court continued: "[W]e do not address the question whether or not an accused must be told the has been indicted before a postindictment Sixth Amendment wavier will be valid. Nor do we even pass on the desirability of so informing the accused – a matter that can be reasonably debated." Id.

While the Patterson court failed to tackle this issue head on, they did reach a number of conclusions. First, Miranda warnings make a person "aware of his right to have counsel present during questioning." This conveys the "sum and substance of the rights that the Sixth Amendment provide[s]." Patterson at 293.

Second, Miranda warnings make a person "aware of the consequences" inherent in waiving their Sixth Amendment rights during postindictment questioning. Id. The court reasoned:

> This is the ultimate adverse consequence petitioner could have suffered by virtue of his choice to make uncounseled admissions to the authorities. This warning also sufficed . . . to let petitioner know what a lawyer could "do for him" during the postindictment questioning: namely, advise petitioner to refrain from making any such statements. By knowing what

[7] As will be explained below, in United States v. Charria, 919 F.2d 842 (2d Cir. 1990), the Second Circuit overturned the Mohabir line of cases after concluding that the reasoning in those cases was inconsistent with the Supreme Court's holding in Patterson.

> could be done with any statements he might make, and therefore, what benefit could be obtained by having the aid of counsel while making such statements, petitioner was essentially informed of the possible consequences of going without counsel during questioning. If petitioner lacked "a full and complete appreciation of all of the consequences flowing" from his waiver, it does not defeat the State's showing that the information it provided to him satisfied the constitutional minimum. Cf. Oregon v. Elstaad, 470 U.S. 298, 316-317 (1985). Patterson, 293-94.

Third, the court explicitly rejected the notion that the Sixth Amendment was superior or more important than the Fifth Amendment. "We consequently reject petitioner's argument that . . . waiver of an accused's Sixth Amendment right to counsel should be 'more difficult' to effectuate than waiver of a suspect's Fifth Amendment rights. Patterson, 297.

Fourth, the court emphasized the need for a pragmatic approach to the waiver question, asking "what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that at stage." Id. at 298. The court discussed a spectrum where postindictment photographic display identification was at one end of the spectrum while a criminal trial was at the other end. Applying this pragmatic approach, the court concluded with the following holding:

> Applying this approach, it is our view that whatever warnings suffice for Miranda's purposes will also be sufficient in the context of postindictment questioning. The State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning, or expand the limited purpose that an attorney serves when the accused is questioned by authorities. With respect to this inquiry, we do not discern a substantial difference between the usefulness of a lawyer to a suspect during custodial interrogation, and his value to an accused at postindictment questioning. Patterson, 298-99.

As noted above, the Supreme Court did not explicitly decide the question as to whether or not a person must be informed they are under indictment in order to obtain a knowing, intelligent and voluntary waiver of their Sixth Amendment right to counsel. However, since then, other circuits have decided the issue, relying on Patterson to reach the conclusion that it is constitutionally unnecessary to advise someone that they have been indicted, so long as they are advised of their Miranda rights.

In United States v. Charria, 919 F.2d 842 (2d Cir. 1990), the Second Circuit considered this explicit issue. The Second Circuit recognized that Patterson had called into question its previous line of cases which employed a hierarchy-of-rights analysis. See United States v. Mohabir, 624 F.2d 1140,

1146-53 (2d Cir. 1980). They found that "Patterson's pragmatic approach supersedes previous rulings of this circuit which . . . called for a higher 'knowing and intelligent' standard for sixth amendment waivers than for other waivers." Charria at 847.

Having recognized the errors in their previous decisions, the Charria court embraced the pragmatic approach of Patterson.

> Accepting that Charria was not informed of the indictment against him, we believe that his argument would make a patchwork of the law in this area – retaining procedures premised on the need to effect a supposed 'distinction between Fifth and Sixth Amendment rights', Mohabir at 1147, after the Supreme Court has recognized that 'there is no support . . . . for the notion that because a Sixth Amendment right may be involved, it is more difficult to waive than a Fifth Amendment counterpart.' Patterson at 297-98. Patterson counsels a shift in sixth amendment waiver analysis away from the abstract importance of the right to counsel and toward a practical inquiry . . . . Charria's argument would undermine this shift, and, further, is inconsistent with Patterson's conclusion that Miranda warnings suffice to effect a valid sixth amendment waiver during postindictment questioning.

Charria, 847-48.

The Charria court concludes by finding that "[e]ven absent being informed that he was under indictment, the Miranda warnings gave Charria ample notice of the dangers of self-representation at a critical stage in the proceedings against him." Id.

