















JPP   3/17/05   14:37

3:03-CR-03433   USA V. MOHAMED

*137*

*CRTRLMEM.*

ORIGINAL

1  CAROL C. LAM
   United States Attorney
2  JOHN N. PARMLEY
   Assistant U.S. Attorney
3  STEPHEN R. COOK
   Assistant U.S. Attorney
4  California State Bar Nos. 178885, 204446
   Federal Office Building
5  880 Front Street, Room 6293
   San Diego, CA 92101-8893
6  Telephone: (619) 557-6198

7  Attorneys for Plaintiff
   United States of America

8



FILED

MAR 1 6 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

9                  UNITED STATES DISTRICT COURT

10                SOUTHERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,        )   Criminal Case No.  03cr3433-JAH
                                     )
13                      Plaintiff,   )   DATE: March 21, 2004
                 v.                  )   TIME:  9:00 a.m.
14                                   )
    OMAR ABDI MOHAMED,               )   UNITED STATES' TRIAL MEMORANDUM
15                                   )
                        Defendant.   )
16  _____ )

17        COMES NOW, the plaintiff, United States of America, by and through its counsel, Carol C.

18  Lam, United States Attorney, and John N. Parmley,  Assistant United States Attorney, and hereby files

19  the attached trial memorandum of facts and law relating to this case.

20                                      I

21                          **STATUS OF THE CASE**

22  A.    **Indictment**

23        The Defendant is charged in a Superseding Indictment with eight counts of immigration and

24  naturalization fraud in connection with a May 9, 2002 naturalization interview, in violation of 18 U.S.C.

25  §§ 1546 and 1015(a).  One additional count charges him with possessing an immigration document

26  obtained by fraud, in violation of 18 U.S.C. § 1546.

27

28

137

B.   **Trial Status**

A jury trial is scheduled for March 21, 2005, at 9:00 a.m., before the Honorable John A. Houston, United States District Judge.  The estimated length of the trial is five days.

C.   **Custody Status**

Defendant has remained in either Immigration or U.S. Marshal's custody since his arrest on January 22, 2004.  He is currently in U.S. Marshal's custody.

D.   **Status of Representation**

Mahir Sherif is retained counsel for Defendant.

E.   **Jury Status**

Defendant has not filed a jury waiver.

F.   **Interpreter**

The United States does not need an interpreter for any of its witnesses.

G.   **Pretrial Motions**

Defendant initially filed pretrial motions to compel discovery, disclose confidential informants, strike prejudicial material from the indictment, obtain grand jury records, obtain grand jury transcripts, suppress statements, suppress evidence obtained during a search warrant, and file further motions.  The United States filed a motion for reciprocal discovery.

At a June 24, 2004, motion hearing, the court granted Defendant's motion for discovery and the Government's motion for reciprocal discovery.  All other motions were denied, including Defendant's motion to strike portions of the indictment.

The United States filed motions *in limine* regarding the admissibility of foreign documents, judicial notice concerning the human gestational cycle and placing limits on the cross-examination of certain government witnesses.  Defendant filed another motion to strike portions of the indictment, as well as motions to exclude certain evidence regarding terrorism, preclude evidence concerning the Global Relief Foundation and the Al-Haramain Foundation, to preclude the introduction of documents from the Kingdom of Saudi Arabia found in Defendant's home, to conduct questioning of the case agent regarding his motivations in pursuing the case outside the presence of the jury, to introduce expert

2

03cr3433

1  evidence regarding Islam, to preclude evidence of an uncharged, ninth child in Australia, for a jury

2  questionnaire, and to exclude evidence regarding "monies"received by Defendant.

3      At a July 26, 2004, motion hearing, the court granted the Government's motions for introduction

4  of foreign documents and judicial notice.  The court denied Defendant's motions to strike portions of

5  the indictment, preclude evidence regarding the Global Relief Foundation and the Al-Haramain

6  Foundation, and to question the case agent outside the presence of the jury.  The court took under

7  submission the motions regarding limiting the scope of cross-examination of the case agent and

8  precluding the introduction of documents from the Kingdom of Saudi Arabia found in defendant's home.