All other circuits to decide this issue have reached the same conclusion. See Quadrini v. Clusen, 864 F. 2d 577 (7th Cir. 1989), Riddick v. Edmiston, 894 F.2d 586 (3d Cir. 1990) and United States v. Muca, 945 F.2d 88 (4th Cir. 1991). See also United States v. Percy 250 F.3d 720, 726 (9th Cir. 2001), (Indicted defendant may waive Sixth Amendment right to counsel by executing valid Miranda waiver in case where defendant arraigned in Tribal Court but not yet arraigned in Federal Court.)

Defendant cites United States v. Karr, 742 F.2d 493 (9th Cir. 1984), a pre-Patterson case, for the proposition that a defendant must be informed both of his right to counsel and the fact that he has been indicted before a waiver can be knowing and voluntary. Defendant's reading of the holding of Karr is incorrect.

Karr simply held that "[a] defendant who has been adequately informed of his right to counsel and of the fact that formal judicial proceedings have begun against him may validly waive his Sixth Amendment right to counsel." Karr at 496. It does not follow that Karr also holds that an individual

who has not been informed of the fact that he has been indicted cannot validly waive his Sixth Amendment right to counsel. That factual situation was not present in Karr and was therefore not part of its holding.

This court should look to the reasoning of the Patterson case as well as the others listed above and find that the totality of circumstances here show that defendant knowingly and intelligently waived his Sixth Amendment right to counsel when he was informed of and waived his Miranda rights.

E. THE SEARCH WARRANT WAS NOT OVERBROAD

Finally, Defendant contends that the search warrant was overbroad. Specifically, he claims that the search warrant "contained no limitations" on which documents could be seized. This contention is false. The warrant incorporated a detailed affidavit and the section entitled "Items to be Seized" was as specific as possible given the circumstances of the case. It permitted the officers to only take items which were evidence of violations of Title 18 United States Code Sections 1001, 1425 and 1546. Furthermore, the seizing agents acted in good faith while executing a lawfully issued search warrant.

The purpose of the particularity requirement of the Fourth Amendment is to make general searches impossible. Marron v. United States, 275 U.S. 192, 196 (1927). However, a search warrant need not identify with mathematical precision the exact items to be seized. As the Ninth Circuit has repeatedly recognized, "[t]he specificity required in a warrant varies depending on the circumstances of the case and the type of items involved. Warrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986); see also United States v. Hernandez-Escarsega, 886 F.2d 1560, 1567 (9th Cir. 1989); United States v. Holzman, 871 F.2d 1496, 1508 (9th Cir. 1989) ("The degree of specificity required is flexible and may vary depending on the circumstances and the type of items involved."); United States v. Hillyard, 677 F.2d 1336, 1339 (9th Cir. 1982) ("The particularity guarantee does not preclude the use of generic language"); United States v. Hayes, 794 F.2d 1348, 1354 (9th Cir. 1986) ("A warrant need only be reasonably specific in its description of the objects of the search and need not be elaborately detailed.")

Because the government established probable cause to seize a broad range of records, the specifications of the warrant met the particularity requirement of the Fourth Amendment. The search

warrant here is like those upheld in Hernandez-Escarsega and United States v. Fannin, 817 F.2d 1379 (9th Cir.1989). In Fannin, the Ninth Circuit upheld similar language despite an overbreadth challenge. In that case, the warrant authorized seizure of items "including correspondence, bank records, photographs, telephone answering devices, currency, ledgers, and other items providing evidence of illegal trafficking in controlled substances." Id. at 1381. The warrant was not constitutionally infirm because the scope of the search was limited to items related to the particular criminal activity described in the warrant and attached affidavit. Id. at 1383. It therefore effectively told the executing officers "to seize only those items related to illegal drug trafficking." Id. Similarly, the search warrant in this case limited the discretion of the executing agents by effectively telling them to seize only those items which were related to immigration and naturalization fraud.

As the incorporated affidavit explained, the defendant committed the crimes of naturalization fraud and lying to federal officials during his naturalization interview. Because he committed fraud in his naturalization interview, agents had probable cause to search for documents which would include evidence of such fraud. By its very nature, such evidence was limited in scope to the naturalization process and his immigration fraud. In other words, only information relevant to the naturalization process and his immigration fraud was seizable under the warrant. Agents could not adequately predict with more specificity, however, what information would be in the defendant's possession which would relate to his naturalization fraud. Therefore, the warrant was as particular as possible.

Looking at each section of the "Items to be Seized" listed in Attachment B of the search warrant, the court can see that each item relates to the naturalization process and immigration fraud with the exception of the "dominion and control" section, which will be discussed below. Sections "a", "b" and "c" all relate to identification documents such as passports, birth certificates, travel documents, social security cards, etc. Section"d" relates to employment, income, and financial information. The naturalization process requires individuals to state their employment and memberships in various organizations.

Furthermore, the facts of this case show that defendant's fraud originated from his deception concerning the over $300,000 he received from an organization which had been shut down for links to

terrorism. The search warrant therefore permitted agents to seize financial documents related to that lie. Section "e" relates specifically to records of the Western Somali Relief Agency, the organization he lied about.