9      On July 30, 2004, the Court reversed its previous ruling and struck language from the indictment

10  concerning the Global Relief and Al-Haramain Foundations and their designation as Specially

11  Designated Global Terrorists.  The Court further refused to limit the scope of cross-examination of the

12  case agent.  The United States filed a motion asking the Court to reconsider these rulings.  The Court

13  granted Defendant's motion to preclude evidence of an uncharged, ninth child and to introduce expert

14  evidence regarding Islam.

15      The United States filed motions to demand Defendant's notice of intent to use classified

16  information, for permission to submit documents *ex parte* and *in camera* pursuant to the Classified

17  Information Procedures Act ("CIPA"), for a pre-trial hearing pursuant to CIPA, and to approve a generic

18  description of the classified information pertinent to the case.  Defendant filed a motion for discovery

19  of any classified information, including a list of questions he intended to ask the case agent on cross-

20  examination which could result in the disclosure of classified information.

21      The Court granted the United States request to submit documents *ex parte* and *in camera*

22  pursuant to CIPA.  On January 26, 2005, the Court ruled that national security concerns outweighed

23  defendant's need for classified documents.  The Court reversed its earlier ruling and prohibited defense

24  counsel from asking questions on cross-examination of the case agent which could result in the

25  disclosure of classified information.   The Court approved the United States' proposed generic

26  description to Defendant of the classified information involved in the case.

27

28                                          3                                    03cr3433

1    On February 15, 2005, the Court granted the United States' motion to reconsider its earlier ruling

2  striking language from the indictment.  The Court ordered that the United States may present evidence

3  that the Global Relief and Al-Haramain Foundations were designated as Specially Designated Global

4  Terrorists by the Treasury Department.  The Court will issue a limiting instruction concurrent with this

5  evidence.  The Court denied Defendant's motion for a jury questionnaire.  The court denied Defendant's

6  motion to exclude Saudi documents but requested that the parties work together to make appropriate

7  redactions.    The  Court  further  directed  defense  counsel  to  comply  with  expert  witness  notice

8  requirements or face exclusion of that evidence.

9                                                     II

10                                   **STATEMENT OF FACTS**

11    OMAR ABDI MOHAMED is a Somali citizen, who emigrated to San Diego from Canada in

12  1995 on a fraudulently obtained religious worker's visa.  Through this religious worker's visa he was

13  able to become a Lawful Permanent Resident.  In April of 2000, MOHAMED applied to become a

14  United States Citizen by filling out INS Form N-400 (Application for Naturalization).

15    In May 2002, MOHAMED was interviewed by United States immigration officials in connection

16  with his written application.  In his interview and application, MOHAMED made multiple material false

17  statements and omissions.  These lies form the basis of the current charges.

18    First, MOHAMED indicated that he was the President and founder of the Western Somali Relief

19  Agency (WSRA).  He falsely claimed that WSRA received no funding, and was an entity in name only.

20  However, financial records show that the Western Somali Relief Agency received over $326,000.00

21  from the Global Relief Foundation (GRF) and $5,000.00 from the Al-Haramain Foundation.    The

22  Global Relief Foundation is an Illinois based charity whose assets were seized by executive order

23  because of links to known terrorist organizations.  Similarly, the Al-Haramain Foundation is a global

24  charity which has also been designated by the Treasury Department as a Specially Designated Global

25  Terrorist.

26    MOHAMED  was  also  questioned  about  his  various  employers.    He  failed  to  list  on  his

27  application, or tell his interviewers, that he had been an employee of the Saudi Arabian government for

28                                                     4                                          03cr3433

almost ten years.  Specifically, MOHAMED was a "Propagator," working for the Ministry of Islamic Affairs, Endowments, Da'wah, and Guidance.