In fact, defendant's only complaint is with section "2", which permits the seizure of items which show the defendant's dominion and control of the premises. The warrant here is not overbroad, because the items must be seized for a particular purpose: showing the defendant's link to the house. This type of warrant is permitted in the Ninth Circuit. In United States v. Alexander, 761 F.2d 1294, 1301 (9th Cir. 1985), the warrant contained a provision authorizing agents to search for "items or articles of personal property tending to show identity of persons in ownership, dominion or control of said premises." The district court found that the warrant was too broad. The Ninth Circuit reversed the district court urging a "common sense" reading of the warrant. Id. at 1302. They found that such language was sufficiently particular. Id.

In his motion, defendant relies on two cases for the proposition that the search and seizure in question were overly broad. However, both United States v. Kow, 58 F.3d 423 (9th Cir.1995), and Center Art Galleries-Hawaii, Inc. v. United States, 875 F.2d 747 (9th Cir.1989) overruled on other grounds, J.B. Manning Corp. v. United States, 86 F.3d 926, 927 (9th Cir.1996), are distinguishable. In Kow, the crime was tax fraud and the warrant authorized "the seizure of virtually every document and computer file" at a video distributing company. This was unconstitutionally broad and generic because there was no limit on which documents could be seized or how they related to the criminal activity at issue. Center Art Galleries-Hawaii involved mail and wire fraud in connection with the sale of a forged Salvador Dali painting. The warrant was overbroad because it allowed unrestricted seizure of items without describing the specific crimes suspected. See also United States v. Cardwell, 680 F.2d 75 (9th Cir.1982) (warrant invalid because it failed to describe criminal activity under investigation).

By contrast, in this case, the application here did not ask for, and the warrant did not authorize, seizure of every document, but only those documents related to naturalization fraud and immigration fraud. The affidavit provided ample probable cause to believe that seizing agents would find such documents.

Even where part of a search warrant is overbroad, suppression of all the evidence is not required. If a portion of search warrant is invalid, that portion should be severed, and the search made pursuant to the valid portions should be upheld. United States v. Clark, 31 F.3d 831, 836 (9th Cir. 1994); United v. Baldwin, 987 F.2d 1432, 1436 (9th Cir. 1993). Further, even if a warrant is overbroad as to some items, or the warrant fails to establish probable cause to search for some of the listed items, all the items may still be properly seized under the plain view doctrine. See United States v. Holzman, 871 F.2d 1496, 1512-13 (9th Cir. 1989) ( where warrant found not to properly authorize search for bonds, but bonds not suppressed because discovered in plain view during search made pursuant to valid portion of the warrant).

The final question is whether the good faith exception applies to the question of overbreadth. In the present case, a neutral magistrate reviewed the search warrant and approved it. A "magistrate's determination of probable cause is treated with great deference and is not reviewed de novo." United States v. Alexander, 761 F.2d 1294, 1300 (9th Cir.1985). The court may not reverse a magistrate's finding of probable cause unless it is clearly erroneous. United States v. McQuisten, 795 F.2d 858, 861 (9th Cir.1986). The court need only find that, "under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed." Id. "In doubtful cases, preference should be given to the validity of the warrant." Id.

When agents have executed a warrant that is later found to be defective, suppression of the evidence is not a proper remedy if the agents acted in good faith. United States v. Leon, 468 U.S. 897, 922, 926 (1984). In the present case, the agents reasonably relied on the magistrate's findings that the warrant was legal. Therefore, they acted in good faith. The Ninth Circuit has held that good faith analysis applies to the question of overbreadth. United States v. Schmidt, 947 F.2d 362, 373-74 (9th Cir. 1991)

DATED: June 11, 2004

Respectfully submitted,

CAROL C. LAM
United States Attorney

JOHN N. PARMLEY
Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. OMAR ABDI MOHAMED, Defendant. | Criminal Case No. 03cr3433-JAH<br><br>CERTIFICATE OF SERVICE BY MAIL |

IT IS HEREBY CERTIFIED that:

I, Helaine Curtis, am a citizen of the United States over the age of 18 years and a resident of San Diego County, California; my business address is 880 Front Street, San Diego, California 92101-8893; I am not a party to the above-entitled action; and subsequent to filing with the Clerk of the Court, I will cause to be deposited in the United States mail at San Diego, California, a copy of GOVERNMENT'S RESPONSE AND MOTIONS TO: (1) SUPPRESS STATEMENTS; AND (2) SUPPRESS "SEARCH WARRANT" TOGETHER WITH STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES addressed to:

MAHIR SHERIF, ESQ.
3376 30TH ST.
SAN DIEGO, CA 92104

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 14th day of June, 2004.

Helaine Curtis

HELAINE CURTIS