Similarly, MOHAMED falsely stated that he had worked at the Masjidul Taqwa (Taqwa Mosque) in San Diego.  Further investigation revealed that MOHAMED made arrangements to enter the United States on a religious worker's visa, purportedly to work at that mosque.  However, the Imam from the Taqwa Mosque will testify that this was a fraudulent job offer and that MOHAMED never intended to work, nor did he ever work, at the Mosque.

Furthermore, MOHAMED failed to include his children in Australia in the naturalization application and interview.  Defendant has another "wife" in Australia with whom he has two children. The first child was born on December 19, 2001.  The second was born on December 5, 2003.  During the May 2002 interview, MOHAMED failed to mention his first child in Australia.

All of the above-listed lies and omissions were material to the naturalization process and could have influenced any decision made on his application.

**B.    The Naturalization Process**

An individual with Lawful Permanent Resident status seeking to become a United States citizen may file an INS Form N-400 (Application for Naturalization).  This four-page form calls for basic biographical information about the applicant and his family.  Applicants must list their residences, employment history and travel history outside of the United States.  Other sections of the form relate to citizenship eligibility factors and allegiance to the United States.  A final section asks the applicant to list present and past memberships with every "organization, association, fund, party, club, society or similar group."

After applicants submit their application, they are scheduled for an interview.  Prior to any questions being asked, an INS examiner asks the applicant to raise their right hand and swear or affirm that they will answer the questions in the interview truthfully.  The interview itself consists of the examiner reviewing the application section by section, asking the applicant to confirm, and in some cases elaborate on, his or her answers.  The applicant is given the chance to correct any errors on the form.

03cr3433

C.   **Special Religious Worker's Visas**

As noted above, MOHAMED came to the United States on a religious worker's visa. This visa requires that the applicant have a specific job lined up as a religious worker. The sponsoring church or mosque must provide documents, including the specifics of the job offer and proof that they are a legitimate, tax-exempt religious organization. The applicant must prove that he has the necessary credentials and membership in the organization with which he will be working.

D.   **Naturalization Application and Interview of MOHAMED**

1. **Application**

On April 11, 2000, MOHAMED submitted INS Form N-400 (Application for Naturalization) to the INS in San Diego. In the section of the application devoted to listing family members, he noted seven children, six of whom reside with him. He indicated that his oldest son lives in Kenya. He failed to mention his child in Australia.

In the employment section, he falsely indicated that he had worked for the Taqwa Mosque from August 1995 to February 1997. He failed to mention his employment with the Kingdom of Saudi Arabia.

Part 9 of the application asks the applicant to list present and past membership with every "organization, association, fund, party, club, society or similar group." In that section, MOHAMED admitted his affiliation with the Western Somali Relief Agency (WSRA).

2. **Interview**

On May 9, 2002, MOHAMED was interviewed by an INS Examiner in connection with his naturalization application. ICE Senior Special Agent Steven Schultz was present and participated in the interview. MOHAMED was sworn in at the beginning of the interview and the entire proceedings were videotaped.

The interview lasted approximately 45 minutes. MOHAMED and Special Agent Schultz spent approximately five minutes discussing MOHAMED's affiliation with WSRA. MOHAMED initially claimed that he really didn't do much there ("I was a volunteer") but when pressed, he admitted that he was the Director. In describing the WSRA, he claimed that it was set up to help Somalis and Ethiopians

03cr3433

1  who remained in Africa during famine. "We tried, kind of, to help, but we couldn't find anyone. We

2  got a couple of boxes of clothing, or something like that, but we couldn't ship them. It was too

3  expensive." When he was asked how the WSRA was funded, he claimed that the WSRA was a name

4  only, and that "it didn't make it." When asked whether they received any funding, federal or otherwise,

5  MOHAMED said "No." He added that "we tried to do something, but we never did anything."

6      Additionally, during his interview, MOHAMED confirmed (falsely) that he worked at the Taqwa

7  Mosque in San Diego from 1995 through 1997 when he came to the United States. He confirmed the

8  existence of his wife and children in San Diego. He failed to mention his child in Australia. He claimed

9  he had only seven children, rather than eight. He failed to mention anything about his employment

10  and/or affiliation with the Kingdom of Saudi Arabia.

11      **E.  Global Relief Foundation**

12      On September 23, 2001, President Bush issued Executive Order 13224 which permitted the

13  Treasury Department's Office of Foreign Asset Control to freeze the assets of organizations or persons

14  who commit, threaten to commit, or support terrorism.

15      On December 14, 2001, the Treasury Department froze the assets and searched the premises of

16  the Global Relief Foundation (GRF), a charity based in Bridgeview, Illinois. On October 18, 2002, the

17  Office of Foreign Assets Control designated the GRF as a Specially Designated Global Terrorist.

18      **F.  The Al-Haramain Foundation**

19      The Al-Haramain Foundation is another charity similar to the GRF with branches all over the

20  world. On March 11, 2002, OFAC designated the Bosnian and Somalian branches of the Al-Haramain

21  Foundation a Specially Designated Global Terrorist. On January 22, 2004, OFAC designated the

22  Kenyan, Tanzanian, Pakistani and Indonesian branches of the Al-Haramain Foundation a Specially

23  Designated Global Terrorist. On February 19, 2004, OFAC issued an order freezing the assets of the

24  Ashland, Oregon branch of the Al-Haramain Foundation, pending further investigation.[1/]

25

26

27      [1/] The United States intends to introduce certified copies of these orders from the Office of Foreign Assets Control.

28                                                    7                                      03cr3433

1     **G. Western Somali Relief Agency and its Links to Global Relief and Al-Haramain**

2     According to California Secretary of State records, the Western Somali Relief Agency is a non-

3     profit organization located at 7245 Waite Dr. in La Mesa, California. (This is MOHAMED's home

4     address.) The CEO and Agent are both listed as "Omar Mohammed", at the same La Mesa address.[2/]

5     The mailing address is listed as 4979 University Avenue, Suite D, in San Diego, California.

6     MOHAMED is also listed as a signatory on the WSRA bank account at Bank of America. Bank

7     records show that between December 1998, and May 2001, the Western Somali Relief Agency received

8     16 checks totaling $326,838.00 from the Global Relief Foundation. The smallest check was for $80.00

9     while the largest check was for $68,813.00. WSRA received some funding from other sources

10    (approximately $25,000.00), but the vast majority of their money came from GRF. A review of the

11    checks from GRF shows that MOHAMED endorsed the checks when depositing them into the WSRA

12    account.

13    In addition to the hundreds of thousands of dollars received from Global Relief, MOHAMED

14    also received one check for $5,000.00 from the Al-Haramain Foundation in Ashland, Oregon.

15    **H. Defendant's Second Interview and Arrest**

16    On January 22, 2004, MOHAMED was invited down to the Federal Building for another

17    interview. When MOHAMED arrived, Agents took him into an interview room, turned on a video-

18    camera, and administered his Miranda rights. After waiving his rights, MOHAMED was interviewed

19    for approximately forty-five minutes. At the end of the interview he was arrested and booked into

20    custody.

21    During the interview, MOHAMED was asked again about funding for the WSRA. He admitted

22    that he had received funds from some individuals in Minnesota and Tennessee. Then, when he was

23    asked if he got money from anywhere else, he stated that did receive money from Chicago. Then he

24

25

26

---

27    [2/] In some documents, Omar Mohamed is listed as the Secretary/Treasurer.

28                                         8                                    03cr3433

stated that it was from a place called "Global." Eventually, he admitted that it was approximately $200,000.00 from "Global Relief." Finally, he admitted that he knew Global Relief was shut down for links to terrorism.

When he was asked about Saudi Arabia, he admitted to receiving approximately $100,000.00 from the Saudi Government over the course of several years.

At the time of his arrest, MOHAMED was in possession of his Permanent Resident Card (Green Card).

**I. Search Warrant at Mohamed's Residence**

While MOHAMED was sitting down for his interview, Federal agents executed a search warrant at his home. They found a number of receipts for checks from Saudi Arabia. All of the checks came from the Kingdom of Saudi Arabia, Ministry of Islamic Affairs, Endowments, Da'wah, and Guidance. Agents found receipts dated from 1995 through 2003. These letters invariably contained the following verbiage:

> Enclosed is check number xxxx, dated xxxx, in the amount of xxxx, for your salary for the month of xxxx.

Other documents show that MOHAMED received raises and bonuses for doing good work. Another document reminds "Propagators" that they may not leave their "post" or "take leave" without first obtaining permission. Violations of this requirement would result in "disciplinary action to include termination of service." Other documents requested that MOHAMED perform various duties, including writing reports about activities in his community. MOHAMED failed to mention anything about his employment with Saudi Arabia in his naturalization application or first interview.

**J. The Taqwa Mosque**

As noted above, MOHAMED came to the United States on a religious worker's visa in 1995, purportedly to work in the Taqwa Mosque. His immigration file includes all of the relevant paperwork, including a job offer to pay him a salary and provide him with housing for one year. MOHAMED was expected to teach at the Mosque and provide instruction in Arabic.

03cr3433

1    After MOHAMED's arrest, Federal agents interviewed the Imam of the Taqwa Mosque. He told

2  them that he was approached in 1995 by a Somali man who wanted to get someone into the United

3  States to work in their community as a religious leader.  He claimed that they did not yet have a

4  legitimate mosque (they met in an apartment).  This unknown Somali man asked the Imam to falsely

5  state that MOHAMED would be working at his mosque, receiving a salary and be provided housing

6  accommodations.  In exchange, MOHAMED would teach Arabic.

7    The Imam agreed to this arrangement.  He would lend the credibility of his Mosque in order to

8  permit MOHAMED to enter the country.  He reasoned that this was harmless because the unknown

9  Somali committed to providing a salary and housing to MOHAMED.  Therefore, the Imam concluded,

10  he would not be a burden on the United States' welfare system. The Imam now admits that the

11  documents in MOHAMED's A-File were fraudulent.  He never intended for MOHAMED to work for

12  him for a salary or for housing.  In fact MOHAMED never worked at the Taqwa Mosque.

13    MOHAMED received his visa and came to San Diego.  He met briefly with the Imam several

14  times, but never worked for him or taught Arabic at the mosque.

15  **K. Australian Child**

16    MOHAMED has a relationship with a woman in Australia with whom he has had two children.

17  Their oldest child was born in December 2001 while their youngest was born in December 2003.  As

18  of the May 2002 interview, MOHAMED's first Australian child had been born.  MOHAMED failed to

19  mention this child during his May 2002 interview.  In fact, he specifically stated that he had seven

20  children.

21  **L. Materiality**

22    Federal immigration officers will testify at trial that all of the defendant's lies and omissions,

23  collectively and individually were material to MOHAMED's naturalization application.  All could have

24  influenced the ultimate decision as to whether they would have granted his request for naturalization.

25  //

26  //

27  //

28                                              10

# III

# LEGAL ISSUES

A.   APPLICABLE STATUTES

    1.  18 U.S.C. § 1546- False Statement in Connection With Immigration Application

        a.  The Statute

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact . . . shall be fined under this title or imprisoned not more than . . . 10 years.

        b.  Elements

First, the defendant made or subscribed as true a false statement;

Second, the defendant acted with knowledge that the statement was untrue;

Third, the statement was material to the Immigration and Naturalization Service's activities or decisions;

Fourth, the statement was made under oath; and

Fifth, the statement was made in connection with an application required by immigration laws or regulations prescribed thereunder.

        c.  The Law

Materiality is a requirement of visa fraud under subsection (a) and presents a mixed question of fact and law to be decided by the jury.  United States v. Matsumaru, 244 F.3d 1092, 1101 (9th Cir. 2001). A statement is material if it is capable of affecting or influencing a governmental decision.  Id. It need not have actually influenced the agency decision in order to meet the materiality requirement. Id.

No mental state is required with respect to the fact that a matter is within the jurisdiction of a Federal agency. See United States v. Green, 745 F.2d 1205, 1209-10 (9th Cir. 1984).  Moreover, there is no requirement that the defendant has acted with the intention of influencing the government agency. United States v. Yermain, 468 U.S. 63, 73 & n.13 (1984).

03cr3433

1

     2.     18 U.S.C. § 1015(a) - Naturalization Fraud

2

     a.  The Statute

3

     Whoever knowingly makes any false statement under oath, in any case, proceeding, or matter relating to, or under, or by virtue of any law of the United

4

     States relating to naturalization, citizenship, or registry of aliens . . . shall be fined under this title or imprisoned not more than five years, or both.

5

6

     b.  Elements

7

First, the defendant made a false statement;

8

Second, the defendant acted with knowledge that the statement was untrue;

9

Third, the statement was made under oath; and

10

Fourth, the statement was made in any case, proceeding, or matter relating to naturalization.

11

     c.  The Law

12

     This is an infrequently used charge, and few reported cases exist.  However, in a recent case, the

13

Fourth Circuit found that materiality is <u>not</u> a requirement of 18 U.S.C. 1015(a). <u>United States v.</u>

14

<u>Abuagla</u>, 336 F.3d 277 (4th Cir. 2003).

15

     3.     18 U.S.C. § 1546- Fraud and Misuse of Visas, Permits and Other Documents

16

     a.  The Statute

17

     Whoever . . . uses, attempts to use, possesses . . an alien registration receipt card, knowing it to . . . have been procured by means of any false claim or statement, or to

18

     have been otherwise procured by fraud or unlawfully obtained. . . shall be fined under this title or imprisoned not more than . . . 10 years.

19

20

     b.  Elements

21

First, the defendant knowingly possessed an Alien Registration Receipt Card (Green Card); and

22

Second, the defendant knew the document was procured by means of any false claim or statement

23

or otherwise procured by fraud or unlawfully obtained.

24

//

25

//

26

//

27

//

28

12

03cr3433

IV

STIPULATIONS

At this time, the parties have not entered into any stipulations.

V

WITNESSES

A.   WITNESS LIST

The United States may call some of the following witnesses in its case-in-chief, subject to additions or corrections at trial:

1.   Andrew Davidson, Bureau of Citizenship and Immigration Services (BCIS)

2.   Wali Fardan

3.   Peter Farrington, MCC

4.   Kurt Klingerman, BCIS

5.   Gwynne Laurente, FBI

6.   Gregory McNutt, FBI

7.   Peter Shirajian, FBI

8.   Steven Schultz, Department of Homeland Security (DHS)

9.   Todd Temple, FBI

VI

EXHIBITS

The United States will provide a detailed exhibit list at the time of trial. The United States requests that defense counsel examine the exhibits prior to trial to expedite the proceedings.

DATED: March 1__, 2004.

Respectfully submitted,

CAROL C. LAM
United States Attorney

JOHN N. PARMLEY
Assistant U.S. Attorney

13

03cr3433

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 03cr3433-JAH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| | ) | BY MAIL |
| OMAR ABDI MOHAMED, | ) | |
| | ) | |
| Defendant. | ) | |

IT IS HEREBY CERTIFIED that:

I, Helaine Curtis, am a citizen of the United States over the age of 18 years and a resident of San Diego County, California; my business address is 880 Front Street, San Diego, California 92101-8893; I am not a party to the above-entitled action; and subsequent to filing with the Clerk of the Court, I will cause to be deposited in the United States mail at San Diego, California, a copy of **UNITED STATES TRIAL MEMORANDUM** addressed to:

> MAHIR SHERIF, ESQ.
> 3376 30th ST.
> SAN DIEGO, CA 92104

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 16 day of March, 2005.

HELAINE CURTIS