















KAJ    7/5/05    10:55

3:03-CR-03433   USA V. MOHAMED

*161*

*CRMEMSUP.*

ORIGINAL

Law Office of Mahir T. Sherif
MAHIR T. SHERIF, Esq. (SB# 135021)
3376 30th Street
San Diego, CA 92104
Ph: 619-297-4444
Fx: 619-297-4115

Attorney for Defendant, Omar Abdi Mohamed

**FILED**

JUL 1 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      vs.<br><br>OMAR ABDI MOHAMED,<br><br>      Defendant | Case No.: **03-CR-3433-JAH**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST WARRANTS PROCURED BY PERJURED AFFIDAVITS**<br><br>Judge: Honorable John A. Houston<br>Courtroom: 11<br>Date: July 15, 2005<br>Time: 9:00 AM |

Defendant, Omar Abdi Mohamed, by and through his undersigned counsel, respectfully moves the Court to dismiss the indictment due to grand jury misconduct. In the alternative, defendant moves the Court to suppress the search warrant served at Mr. Mohamed's home on or about January 22, 2004, and the arrest warrant as they result from perjured grand jury testimony, not probable cause. Defendant specifically moves this Court to suppress all items seized as a result of the search of Mr. Mohamed's home located at 7245

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 1 of 14

03CR3433

1  Waite Drive, La Mesa, California, all fruits of that evidence, and all other evidence, tangible

2  or intangible, obtained directly or indirectly as a result of that search.

## I.   STATEMENT OF FACTS

4      On December 19, 2003, Agent Steven Schultz testified before a grand jury.[1]  As a result of

5  this testimony a two count indictment was returned charging the defendant with making three

6  material false statements to agents of Immigration and Customs Enforcement (ICE).[2]  The

7  three alleged false statements are 1) that the Western Somali Relief Agency (WSRA) was an

8  entity in name only, 2) that WSRA never received funds and 3) that WSRA had insufficient

9  funds to send two boxes of blankets to Somalia.  Count one charged a violation of Title 18

10  U.S.C. § 1546(a) and count two charged a violation of Title 18 U.S.C. § 1015(a).

11      At the grand jury agent Schultz testified to the following regarding Mr. Mohamed's

12  involvement with organizations:[3]

13          Q. Do you recall what Mr. Mohamed's response was to that question, as to what

14          organizations do you belong to?

15          A. His reply was, I believe is, East Africa Youth Center.  He said he was affiliated with

16          them.

17          Q. Can you speak up a little bit.

18          A. Yes. He said he was affiliated with the East Africa Youth Center. **And after**

19          **further questioning, he admitted** that he was associated with Western Somali Relief.

20      In regards to the false statements Agent Schultz testified as follows:[4]

---

[1] A true and correct copy of the Grand Jury Transcript testimony of Agent Schultz in pertinent part is attached as Exhibit A.

[2] A true and correct copy of the initial Indictment Filed on December 19, 2003 is attached as Exhibit B.

[3] Exhibit A: Page 9-Line 5-14 (P9-L5-14).

[4] Exhibit A: P12-L5-13.

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 2 of 14

03CR3433

1    Q. Didn't he, in fact, state to you on that tape that the Western Somali Relief Agency

2    never got off the ground?

3    A. Yes.

4    Q. That they never received any funding?

5    A. Yes.

6    Q. That they didn't have enough money to send two boxes of blankets to Somalia?

7    A. That's correct.

8    Agent Schultz made these statements to the grand jury based on questioning of Mr.

9  Mohamed at an interview conducted on May 9, 2002.[5]  At this interview, the complete

10  dialogue between Agent Schultz and Mr. Mohamed regarding WSRA took place as follows:[6]

11    Schultz: Before he signs it, I'd like to ask him a couple of questions about Part 9. You

12    said you worked with the Somali and East African Youth Center.

13    Mohamed: Yep, it's a non-profit organization.

14    Schultz: And Western Somali Relief Agency?

15    Mohamed: Yeah, I volunteer.

16    Schultz: You're a volunteer?

17    Mohamed: Yes.

18    Schultz: What, do you have a title? What do you do there?

19    Mohamed: Look With the two organization we founded one, to help...so to help

20    Somali refugee in this country, so there is a lot of fighting with racial and gang related

21    activity in City Heights area, between immigrant and the original residents. Probably

22    mostly the immigrant so we come up with, group of intellectualists, we trying to help

23    them out, so we say we have to take our kid, teach them social skills they need, prevent

24

25    _____

26    [5] A true and correct copy of the Transcript of the May 9, 2002 interview is attached as Exhibit C.

      [6] Exhibit C: Page marked 2510-2511.

27    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
      OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
28    MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
      WARRANTS PROCURED BY PERJURED AFFIDAVITS
      Page 3 of 14

      03CR3433

gang drug awareness, so we build this organization. So when also the famine, happened in Somalia as well as in Ethiopia, we tried to come-up also an organization that the people can make them aware. What is happening so the famine wouldn't be coming it was nation wide here in the United States. So we tried kind of help but we couldn't find anything or anyone. If we got a couple of box of clothing or something like that we couldn't be able to ship them because it was too expensive. So one is helping the youth activity here in San Diego. Another is kinda relief we set up, we were hoping that it will help the refugee people inside the refugee camps in Kenya, Ethiopia with Famine with all this, but it didn't, it didn't, it didn't make it.

Schultz: So to support this since, it's a non-profit, how...do you ah...how is it funded?

Mohamed: One is out of federal almost grants, us from the Somali east African Youth Center with collaboration with another organization called African Alliance, so we are working just there is 2 employee who go outreach family strength. So the other is just I can say it is only by name, so it didn't make it, it didn't make it.

Schultz: So there was no funding for federal grants like there was for the other one?

Mohamed: No, no, no.

Schultz: Did you have a ah...What was your position in these organizations?

Mohamed: Both of them, I was director, the one I now almost director effectively is the one Youth.

Schultz: Youth?

Mohamed: Youth, yes. That one we have to work with San Diego Police Department. We work with other organizations to keep the people out of the street, teach them social skill they need, so they don't endanger the life of the people, also academics tutor, counseling, also work juvenile people so when they need counseling, they be will be referred to me, in Somali cultural – setting. So I counsel them, I teach them how anger management and all those stuff.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 4 of 14

03CR3433

1    Schultz: Well, that's good.

2    Mohamed: Thank you.

3    Schultz: And the, the other one, the Western Somali Relief....

4    Mohamed: The other one we tried to do something but we couldn't do anything so....

5    Schultz: But you still have an office there?

6    Mohamed: Look, we share with other people so generally other people take care of just

7    we have in the name, so now we in the process of closing, because we couldn't able to

8    come.

9    Schultz: But you were the director of that also?

10    Mohamed: Yep, I was the director of that also.

11    Schultz: But you couldn't get any funding to keep it going? Nobody would support it?

12    Mohamed: No, we couldn't.

13    As stated, it was a result of Agent Schultz's testimony that the grand jury returned a two

14    count indictment against Mr. Mohamed.  This initial indictment was then utilized by Agent

15    Schultz to obtain a search warrant[7] for Mr. Mohamed's residence and a sealed arrest warrant

16    was issued for Mr. Mohamed.[8]  Mr. Mohamed was arrested on January 22, 2004, after being

17    interviewed a second time by ICE agents.[9]  Simultaneously, his home was searched and

18    several items were seized from his home at 7245 Waite Drive, La Mesa, Ca. 91941.[10]

19    Following Mr. Mohamed's arrest and this seizure of evidence Agent Schultz went before the

20

21    [7] A true and correct copy of Application and Affidavit for Search Warrant is attached as Exhibit D (Pages are

22    marked 1192-1212).  The affidavit supporting this application begins at page 1198. At page 1201, paragraph 10

23    Agent Schultz reiterates the testimony he gave to the grand jury. At page 1202, paragraph 11, Agent Schultz
      references the fact that Mr. Mohamed was indicted by a grand jury to support the search warrant.

24    [8] Exhibit D: Page 1202, paragraph 11 at its closure states: "A sealed warrant has been issued for his arrest."

25    [9] A true and correct copy of the Transcript of the January 22, 2004 Interview is attached as Exhibit E. It is
      marked pages 2475-2497. Page 2497 recounts the arrest of Mr. Mohamed.

26    [10] A true and correct copy of Return of Warrant and the Receipt for Property Received are attached as Exhibit F.

27    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
      OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
28    MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
      WARRANTS PROCURED BY PERJURED AFFIDAVITS
      Page 5 of 14

03CR3433

grand jury a second time. In this testimony, Agent Schultz specifically references items found at Mr. Mohamed's home as evidence to support new allegations.[11]  Following this second testimony of Agent Schultz before the grand jury a superseding indictment was filed.[12]  The superseding indictment charges nine counts, thus seven counts were added to the initial indictment.

On March 30, 2005, a jury acquitted Mr. Mohamed of both count one and count two as was charged in the original indictment.[13]

## II.   ARGUMENT

### A.  Where Perjured Testimony Is Presented to the Grand Jury and Is the Crux of the Testimony Used to Indict A Defendant Grand Jury Misconduct Has Occurred and the Standard for Dismissing the Indictment Is Met

The grand jury "is a constitutional fixture in its own right." Nixon v. Sirica, 159 U.S. App. D.C. 58, 74, n. 54 (1973).  The grand jury exists as a buffer between the government and the people and is charged with the twin duties of bringing to trial those justly accused, while shielding the innocent from unfounded accusations and prosecution. See Stirone v. U.S., 361 U.S. 212, 218 n. 3 (1960).  An independent and informed grand jury functions to discern innocence as well as guilt, to protect citizens from governmental persecution and to prosecute those who may have broken the law. See U.S. v. Dionisio, 410 U.S. 1, 16-17 (1973).

///

///

---

[11] A true and correct copy of the pertinent portions of Grand Jury Transcript Dated March 19, 2004 is attached as Exhibit G. Pages are marked 3453-3455. Page 3453-Line23 through Page 3455-Line 5 details document evidence found at Mr. Mohamed's home being used to support further allegations against Mr. Mohamed.

[12] A true and correct copy of The Superseding Indictment is attached as Exhibit H.

[13] A true and correct copy of Judgment of Dismissal Dated March 30, 2005 is attached as Exhibit I.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 6 of 14

03CR3433

### i.  The Standard for Dismissing an Indictment Due to Grand Jury Misconduct

There are two theories upon which a motion to dismiss an indictment for grand jury misconduct may be based.  One is under the constitutional theory wherein it must be shown that "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." Bank of Nova Scotia v. U.S., 487 U.S. 250, 257 (1988).  The second is under the court's supervisory powers wherein federal courts "may within limits, formulate procedural rules not specifically required by the Constitution or the Congress." U.S. v. Hasting, 461 U.S. 499, 505 (1983).  To invoke its supervisory powers a federal court must be rectifying instances that affect substantial or fundamental rights. Bank of Nova Scotia, 487 U.S. at 254.  This requirement translates into a requirement that the defendant show prejudice. U.S. v. Derrick, 163 F.3d 799 (4th Cir. 1998). *See also* Bank of Nova Scotia, 487 at 254-55, 263.

Prejudice may be shown in one of two ways: 1) when there is a violation that "substantially influenced the grand jury's decision to indict;" or 2) "if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations." Id. at 256 (*quoting* U.S. v. Machanik, 475 U.S. 66, 78 (1986)).

### ii.  Perjured Testimony, which Is the Basis of the Indictment Returned, Given By the Only Witness Before the Grand Jury Both Renders the Proceeding Fundamentally Unfair and Impacts A Defendant's Fundamental Rights

In the instant case, the facts as recounted above indicate the testimony which Agent Schultz gave to initially indict Mr. Mohamed.  It is clear that Agent Schultz testified to the grand jury conclusively that Mr. Mohamed out rightly made three statements to him that were

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 7 of 14

03CR3433

1   lies.[14]  These three false statements constitute the crux of count one and count two.  The grand

2   jury was not provided any of the actual facts that formed the basis of Agent Schultz's

3   conclusory testimony.  When a trial was conducted and the facts were examined in detail the

4   jury acquitted Mr. Mohamed on the two counts that formed the initial indictment.[15]  The

5   acquittal demonstrates that the testimony that Agent Schultz gave to the grand jury was not the

6   truth.  If it were the truth, then Mr. Mohamed would have been found guilty.  The fact that

7   such conclusory statements were made by Agent Schultz to the grand jury further evidences

8   there lack of validity.  It is very simple to make strong conclusory statements and then have an

9   indictment returned.  However, had all of the facts and the basis from Agent Schultz's

10  testimony been examined or divulged, this indictment would not have been returned, as the

11  grand jurors would have been aware of Agent Schultz's skewed interpretation of what Mr.

12  Mohamed stated to him.  This skewed interpretation and misrepresentation resulted in perjured

13  testimony by Agent Schultz to the grand jury.

14      In addition, defendant points out further misrepresentation by Agent Schultz to the grand

15  jury in his testimony regarding Mr. Mohamed "admitting" his association with WSRA "after

16  further questioning" by the Agent.  This again is an out right lie to the grand jury.  Mr.

17  Mohamed listed WSRA on his application for naturalization (N400)[16] and never denied his

18  association with WSRA.  However, as one can see from this testimony, Agent Schultz is

19  presenting to the grand jury a skewed point of view.  His statement to the grand jury that Mr.

20  Mohamed "admitted" this "after further questioning" creates a strong inference to the grand

21  jurors.  The inference created is that Mr. Mohamed was lying initially, but then later

22  "admitted" his association.  This simply is not the case and added further to the entire

23  misrepresentation Agent Schultz made before the grand jury.

24

25  [14] Exhibit A: P12-L5-13.

    [15] Exhibit I.

26  [16] A true and correct copy of Mr. Mohamed's N400 Application is attached as Exhibit J.

27          MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
            OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
28      MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
            WARRANTS PROCURED BY PERJURED AFFIDAVITS
                            Page 8 of 14

### iii. Prejudice Exists As the Perjured Testimony Substantially Influenced the Grand Jury's Decision to Indict

In the case at bar, Agent Schultz's testimony to the grand jury that Mr. Mohamed unequivocally made three false statements to him[17] did substantially influence the grand jury's decision to indict. This is demonstrated in that the indictment itself[18] that was returned alleged these exact same three false statements (that the Agent testified to) by the defendant. In fact, the allegations under the initial indictment in their entirety depend on these three false statements which Agent Schultz unequivocally stated Mr. Mohamed made to him.

### iv. The Perjured Testimony Was Knowing and Material to the Return of the Indictment

To dismiss an indictment based on perjured testimony at the grand jury and have such constitute a basis for grand jury misconduct requiring dismissal of the indictment, the perjury must be knowing and material. United States v. Kennedy, 564 F.2d 1329, 1338 (9th Cir. 1977), cert. denied, 435 U.S. 944 (1978). The same rule is reiterated in United States v. Basurto, 497 F.2d 781 (9th Cir. 1974). The Basurto court held the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Id. at 785.

In the case at bar, the facts of the case speak for themselves. One can read the dialogue which took place at the May 9, 2002 interview between Agent Schultz and Mr. Mohamed regarding WSRA,[19] then read Agent Schultz's testimony to the grand jury[20] and the perjury is

---

[17] Exhibit A: P12-L5-13.

[18] Exhibit B.

[19] Exhibit C: Page marked 2510-2511.

[20] Exhibit A: P12-L5-13.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 9 of 14

03CR3433

1  evident.  It is very simple to see that Mr. Mohamed did not make an outright statement to

2  Agent Schultz that WSRA "never received funding".  It is also evident that Mr. Mohamed is

3  speaking to Agent Schultz in the past tense, that he is referring to an agency that "didn't make

4  it".  Pure logic tells one that if it "didn't make it" that Mr. Mohamed himself is admitting that

5  it once was in existence and once was at least attempting to make it.  In addition, Mr.

6  Mohamed states that he was the director of WSRA, in order to be the director of an agency,

7  again logic cries that the agency must have at some point in time been existing.  Furthermore,

8  Mr. Mohamed makes a statement that "if" it got a couple of boxes or blankets they wouldn't

9  be able to send them.  Agent Schultz never asks any clarifying questions as to when Mr.

10  Mohamed was referring to.  Instead he goes before a grand jury, he states conclusively that

11  Mr. Mohamed lied to him regarding these three points.  No explanation regarding what Mr.

12  Mohamed stated is given to the grand jury, and the grand jury indicts.  The indictment is based

13  solely on these three lies.  Therefore, the perjury offered by Agent Schultz is material.

14  Without these three statements from Agent Schultz which were perjured statements, an

15  indictment would not have followed.

16      Secondly, the perjured testimony was known to the Government.  The May 9, 2002

17  interview between Agent Schultz and Mr. Mohamed was both videotaped by the government

18  and it was transcribed by the government.  Thus, the contents of this interview and the

19  statements made by Mr. Mohamed were in the Government's possession and known to them.

20  In addition, by reading the manner in which the prosecutor before the grand jury questions

21  Agent Schultz regarding these three statements, it is evident that this individual knows the

22  three lies he is attempting to prove to the grand jury.  He cuts right to the chase and asks Agent

23  Schultz three specific questions tailored to allow Agent Schultz to answer "Yes", "Yes", "That

24  is correct".  Again, it is these three specific questions asked by the prosecutor and Agent

25  Schultz's affirmative answers which form the allegations in the indictment that was returned

26  against the defendant.

27
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 10 of 14

03CR3433

1    Finally, jeopardy had not attached at the grand jury proceeding.  Jeopardy attaches when

2    the jury is empaneled and sworn. U.S. Const. Amend. V. *See also* Critz v Bretz, 437 U.S. 28

3    (1978).

4    In conclusion, defendant contends that under either theory: constitutional or supervisory

5    powers the proper remedy where perjured testimony forms the basis of the grand jury

6    testimony that was material to indict is to dismiss the indictment.  Under these circumstances,

7    the proceedings of the grand jury are fundamentally unfair and have been compromised so as

8    to deprive the defendant of both his Fifth Amendment right of presentment and indictment to a

9    grand jury and of due process of law.

### v.  All Counts Presently Before This Court Exist Only As a Result of Grand Jury Misconduct and Require Dismissal

12    The case at bar presents a peculiar set of facts.  In the instant case, the perjury that

13    occurred before the grand jury allowed for an initial two count indictment to be returned

14    against the defendant.  This initial indictment then provided the basis for an arrest warrant for

15    the defendant[21] and a search warrant for the defendant's home.[22]  As a result of these warrants,

17    evidence was obtained that the Government then utilized to file a superseding indictment.[23]

18    Because these warrants rely at their heart on the same perjured statements by Agent Schultz,

19    they themselves are not reliable or able to justify a search or arrest of the defendant.  The

20    Supreme Court has held, "where the defendant makes a substantial preliminary showing that a

---

[21] Exhibit D: Page 1202, paragraph 11 at its closure states: "A sealed warrant has been issued for his arrest."

[22] Exhibit D: Page 1201, paragraph 10 Agent Schultz reiterates the testimony he gave to the grand jury. At page 1202, paragraph 11, Agent Schultz references the fact that Mr. Mohamed was indicted by a grand jury to support the search warrant.

[23] Exhibit G: Page 3453-Line23 through Page 3455-Line 5 details document evidence found at Mr. Mohamed's home being used to support further allegations against Mr. Mohamed.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 11 of 14

03CR3433

false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).

As detailed above, the perjured statements and misrepresentations by Agent Schultz can be nothing but knowingly made. Agent Schultz himself interviewed Mr. Mohamed, heard his actual statements, and then purposely misrepresented them to obtain an indictment against him. Simultaneously with the indictment an arrest warrant was issued under seal. Agent Schultz then utilized the same perjured statements along with the fact that an indictment and arrest warrant had been issued to obtain a search warrant for Mr. Mohamed's home. The interview of Mr. Mohamed (wherein what he actually stated to the agent) was always in the possession of the Government and thus the truth of what Mr. Mohamed stated was known to them. This Court was present for the course of the trial of Mr. Mohamed wherein the jury acquitted him of counts one and two (the initial indictment counts).[24] Thus, this Court in and of itself has heard all of the evidence, the same as the jury which acquitted Mr. Mohamed. It is this acquittal and the evidence as set forth at trial that proves the perjured statements of Agent Schultz. These perjured statements are what the Government knowingly presented to justify both a search warrant and an arrest warrant. As this Court has heard the evidence the defendant respectfully requests this Court find the search warrant was invalid and executed in violation of the Fourth Amendment, and thereby that all fruits of this warrant be suppressed.

---

[24] Exhibit I.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 12 of 14

03CR3433

Mapp v. Ohio, 367 U.S. 643, 654 (1961). Furthermore, defendant requests that the arrest

warrant be dismissed for the same reasons.

Defendant concludes this argument by showing that these perjured statements by

Agent Schultz, and most importantly that the initial indictment was returned are what provided

probable cause for both the arrest warrant and the search warrant. Without the indictment

(that is, without the perjured testimony) there would not have been probable cause to arrest

Mr. Mohamed. Again, the crux of the allegations which Mr. Mohamed was indicted for are

the very same perjured statements Agent Schultz made to the grand jury. Thus, the perjured

testimony and the indictment that resulted are what provided probable cause to arrest.

Furthermore, the search warrant issued to search Mr. Mohamed's home residence references

in the supporting affidavit the fact that Mr. Mohamed was indicted,[25] that an arrest warrant

had issued,[26] and also that the purpose for searching Mr. Mohamed's home was to find

property and evidence which signified false statements Mr. Mohamed might have made.[27]

## CONCLUSION

For the foregoing reasons, defendant respectfully requests this Court dismiss the

indictment due to grand jury misconduct, specifically knowing and material perjured

testimony; that this Court suppress the unlawfully obtained search warrant and the fruits

thereof, and that this Court dismiss the search warrant that issued only as a result of grand jury

misconduct.

///

---

[25] Exhibit D: Page 1201, paragraph 10 Agent Schultz reiterates the testimony he gave to the grand jury.

[26] Exhibit D: Page 1202, paragraph 11, Agent Schultz references the fact that Mr. Mohamed was indicted by a grand jury to support the search warrant.

[27] Exhibit D: Page 1198, paragraph 2.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE INDICTMENT FOR GRAND JURY
MISCONDUCT AND TO SUPPRESS THE SEARCH AND ARREST
WARRANTS PROCURED BY PERJURED AFFIDAVITS
Page 13 of 14

03CR3433

Dated: 7/1/05

Respectfully Submitted,

By: _____
Mahir T. Sherif
Attorney for Defendant

03CR3433

# Exhibit A

AGENT STEVEN SCHULTZ   12/19/

BEFORE THE GRAND JURY PANEL NO. 03-2

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

TRANSCRIPT OF PROCEEDINGS

SAN DIEGO, CALIFORNIA

DECEMBER 19, 2003

WITNESS:   AGENT STEVEN SCHULTZ

APPEARANCES:

CAROL C. LAM

UNITED STATES ATTORNEY

BY:   JOHN PARMLEY

ASSISTANT UNITED STATES ATTORNEY

880 FRONT STREET, ROOM 5255

SAN DIEGO, CALIFORNIA   92101-8893

REPORTED BY:   DEBORAH M. O'CONNELL, RPR, CSR NO. 10563

SPHERION DEPOSITION SERVICES

530 WEST C STREET, SUITE 600

SAN DIEGO, CALIFORNIA   92101

(619) 235-2400



MAY NOT BE COPIED. PROPERTY OF U.S. GOVERNMENT. NOT TO BE REPRODUCED.

spherion
deposition services
530 West "C" Street, Suite 600
San Diego, CA 92101
Voice: 619-235-2400 or 800-537-0727
Fax: 619-235-2500
Email: sandiegocourtreporting@spherion.com

AGENT STEVEN SCHULTZ   12/19/03

1          I N D E X

2

3

4

5

6

7                        E X H I B I T S

8

9

10    FOR GRAND JURY                                    MARKED

11

      1        DIGITIZED COPY OF VIDEOTAPED                7
12             INTERVIEW

13

14

15

16

17

18

19

20

21

22

23

24

25



MAY NOT PROPERLY BE GOVERNMENT OF U.S. REPRODUCED.

2

03413

AGENT STEVEN SCHULTZ    12/19/03

```
1      SAN DIEGO, CALIFORNIA, FRIDAY, DECEMBER 19, 2003,

2                        9:08 A.M.

3                        -  -  -

4              AGENT STEVEN SCHULTZ,

5   CALLED AS A WITNESS, HAVING BEEN FIRST DULY SWORN, WAS

6   EXAMINED AND TESTIFIED AS FOLLOWS:

7

8              GRAND JURY FOREPERSON:  FOR THE RECORD,

9   PLEASE STATE YOUR FULL NAME.

10             THE WITNESS:  MY NAME IS STEVEN SCHULTZ,

11  S-C-H-U-L-T-Z.

12

13                     EXAMINATION

14  BY MR. PARMLEY:

15        Q.   GOOD MORNING, AGENT SCHULTZ.  HOW ARE YOU?

16        A.   I'M FINE.  HOW ARE YOU?

17        Q.   GOOD.  COULD YOU PLEASE TELL US WHAT YOUR

18  TITLE IS, WHAT YOU DO FOR A LIVING.

19        A.   I'M A SENIOR SPECIAL AGENT WITH U.S.

20  IMMIGRATION AND CUSTOMS ENFORCEMENT.  I'M ASSIGNED TO

21  THE TASK FORCE IN SAN DIEGO.

22        Q.   HOW LONG HAVE YOU BEEN WORKING IMMIGRATION

23  MATTERS FOR THE FEDERAL GOVERNMENT?

24        A.   FOR THREE YEARS.

25        Q.   ARE YOU FAMILIAR WITH THE CASE, THE UNITED
```

3

MAY NOT BE GOVERNMENT'S PROPERTY REPRODUCED INS

03413

1   STATES VERSUS OMAR ABDI MOHAMED?

2        A.   YES, I AM.

3        Q.   HOW ARE YOU FAMILIAR WITH THAT CASE?

4        A.   I'M FAMILIAR WITH IT BECAUSE I CONDUCTED AN

5   INVESTIGATION OF THIS INDIVIDUAL FOR CRIMINAL FRAUD.

6        Q.   COULD YOU TELL US WHAT THE IMMIGRATION

7   BACKGROUND IS OF MR. MOHAMED.

8        A.   MR. MOHAMED ENTERED THE UNITED STATES AS A

9   RELIGIOUS WORKER.   HE WAS GIVEN LAWFUL ALIEN PERMANENT

10  RESIDENT STATUS, AND EVENTUALLY HE APPLIED FOR

11  NATURALIZATION AS A U.S. CITIZEN.

12       Q.   DID HE OBTAIN LAWFUL PERMANENT RESIDENT

13  STATUS IN THE UNITED STATES ON JULY 8, 1995?

14       A.   YES.

15       Q.   WHAT COUNTRY IS HE A CITIZEN OF?

16       A.   HE IS A CITIZEN OF SOMALIA.

17       Q.   ON APRIL 11, 2000, IS THAT WHEN HE

18  SUBMITTED THE FORM REQUESTING NATURALIZATION?

19       A.   YES.

20       Q.   AND IS THAT IMMIGRATION FORM N-400?

21       A.   YES, IT IS.

22       Q.   TELL ME ABOUT THAT FORM.   WHAT IS THAT?

23       A.   IT'S A FORM -- IT'S AN APPLICATION REQUIRED

24  OF A PERSON OF WHICH IS TO APPLY FOR CITIZENSHIP IN

25  THE UNITED STATES.   THERE ARE SEVERAL QUESTIONS ON IT

MAY NOT PRINT OR COVER HERE IN REPRODUCED. THIS PAPER. NOT BE REPRODUCED.

4

03411

AGENT STEVEN SCHULTZ   12/19/03

1   REGARDING THEIR BACKGROUND, THEIR CITIZENSHIP, AND

2   THEIR MANNER OF ENTRY INTO THE UNITED STATES.

3        Q.   AND TELL ME A LITTLE ABOUT THE

4   NATURALIZATION PROCESS.  IF I'M A LEGAL, PERMANENT

5   RESIDENT, AND I WANT TO BECOME A UNITED STATES

6   CITIZEN, WHAT DO I HAVE TO DO?

7        A.   YOU'RE REQUIRED TO FILL OUT THE FORM N-400,

8   SUBMIT IT TO THE IMMIGRATION SERVICES, AND AFTER IT'S

9   RECEIVED, YOU'RE REQUIRED TO BE PRESENT AT AN

10  INTERVIEW AND SWEAR UNDER OATH THAT THE ANSWERS YOU

11  HAVE GIVEN ARE TRUE.

12       Q.   OKAY.  SO YOU FILL OUT THE FORM FIRST; IS

13  THAT RIGHT?

14       A.   CORRECT.

15       Q.   AND THEN AT SOME POINT, YOU COME IN FOR AN

16  INTERVIEW?

17       A.   YES.

18       Q.   AND YOU SWEAR -- YOU RAISE YOUR RIGHT HAND

19  AND SWEAR TO TELL THE TRUTH IN THE INTERVIEW?

20       A.   YES.

21       Q.   AND IS ONE OF THE PURPOSES OF THE INTERVIEW

22  TO GO OVER THE APPLICATION FORM AND MAKE SURE AND

23  CONFIRM THAT EVERYTHING IN IT IS ACCURATE?

24       A.   YES.  IT'S ALSO TO UPDATE IT IF THERE ARE

25  ANY CHANGES THAT HAVE BEEN MADE SINCE IT WAS

5

AGENT STEVEN SCHULTZ   12/19/03

1    SUBMITTED.

2        Q.   AND IF THERE IS SOMETHING ON THE FORM THAT

3    MIGHT CAUSE CONCERN, WOULD THAT BE THE TIME THAT

4    WHOEVER THE EXAMINER IS, WOULD ASK QUESTIONS AND TRY

5    TO DETERMINE IF THERE WAS A PROBLEM HERE OR NOT?

6        A.   YES.

7        Q.   I WANT TO TALK TO YOU ABOUT -- WELL, TO

8    CLEAN THAT UP, WAS MR. MOHAMED, DID HE ACTUALLY COME

9    IN ON AN INTERVIEW FOR HIS NATURALIZATION FORM?

10       A.   YES, HE DID.

11       Q.   WAS THAT ON MAY 9, OF 2002?

12       A.   YES.

13       Q.   WERE YOU PRESENT DURING THAT?

14       A.   YES, I WAS.

15       Q.   WAS THERE ALSO AN OFFICER WITH THE BUREAU

16   OF IMMIGRATION AND CUSTOMS ENFORCEMENT NAMED KIRT

17   KLINGERMAN THERE?

18       A.   YES, HE'S A NATURALIZATION EXAMINER.

19       Q.   AND IS HE THE PERSON THAT DID THE BULK OF

20   THE INTERVIEW?

21       A.   YES, HE DID.

22       Q.   WAS THAT VIDEOTAPED?

23       A.   YES.

24       Q.   HAVE YOU HAD AN OPPORTUNITY TO REVIEW THE

25   VIDEOTAPE?

6

MAY NOT BE PHOTOGRAPHICALLY REPRODUCED OR TRANSMITTED.

A. YES.

Q. I'M GOING TO SHOW YOU WHAT I'M GOING TO MARK FOR IDENTIFICATION AS GRAND JURY EXHIBIT NO. 1.

(GRAND JURY EXHIBIT 1 WAS MARKED.)

BY MR. PARMLEY:

Q. IT LOOKS LIKE A COMPACT DISK. DOES GRAND JURY EXHIBIT NO. 1 CONTAIN A DIGITIZED COPY OF THE VIDEOTAPED INTERVIEW?

A. YES, IT DOES.

Q. ALONG WITH THE TRANSCRIPT?

A. YES.

Q. THAT'S BEEN LOADED ON MY LAP TOP HERE TO SHOW TO THE GRAND JURY.

A. YES.

Q. AND YOU'VE REVIEWED THAT?

A. YES.

Q. AND I WANT TO TALK TO YOU ABOUT SOMETHING CALLED THE GLOBAL RELIEF FOUNDATION.

DO YOU KNOW WHAT THE GLOBAL RELIEF FOUNDATION IS?

A. THE GLOBAL RELIEF FOUNDATION WAS AN ORGANIZATION THAT WAS SHUT DOWN BY THE OFFICE OF FOREIGN ASSETS CONTROL IN THE UNITED STATES OF AMERICA. THEY WERE SHUT DOWN BECAUSE THEY WERE FUNDING TERRORIST ORGANIZATIONS.

MAY NOT BE REPRODUCED
PROPERTY OF U.S. GOVERNMENT

AGENT STEVEN SCHULTZ   12/19/03

1      Q.   WAS THAT ON DECEMBER 14 OF 2001?

2      A.   YES.

3      Q.   AND SO WAS THE GLOBAL RELIEF FOUNDATION

4   PURPORTEDLY A CHARITY?

5      A.   YES.  THAT'S HOW THEY PORTRAYED THEMSELVES.

6      Q.   AND THE TREASURY DEPARTMENT SHUT THEM DOWN

7   AND BLOCKED ALL OF THEIR ASSETS BECAUSE THEY WERE

8   FOUND TO BE FUNDING TERRORIST ACTIVITIES; IS THAT

9   CORRECT?

10     A.   YES.  THEY WERE DESIGNATED A SPECIALLY

11  DESIGNATED GLOBAL TERRORIST.

12     Q.   WAS THAT ON OCTOBER 18, 2002, WHEN THEY

13  RECEIVED THAT DESIGNATION?

14     A.   YES, IT WAS.

15     Q.   AND BASICALLY, IF SOMEBODY WAS DOING

16  BUSINESS WITH THE GLOBAL RELIEF FOUNDATION, WOULD THAT

17  BE CAUSE FOR CONCERN IN THE IMMIGRATION AND CUSTOMS

18  ENFORCEMENT?

19     A.   YES, IT WOULD.

20     Q.   ESPECIALLY IF THAT INDIVIDUAL WAS APPLYING

21  FOR NATURALIZATION?

22     A.   YES.

23     Q.   I WANT TO TALK TO YOU ABOUT THE INTERVIEW

24  NOW THAT HAPPENED ON MAY 9, 2002.  ON THE FORM THAT

25  THEY FILL OUT, THE NATURALIZATION FORM, IS THERE A

8

03418-   03410

AGENT STEVEN SCHULTZ   12/19/03

1    SECTION WHERE YOU WOULD LIST WHAT KIND OF

2    ORGANIZATIONS YOU BELONG TO?

3        A.    YES.    THAT QUESTION IS SPECIFICALLY

4    ADDRESSED ON THE N-400.

5        Q.    DO YOU RECALL WHAT MR. MOHAMED'S RESPONSE

6    WAS TO THAT QUESTION, AS TO WHAT ORGANIZATIONS DO YOU

7    BELONG TO?

8        A.    HIS REPLY WAS, I BELIEVE, THE EAST AFRICA

9    YOUTH CENTER.    HE SAID HE WAS AFFILIATED WITH THEM.

10       Q.    CAN YOU SPEAK UP A LITTLE BIT.

11       A.    YES.    HE SAID HE WAS AFFILIATED WITH THE

12   EAST AFRICA YOUTH CENTER.    AND AFTER FURTHER

13   QUESTIONING, HE ADMITTED THAT HE WAS ASSOCIATED WITH

14   WESTERN SOMALI RELIEF.

15       Q.    AND HE ACTUALLY WROTE WESTERN SOMALI RELIEF

16   AGENCY ON HIS FORM, IS THAT CORRECT?

17       A.    YES, THAT IS CORRECT.

18       Q.    WHEN YOU WENT IN TO QUESTION HIM, DID YOU

19   QUESTION HIM ABOUT THAT?

20       A.    YES, I DID.

21       Q.    I'M GOING TO PLAY A PORTION OF THE

22   VIDEOTAPE FOR THE GRAND JURY.    I'M GOING TO PLAY THE

23   FIRST FEW MINUTES SO THE GRAND JURY GETS A FLAVOR

24   ABOUT HOW THE INTERVIEW TOOK PLACE.    AND I'M GOING TO

25   CUT TOWARDS THE MIDDLE OF IT WHEN YOU START ASKING HIM

9

AGENT STEVEN SCHULTZ   12/19/03

1    QUESTIONS ABOUT THAT.  ALL RIGHT.

2                    (VIDEOTAPE PLAYING.)

3                    (VIDEOTAPE STOPPED.)

4                    MR. PARMLEY:  LET ME STOP THE TAPE FOR A

5    SECOND.  CAN EVERYONE IN THE GRAND JURY HEAR THAT

6    OKAY?

7                    GRAND JUROR:  YES.

8    BY MR. PARMLEY:

9         Q.   AND AGENT SCHULTZ, IS THAT A COPY OF THE

10   INTERVIEW WHICH YOU DID?

11        A.   YES, IT IS.

12        Q.   IS THAT YOUR VOICE WE JUST HEARD?

13        A.   YES, IT IS.

14        Q.   OKAY.  I'M GOING TO PLAY THAT AGAIN.

15                   (VIDEOTAPE PLAYING.)

16                   MR. PARMLEY:  I'M GOING TO STOP THE TAPE

17   FOR A MINUTE.

18                   (VIDEOTAPE STOPPED.)

19   BY MR. PARMLEY:

20        Q.   ONE OF THE THINGS THAT MR. MOHAMED

21   MENTIONED WAS AN ATTORNEY NAMED KRISTY CABRAL.  DID

22   YOU RECALL HEARING THAT?

23        A.   YES.

24        Q.   DID YOU ACTUALLY CONFIRM THAT INDIVIDUAL IS

25   NOT AN ATTORNEY?

10

MAY NOT PROHIBIT GOVERNMENT IS REFERRED TO AN EXAMINENT IS NOT REPRODUCED

0342

AGENT STEVEN SCHULTZ   12/19/03

1       A.   YES, I DID.

2       Q.   SHE'S A PERSON WHO WORKS AT THE CENTER

3   WHICH HELPED HIM TO FILL OUT HIS PAPERWORK?

4       A.   THAT'S CORRECT.

5       Q.   SO AS FAR AS YOUR INTERVIEW WITH HIM AND

6   YOUR RESEARCH, HE WAS NOT REPRESENTED BY AN ATTORNEY;

7   IS THAT CORRECT?

8       A.   THAT'S CORRECT.

9       Q.   I'M GOING TO GO AHEAD AND SKIP FORWARD.

10  BUT HOW LONG WAS THAT INTERVIEW, AGENT SCHULTZ?

11      A.   IF I RECALL, IT LASTED ALMOST AN HOUR.

12      Q.   I'M GOING TO SKIP FORWARD TO ABOUT THE

13  20-MINUTE MARK, WHICH IS ABOUT WHEN YOU START SPEAKING

14  TO HIM.

15           (VIDEOTAPE PLAYING.)

16           (VIDEOTAPE STOPPED.)

17  BY MR. PARMLEY:

18      Q.   I'VE STOPPED THE TAPE.  I'M GOING TO -- I'D

19  LIKE TO ASK YOU SOME QUESTIONS ABOUT THAT INTERVIEW,

20  AGENT SCHULTZ.

21           IF I UNDERSTAND CORRECTLY, HE WAS SPEAKING

22  ABOUT TWO ORGANIZATIONS?

23      A.   YES.

24      Q.   ONE WAS THE EASTERN SOMALI YOUTH CENTER OR

25  SOMETHING LIKE THAT?

11

SPHERION DEPOSITION SERVICES
(800) 514-2714

03425

AGENT STEVEN SCHULTZ   12/19/03

1      A.   YES.

2      Q.   AND THE OTHER WAS THE WESTERN SOMALI RELIEF

3   AGENCY?

4      A.   YES.

5      Q.   DIDN'T HE, IN FACT, STATE TO YOU ON THAT

6   TAPE THAT THE WESTERN SOMALI RELIEF AGENCY NEVER GOT

7   OFF THE GROUND?

8      A.   YES.

9      Q.   THAT THEY NEVER RECEIVED ANY FUNDING?

10      A.   YES.

11      Q.   THAT THEY DIDN'T HAVE ENOUGH MONEY TO SEND

12   TWO BOXES OF BLANKETS TO SOMALIA?

13      A.   THAT'S CORRECT.

14      Q.   DID YOU INVESTIGATE TO LEARN WHETHER OR NOT

15   THAT WAS TRUE?

16      A.   YES.   WE SUBPOENAED BANK RECORDS FOR

17   WESTERN SOMALI RELIEF, AND WE DETERMINED THAT BETWEEN

18   DECEMBER OF 1999 AND FEBRUARY OF 2001, WESTERN SOMALI

19   RELIEF AGENCY RECEIVED 3,000 -- EXCUSE ME, $351,036.

20      Q.   AND WHERE DID THEY RECEIVE THAT FUNDING

21   FROM?

22      A.   THE GLOBAL RELIEF FOUNDATION.

23      Q.   THE GLOBAL RELIEF FOUNDATION THAT YOU

24   EARLIER TESTIFIED HAS NOW BEEN DESIGNATED A SPECIALLY

25   DESIGNATED TERRORIST ORGANIZATION?

12

MAY NOT PROPERLY REPRODUCE GOVERNMENT INSTRUMENTS

**Exhibit B**

SECRET
Unsealed 1/22/04

FILED

03 DEC 19 AM 11: 22

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2003 Grand Jury 03 CR 03433 JAH

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Criminal Case No. _____ |
| Plaintiff, ) | I N D I C T M E N T |
| v. ) | Title 18, U.S.C., Sec. 1546(a) – False Statement in Connection With |
| OMAR ABDI MOHAMED, ) | Immigration Application; Title 18, U.S.C., Sec. 1015(a) – |
| Defendant. ) | False Statement in Matter Relating to Naturalization |

The grand jury charges:

INTRODUCTORY ALLEGATIONS

1.   Defendant OMAR ABDI MOHAMED is a citizen of Somalia who obtained lawful permanent resident status in the United States on July 8, 1995.

2.   On April 11, 2000, defendant MOHAMED submitted INS Form N-400 (Application for Naturalization) to the Immigration and Naturalization Service in support of his request for United States naturalization.

//

//

//

JNP:nlv:San Diego
12/18/03

3.   On December 14, 2001, the United States Treasury Department's Office of Foreign Asset Control issued an order freezing the assets of the Global Relief Foundation, a charity based in Bridgeview, Illinois.

4.   On May 9, 2002, defendant MOHAMED was interviewed under oath by Immigration and Customs Enforcement (ICE) District Adjudications Officer Kirt Klingerman and Senior Special Agent Steven Schultz pursuant to his naturalization request.

5.   On October 18, 2002, the Office of Foreign Assets Control designated the Global Relief Foundation a Specially Designated Global Terrorist.

## Count 1

On or about May 9, 2002, in the Southern District of California, defendant OMAR ABDI MOHAMED, did knowingly make material false statements under oath to Immigration and Customs Enforcement (ICE) Senior Special Agent Steven Schultz in connection with an application required under the immigration laws, and regulations prescribed thereunder, to wit, an application for naturalization [Form N-400], in that he claimed that the Western Somali Relief Agency was an entity in name only, that it never received funds, and that the entity had insufficient funds to send two boxes of blankets to Somalia; which the defendant then and there knew was false, in that, in truth and in fact, between December 1998 and February 2001, the Western Somali Relief Agency received $351,036 from the Global Relief Foundation; in violation of Title 18, United States Code, 1546(a).

//

//

//

<u>Count 2</u>

On or about May 9, 2002, within the Southern District of California, defendant OMAR ABDI MOHAMED did knowingly make false statements under oath in a proceeding and matter relating to naturalization to Immigration and Customs Enforcement (ICE) Senior Special Agent Steven Schultz in that he claimed that the Western Somali Relief Agency was an entity in name only, that it never received funds, and that the entity had insufficient funds to send two boxes of blankets to Somalia; which the defendant then and there knew was false, in that, in truth and in fact, between December 1998 and February 2001, the Western Somali Relief Agency received $351,036 from the Global Relief Foundation; in violation of Title 18, United States Code, 1015(a).

DATED: December 19, 2003.

A TRUE BILL:

_Andrea H. Joly_
Foreperson

CAROL C. LAM
United States Attorney

By: _____
JOHN N. PARMLEY
Assistant U.S. Attorney

3

**Exhibit C**

NATURALIZATION INTERVIEW OF OMAR ABDI Mohamed

Steve Schultz:    Today's date is May the 9th, 2002. The time is approximately 10:00a.m. in the morning. We are conducting a naturalization interview of Mr. Omar Abdi Mohamed. His *immigration number is A44917640. Immigration Officer Kirk Klingerman: will be conducting the interview and it will be witnessed by Immigration Officer Steven Schultz.*

IO Klingerman:   Ok. Good Morning, Sir. May I see some identification from you? Your Driver's License, Social Security card and Alien Registration card.

O. Mohamed:    It's my (UI). Here's my I.D.

IO Klingerman:   Do you have a Social Security Card?

O. Mohamed:    Yep, this is my Social Security Card.

IO Klingerman:   Ok. Very good. Now, I'm gonna have to place you under oath but before I can continue the interview we have an attorney of record, Trish Cabral from International Rescue Committee. If she's not here then we need you to sign a waiver giving us permission to continue the interview without her presence. Go ahead and read that. Possibly this person assisted you with the paperwork when you completed that and sometimes they submit a representative form, a Form G-28.

O. Mohamed:    Ok. So . . .

IO Klingerman:   This is just to continue without this person here. This person has indicated to us that she is your attorney of record.

O. Mohamed:    Attorney of mine?

IO Klingerman:   Your lawyer.

O. Mohamed:    I didn't retain a lawyer.

IO Klingerman:   Did you have any assistance when you prepared the paperwork?

O. Mohamed:    Yes, someone with IRC helped me, because I . . .

IO Klingerman:   Then the agency submitted this paperwork. saying that you do have an attorney. If you don't have an attorney, that's fine. But since I do have the G-28 in file, I need to just get your permission to go ahead and conduct the interview.

O. Mohamed:    She should contact me?

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

IO Klingerman:   Well, it's the agency, International Rescue. They have attorneys working for them and they've obviously assisted, this individual assisted with the completion of your paperwork.

O. Mohamed:   When I file this, they did not tell me anything, just they say . . .

IO Schultz:   She is not required to be here, that's what that form is for . . .

O. Mohamed:   Ok.

IO Schultz:   If you want to continue the interview without her present and you can just sign it.

IO Klingerman:   Very good. Thank you.

O. Mohamed:   Ok. I'm a little confused, because I had no idea.

IO Klingerman:   If you'll stand up. I need to place you under oath. If you'll raise your right hand.

IO Klingerman: (to IO Schultz)   Wanna do this sitting down?

IO Schultz:   Actually it would probably be better because he's not in the a . . .

IO Klingerman:   Ok, listen we'll do this sitting down. So we can get you on camera here. If you'll raise your right hand. Do you promise to answer my questions truthfully and honestly during this interview?

O. Mohamed:   Yes, I do.

Io Klingerman:   Ok, very good, and at any point if you don't understand my questions please just let me know and I'll go ahead and rephrase this.

O. Mohamed:   Ok.

IO Klingerman:   Ok, sir, what is your full and complete name?

O. Mohamed:   Omar Abdi Mohamed.

IO Klingerman:   Ok, and would you spell your middle name?

O. Mohamed:   A-B-D-I.

IO Klingerman:   Very good. What is your current address?

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

O. Mohamed:      7245 Waite Drive, La Mesa, California 91941

IO Klingerman:   Ok, what is your date of birth?

O. Mohamed:      January 1st 1960.

IO Klingerman:   Very good. And what is your country of birth?

O. Mohamed:      Somalia.

IO Klingerman:   Do you know your Social Security number?

O. Mohamed:      Yep..

IO Klingerman:   What is it?

O. Mohamed:      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.

IO Klingerman:   Very good. Sir, when did you make entry into the United States?

O. Mohamed:      On July 8, 1995.

IO Klingerman:   And do you remember what Port of Entry you were admitted?

O. Mohamed:      Toronto.

IO Klingerman:   Toronto to?

O. Mohamed:      San Diego. Yeah to San Diego.

IO Klingerman:   What about New York, did you?

O. Mohamed:      No no, not New York)... Port of Entry. I flew from Toronto to all the
way to... just transit I think Pittsburgh, Pennsylvania. It was non-stop from there from Toronto
to Pittsburgh, Pittsburgh to San Diego all the way. That was the way . . . .

IO Klingerman:   What is your country of citizenship?

O. Mohamed:      Somalia.

IO Klingerman:   Sir, have you ever used any other names since becoming a permanent
resident..

O. Mohamed:      No, no.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

IO Klingerman:    And you're 6'2 or 6' we've got you here at 5'11, and here its 6'2 and here it's 6'3. What's your height?

O. Mohamed:    The people get mixed up. I think I'm 6'2 little inches, but I'm, I'm almost up to 6'2. Tall 6'2, 6'2.

IO Klingerman:    Sir, are you married?

O. Mohamed:    Yep.

IO Klingerman:    Ok. Now as far as absences go for the United States, you filed this application out, or you submitted it, and we have a date of April 18th, 2000 and you've listed, you listed some absences from the United States. I'd like to go over those right now. August 6, 1997 to August 28th, you were out of the country, and your destination was Kenya, Saudi, Saudi Arabia, is that correct?

O. Mohamed:    Transit, Saudi Arabia, yeah.

IO Klingerman:    And that's to visit family?

O. Mohamed:    Yep, my mom and my dad live in refugee camps in Kenya.

IO Klingerman:    We also have March 23rd 1997 to March 30th 1997, and you went to England?

O. Mohamed:    Yep

IO Klingerman:    And the purpose was for education?

O. Mohamed:    Yep, community. I was selected in the community. They talk about, what they call tribal leaders, tribal intellectuals, so they have a forum and they talk Somali problems, how to solve, so I was those people who were advocating what is needed.

IO Klingerman:    Moving on February 28, 1997 to March 4th of 1997, you went to Canada to visit family?

O. Mohamed:    Yeah, my wife and children were staying there at that time.

IO Klingerman:    Very good. And December 23rd 1996 to December 30th 1996 you also listed Canada to visit family.

O. Mohamed:    Yep, also to visit my wife and children.

IO Klingerman:    You've also indicated that you've made day trips down to Tijuana for tourism?

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O. Mohamed:   Generally, we went to try buy some cheap stuff.  I and My wife and children all went there.

IO Klingerman:   Sure, any other trips not listed here?

O. Mohamed:   Yep, I have a lot of cousins especially female almost, in Sydney Australia.  So they have bunch of marriage, so they invited us to go.  I went couple of times.

IO Klingerman:   Ok.  You wanna tell me those dates?

O. Mohamed:   I went December 2000.  I went July 2000.

IO Klingerman:   December 2000, do your remember approximately?

O. Mohamed:   I went approximately 28 December.

IO Klingerman:   28 December?

O. Mohamed:   Yeah, 2000. and back late January I went also.

IO Klingerman:   And you returned January '01?

O. Mohamed:   Yeah, 01 January, 30 or 29 I'm not sure.

IO Klingerman:   That's fine . . . Australia.

O. Mohamed:   Also, I went again July for 2000 and come back late August, this time we were gone 6 weeks or 4 weeks, probably.  Then I went December 2001 again and come back 30th or 31st January 2002.

IO Klingerman:   And these were all to Australia?

O. Mohamed:   Yeah, all to Australia.

IO Klingerman:   And visit family?

O. Mohamed:   Yeah and also families.  When I did that a[   *Important.* ]

IO Klingerman:   Sure.  (Knock on Door) -  Now as far as info employment we have your current address as you stated at 72 you've listed that you lived here from September 15, 1999 now

O. Mohamed:   Yep.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

*Knock on the DOOR*

IO Klingerman:   Before that you lived at 4404 Alamo Drive and that was from March 3rd or March of 1997 . . .

O. Mohamed:   When my wife came.

IO Klingerman:   Or March of 1997 to 1999 and before that you were . . .

O. Mohamed:   . . .4236 48th Street.

IO Klingerman:   Do you know the dates?

O. Mohamed:   From July or beginning, I came July 7 and rent began on August until March.

IO Klingerman:   What year was that, in July?

O. Mohamed:   1995.

IO Klingerman:   '95 ok, any other addresses'?

O. Mohamed:   No. I tried one time to move to Minnesota but I couldn't able to handle the weather cause I stay one week and not able to find apartment.

IO Schultz:   Too cold?

O. Mohamed:   Too cold, so . . .

IO Klingerman:   Ok. As far as employment history goes right now. You've listed SAY, San Diego Inc. Is that your place of employment?

O. Mohamed:   No, no, no. I left that job.

IO Klingerman:   Ok, what is your current employer?

O. Mohamed:   I am currently with San Diego City School.

IO Klingerman:   When did you start with them?

O. Mohamed:   The school I started almost 98. I started at Central Elementary School. I don't recall exactly what the date is.

S. Schultz:   Maybe close to . . .

IO Klingerman:   1998 to present. That's fine.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O. Mohamed:    Yeah, so it's listed down there.  You see I moved from one school to another school from my original job.

IO Klingerman:  That was at Euclid Elementary?

O. Mohamed:    Yeah.

IO Klingerman:   Ok.  Is that who your still with?

O. Mohamed:     No, I left them. Now I'm at Jackson Elementary School. This is why move me from Euclid to Jackson Elementary School.

IO Schultz:      Jackson?

O. Mohamed:     Yeah, Jackson Elementary School.  So something changed since I filed.

IO Klingerman:  Ok., what's your position?

O. Mohamed:     I'm I.A., Instructional Aide for immigrant population kids to learn the culture, language, adapt to school, to help the class, teachers.

IO Klingerman:   And then back in August of 95 you were working for Ma...

O. Mohamed:     Taqwa.  Yep.

IO Klingerman:  Ok.  That was to Feb. 97?

O. Mohamed:     Yep.

IO Klingerman:  Ok.  You've indicated in parts about your marital history, you've been married 2 times.

O. Mohamed:     Yep, I married 2 times.

IO Klingerman:  Ok.  And your first wife's name, what's your present wife's name?

O. Mohamed:     Haweya Yusuf Shire

IO Klingerman:   And would you spell her middle name?

O. Mohamed:     S-H-I-R-E, her middle name.

IO Klingerman:   Ok.  We have Haweya and I then have SHIRE listed as her last name.

O. Mohamed:     Yeah.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

IO Klingerman:   Yes, Yusuf....

O. Mohamed:      Oh sorry, sorry.  I thought you asked me about the middle name, I mean the last name.  The middle name is Yusuf.  Y-U-S-U-F.

IO Klingerman:   Y-U-S-U-F.  And she lives at your address also?

O. Mohamed:      Yep.

IO Klingerman:   Ok, very good.  And now, you know indicated also in Part 8, information about your children.  You have seven children?

O. Mohamed:      Uh huh.  (Nods Head)

IO Klingerman:   Ok , uh.... If my pronunciation's off . . .

O. Mohamed:      No problem.

IO Klingerman:   You need to cut me some slack here.  Abderahman Omar Mohamed: and his birthday is . . .

O. Mohamed:      11-11-90.

IO Klingerman:   Very good.  And then Miriam Omar Mohamed: birthday . . .

O. Mohamed:       8, August 8, 1993.

IO Klingerman:   Ok, we've got August 8th here . . .

O. Mohamed:       I mean sorry, the more children sometime you skip. I said, I want to say August 8, I mean the month. I don't mean the date.  The date is August 4, 1993.

IO Klingerman:   And we have Hafsa Omar . . .

O. Mohamed:      She's born December 29, 1991.

IO Klingerman:   Ok.  And then we have Khalid . . .

O. Mohamed:      Yeah, he's born April 22, 95.

IO Klingerman:   Ok.  Very good.  Oh these children were born in Canada?

O. Mohamed:      Yep, they are Canadian.

IO Klingerman:   And are they residing in Canada?

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O. Mohamed:      No they are with me here.  They're all here.

IO Klingerman:   Ok, very good, and we have two children here born in the U.S. - Fatima Omar Mohamed: and Zubair.

O. Mohamed:      Omar Mohamed . . .

IO Klingerman:   What's the birthday of Fatima?

O. Mohamed:      Fatima, she born March 6, '98.

IO Klingerman:   And Zubair?

O. Mohamed:      September 9, '99.

IO Klingerman:   And you also have Abdullahi Omar Mohamed?

O. Mohamed:      Abdullahi Omar Mohamed.

IO Klingerman:   And do you remember his birthday?

O. Mohamed:      Yep, he born April 12, 1985, he born in Somalia.

IO Klingerman:   Ok, now where is he?

O. Mohamed:      Kenya, in refugee camp, that's the one I went to visit him there.  By the way he was supposed to come, simultaneously while we were coming from Canada but somehow, National Visa Center, there something happened.  They put that he was born in Canada, which was not right, it's was not on original or my application, but then they didn't send him.

IO Klingerman:   I'm not sure what is going on with that particular child of yours.

IO Klingerman:   The Next question is have you ever registered to vote or voted here in the United States?

O. Mohamed:      Never.

IO Klingerman:   At any time have you ever ordered, incited, assisted or otherwise participated in the persecution of any person.

O. Mohamed:      No.

IO Klingerman:   And these answers that you have previously answered are just confirming your responses.  Since becoming a permanent resident have you ever failed to file a federal income tax return?

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O. Mohamed:     No, no.

IO Klingerman:   Since becoming a permanent resident have you filed an income tax return as a non-resident or failed to file a return because you considered yourself to be a permanent resident?

O. Mohamed:     No, I filed every time.  Can you repeat the question again?

IO Klingerman:   Sure, no problem.  Since becoming a permanent resident have you filed an income tax return as a non resident or failed to file a federal return because you considered yourself to be a non-resident?

O. Mohamed:     No.

IO Klingerman:   Ok.  Are deportation proceedings pending against you or have you ever been deported, ordered deported, or ever have applied for suspension of deportation?

O. Mohamed:     No.

IO Klingerman:   Have you ever claimed to be a United States Citizen in any way?

O. Mohamed:     No.

IO Klingerman:   Have you ever advocated or practiced polygamy?

O. Mohamed:     No.

IO Klingerman:   Do you have a problem with Drugs or Alcohol?

O. Mohamed:     Never.

IO Klingerman:   Have you ever knowingly and for gain helped any alien enter into the U. S. illegally?

O. Mohamed:     No.

IO Klingerman:   Have you ever been an illicit trafficker of narcotics, or drugs or marijuana?

O. Mohamed:     No.

IO Klingerman:   Have you ever given false testimony for the purpose of obtaining an immigration benefit?

O. Mohamed:     No.

MAY NOT BE REPRODUCED PROPERTY OF U. S. GOVERNMENT

IO Klingerman:   Have you ever knowingly committed a crime for which you have not been arrested for?

O. Mohamed:     No.

IO Klingerman:   Have you ever been arrested cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance, excluding traffic violations?

O. Mohamed:     No.

IO Klingerman:   Ok. Part 8 - your allegiance to the U.S. Do you believe in the Constitution and the form of government of the U.S.?

O. Mohamed:     Yep, yes.

IO Klingerman:   Are you willing to take the full oath of allegiance to the U.S.?

O. Mohamed:     Yep, yes.

IO Klingerman:   If the law requires it are you willing to bear arms on behalf of the United States?

O. Mohamed:     Yes.

IO Klingerman:   If the law required it are you willing to perform non-combatant services in the armed force of the U. S?

O. Mohamed:     Yep.

IO Klingerman:   Armed Forces of the U.S. If the law requires it are you willing to perform work of national importance under civilian direction?

O. Mohamed:     Yep.

IO Klingerman:   Part 9, Memberships and organizations. You … this is … I'll read you the questions. List your present and past memberships or affiliations with every organization, association, fund, foundation, party, club, society or similar group in the United States or in any other place, include any military service, in this part. If none, write none, include names of organizations locations, dates of membership, and nature of the organization. You've listed the Somali and East African Youth Center Incorporated., a non-profit community service, that's from 1997 to present.

O. Mohamed:     Yep, I'm the director of that non-profit organization now.

IO Klingerman:   I'm sorry …

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT.

O. Mohamed:      I'm the director of the non-profit organization now.

IO Klingerman:    And you've also listed their address 4979 University Ave., Suite D.  Very good.  You've also have listed Western Somali Relief Agency, Incorporated.

O. Mohamed:      Yep.

IO Klingerman:     And that's from 1997 to present?

O. Mohamed:      Yep.

IO Klingerman:     And they're in the same building, just a different suite number?

O. Mohamed:      Yep.

IO Klingerman:    Ok, Suite C?

O. Mohamed:      Suite C.

IO Klingerman:     4979 University . . .

O. Mohamed:      Avenue.

IO Klingerman:    Avenue, very good.

IO Klingerman:    Do you have any parents that are United States citizens?

O. Mohamed:      No.

IO Klingerman:    Ok sir, is that your signature right here on the form here?  Can you go ahead and . . .

O. Mohamed:      Yes, that's my signature.

IO Klingerman:    Very good.  And you did get assistance in preparing these forms?

O. Mohamed:      Yeah.

IO Klingerman:    Very good.  Now I know that is your signature, for immigration purposes we need you to sign very clearly, so it's going to be your first, middle and last.  So that will be Omar Abdi Mohamed.

O. Mohamed:      Ok.

IO Klingerman:    Very clearly and legibly.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O. Mohamed:    Ok.

IO Schultz:    Before he signs it, I'd like to ask him a couple of questions about Part 9. You said you worked with the Somali and East African Youth Center.

O. Mohamed:    Yep, it's a non-profit organization.

IO Schultz:    And Western Somali Relief Agency?

O. Mohamed:    Yeah, I volunteer.

IO Schultz:    You're a volunteer?

O. Mohamed:    Yes.

IO Schultz:    What, do you have a title? What do you do here?

O. Mohamed:    Look With the two organization we founded, one, to help . . . .to to help Somali refugee in this country, so there is a lot of fighting with racial and gang related activity in City Heights area, between immigrant and the original residents. Probably mostly the immigrant so we come up with, group of intellectualists, we trying to help them out, so we say we have to take our kid, teach them social skills they need, prevent going drug awareness, so we build this organization. So when also famine, happened in Somalia as well as in Ethiopia, we tried to come-up also an organization that the people can make them aware.. What is happening so the famine wouldn't be coming it was nationwide here in the United States. So we tried kind of help but we couldn't find anything or anyone. If we got a couple of box of clothing or something like that we couldn't be able to ship them because it was too expensive. So one is helping the youth activity here in San Diego. Another organization we set up we were hoping that it will help the refugee people inside the refugee camps, Kenya, Ethiopia, with Famine with all this, but it didn't, it didn't, it didn't make.

IO Schultz:    So to support this since it's a non-profit, how . . . do you ah . . . how is it funded?

O. Mohamed:    One is out of federal almost grants, us from the Somali east African Youth Center with collaboration with another organization called African Alliance, so we are working just there is 2 employee who go outreach family strength. So the other is just I can say it is only by name, so it didn't make, it didn't make it.

IO Schultz:    So there was no funding for federal grants like there was for the other one?

O. Mohamed:    No, no, no.

IO Schultz:    Did you have a ah.. What was your position in these organizations?

MAY NOT BE REPRODUCED. PROPERTY OF THE U.S. GOVERNMENT.

O. Mohamed:     Both of them, I was director, the one I now almost director effectively is the one Youth.

IO Schultz:     Youth?

O. Mohamed:     Youth, yes.  That one we have to work with the San Diego Police Department. We work with other organizations to keep the people out of the street, teach them social skill they need, so they don't endanger the life of the people, also academics tutor, counseling also work juvenile people so when they need counseling, they be will be referred to In Somali cultural - setting.  So I counsel them, I teach them how anger management and all these stuff.

IO Schultz:     Well, that's good.

O. Mohamed:     Thank you.

IO Schultz:     And the, the other one, the Western Somali ...

O. Mohamed:     The other one we tried to do something but we couldn't do anything so . . .

IO Schultz:     But you still have an office there?

O. Mohamed:     Look, we share with other people so generally other people take care of just we have in the name, so now we in the process of closing, because we couldn't able to come.

IO Schultz:     But you were the director of that also?

O. Mohamed:     Yep, I was the director of that also.

IO Schultz:     But you couldn't get any funding to keep it going?  Nobody would support it?

O. Mohamed:     No, we couldn't.

IO Schultz:     So how is the other one working?  The youth center . . . is that working well?

O. Mohamed:     The youth center is working well, we work well.  All of us, we have, we have kinda little grant, grant so it work and it help with the youth, so we've reduced work (UI) . . . and the police they [UI], we've reduced the violence level in the neighborhood.

IO Schultz:     How many people are helping you?

O. Mohamed:     Oh, 10 to 15 people.

IO Schultz:     Oh, that's good, I'm glad to see you guys are doing well.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O. Mohamed:      15 sometimes 10 sometimes 7.  So we make our neighborhood, Winona, 50th Avenue, safer.

IO Schultz:      That's good, sometimes that's a dangerous area.

O. Mohamed:      Yeah, dangerous area, so we try our best to contribute to our Community.  (UI)

IO Schultz:      That's good.

O. Mohamed:      Thank you.

IO Schultz:      Have you ever been in the military?

O. Mohamed:      Myself?

IO Schultz:      Yeah.

O. Mohamed:      In the United States?

IO Schultz:      No.  Ever in your whole life?

O. Mohamed:      No, never.

IO Schultz:      Well I guess that's all I had any questions about.

IO Klingerman:   Ok, we'll get on to the examination portion here in just a minute.

O. Mohamed:      So the signature you asked me here?

IO Klingerman:   It will be legible, signature in cursive, first, middle, and last.  If you'll go ahead and sign right there, I'll give you a black pen.

O. Mohamed:      Here?

IO Klingerman:   Please, right here.

O. Mohamed:      I put the first, the middle and the last?

IO Klingerman:   Correct.

IO Klingerman:   Ok, in the small space, can you try writing that in cursive . . . just straight across there . . .

O. Mohamed:      In cursive?

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

IO Klingerman:   Yes, if you can't that's fine.

O. Mohamed:      Let me try.

IO Klingerman:   Alright.  Now here's the part you've been waiting for.  What are the three branches of our government?

O. Mohamed:      Legislature. Legislative, Executive, Judicial.

IO Klingerman:   What makes up Congress?

O. Mohamed:      Senate and House of Representatives

IO Klingerman:   Very Good.  How many senators are there in Congress?

O. Mohamed:      A hundred.

IO Klingerman:   What are some of the basic beliefs of the Declaration of Independence?

O. Mohamed:      All humans are equal, and we should enjoy justice, and pursuit of happiness.

IO Klingerman:   What is the National Anthem of the United States?

O. Mohamed:      Star Spangled Banner.

IO Klingerman:   And who wrote the song?

O. Mohamed:      Francis Scott, Francis Scott

IO Klingerman:   What special group advises the President?

O. Mohamed:      The cabinet and the department.  Probably the cabinet, which  is administers.

IO Klingerman:   What did the Emancipation Proclamation do?

O. Mohamed:      Freed the and slaves.

IO Klingerman:   What holiday was celebrated for the first time by the American Colonists?

O. Mohamed:      Thanksgiving.

IO Klingerman:   What is the head executive of city government called?

O. Mohamed:      Mayor.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

IO Klingerman:   Ok, write next to this X here, I want you to write this sentence for me - I live in San Diego, California.

O. Mohamed:      Should I write here?

IO Klingerman:   Yeah, right here . . . just write small - I live in San Diego, California.

O. Mohamed:      I live in San Diego?

IO Klingerman:   I live in San Diego, California. Ok, great. Very Good.

IO Klingerman:   Ok, now we have our reading sample, if you'll please . . . it's a poor copy but do the best to read the first 2, right next to the . . .

O. Mohamed:      The American flag is red, white and blue. The United States has 50 states.

IO Klingerman:   Very good, that's fine. Sir, this is your certificate preparation sheet in your oath declaration - is all the information listed here correct.

O. Mohamed:      Last name here. Yeah.

IO Klingerman:   You were married in Somalia, 62, is that your phone number right here?

O. Mohamed:      Yep.

IO Klingerman:   Ok, go ahead and read that and sign it, and now once again with your signature we're going to need it in cursive, first, middle and last and today's date, please.

O. Mohamed:      Ok, so I have to sign right here . . .

IO Klingerman:   For immigration purposes we need a legible signature, so go ahead and read that and then go ahead sign and date it. Signing it first, middle and last. These are the photographs that you have submitted. What we're going to do is, one of those is going to be selected for your certificate. So if you go ahead and sign your name, you'll have to write it small, if you run out of space, that's ok you can drop right below it and continue on - one line below, first, middle, and last go ahead and sign that.

O. Mohamed:      Do it in cursive?

IO Klingerman:   Please. Then if you'll do this second photo also. Ok, very good. I just want to follow up right here you did an addendum for Part 5 information about your marital history.

O. Mohamed:      Yeah.

IO Klingerman:   Your wife, Faduma . . .

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O. Mohamed:     Yeah, died.

IO Klingerman:  Died.  Now do you have any documentation?

O. Mohamed:     No, all documentation was destroyed in the civil war in Somalia.  She the eldest, by my eldest son's, who is in refugee camp, mom.

IO Klingerman:  Ok.

O. Mohamed:     Yeah, so all her records is gone with the civilian war for the whole country, at that time.

IO Schultz:     Where is your son now?

O. Mohamed:     He is still in the refugee camp, still stranded there.

IO Schultz:     Still?

O. Mohamed:     Can you imagine?

IO Schultz:     Mmmm, not good.

IO Klingerman:  Did you understand our questions today?

O. Mohamed:     Oh,  I understand very well, I'm an educated guy, I'm doing my Masters program now.

IO Klingerman:  Outstanding.  Now do you have children, of which are living with you is that correct?

O. Mohamed:     Yeah. Yeah.

IO Klingerman:  Ok, since you .. how are you supporting your child back in Kenya?

O. Mohamed:     Look, my dad is some kind of ... they are surviving anyway, they are.  My dad used to have a business, small shop, so he's smuggling.  So they are in refugee camp and the United Nations is rationing the food.  I send them from time to time $50.00 (fifty dollars) something like that.  So he's a grown kid now, anyway now he's turned seventeen so he's not like a younger.  He's going to do something.

IO Klingerman:  I'm gonna need some evidence that you are current with child support, maybe you can contact social services agency back there.

O. Mohamed:     They don't have social services back there.  They have nothing.

MAY NOT BE REPRODUCED
PROPERTY OF U. S.
GOVERNMENT

002524

IO Klingerman:   I'll kinda leave it generic.  I won't tell you what agency to contact but were gonna need some sort of verification that you're current.  With naturalization it's very important that everybody meet a level of good moral character and by that, that's maintaining responsibility for your children and so what I'm gonna do is give you this form.  It's an N14, requesting you provide child support information and getting me your current with child supports payments.

O Mohamed:       Where?  Here?

IO Klingerman:   Well if your children are living with you then obviously your current but we still have a child who is out of this country, who's under 18, so I'm going to need to look at that as well.  So I'm going to make the copy of this and I'm going to give it to you.

O. Mohamed:      Ok

IO Klingerman:   Other than that, you did pass the history examination. You passed the reading and writing, but you still have some information out there that we need to get before we can complete this file.  I'll make a notation that a decision cannot be made on your application today.  And this is going to be your copy right here.  I will need some photo copies of this and in the lobby out there.  I'll  go ahead and return this information back to you, but I'm finished with all my questions.  I want to thank you for all your time.

IO Klingerman:(to IO Schultz:)   Do you have any other questions?

IO Schultz:        I have no other questions.

O. Mohamed:       But child support.. he was asked me to pay, I was told it wasn't included.  I can bring whatever I sent to him.

IO Klingerman:   That would be of help.

IO Schultz:        What we want to see is some kind of proof.

O. Mohamed:      Yeah.  I can bring it by later today.

IO Klingerman:   You don't have to do it today, I'll give you 30 days to get that information back to me and if you can get it back sooner than that, that is fine.  If you need more time . . .

O. Mohamed:       So what do I do, should I come to you directly?

IO Klingerman:   What you will do is . . . my name will be on this form, ok.  My Office is actually located down on the 1st floor, where your appointment notice was sent to.  So you can go there and inquire directly to me on that, alright?  So, we're finished.  Once again, thank you for your time and I will return that information to you in just a few minutes out there is the waiting area, in fact, I'll walk you out there.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

IO Schultz:    This concludes the interview, the time is approximately 10:42 a.m.



MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of

**7245 Waite Drive
La Mesa, CA  91941**

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

**CASE NUMBER:**

I, Steven W. Schultz, being duly sworn, depose and say:

I am a Special Agent, U.S. Immigration and Customs Enforcement, and have reason to believe

that on the property or premises known as: 7425 Waite Drive, La Mesa, CA 91941 as more fully described in :

### *SEE ATTACHMENT A*

in the Southern District of California there is now concealed a certain person or property, namely:

### *SEE ATTACHMENT B – PROPERTY TO BE SEIZED*

which is:
(1) property that constitutes evidence of the commission of a criminal offense; and (2) property designed and
 added for use or which is or has been used as a means of committing a criminal offense;

concerning a violation of  Title 18 United States Code, Sections 1001, 1425 and 1546.
The facts to support a finding of probable cause are as follows:

### *SEE ATTACHED AFFIDAVIT*

Continued on the attached sheet and made a part hereof.

Steven W. Schultz
Special Agent/ICE

Sworn to before me, and subscribed in my presence

_____          _____
Date                                              City and State

_____          _____
Name and Title of Judicial Officer            Signature of Judicial Officer

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

AO 93 (Rev. 5/85)  Search Warrant

## UNITED STATES DISTRICT COURT

__SOUTHERN_____ DISTRICT OF _____CALIFORNIA_____

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

7245 Waite Drive
La Mesa, CA 91941

**SEARCH WARRANT**
**CASE NUMBER:** 04 mg 8154

TO: <u>DHS/ICE Special Agent Steven W. Schultz</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by <u>Steven W. Schultz, DHS/ICE Special Agent</u> who has reason to believe that ____ on the person of or __XX__ on the premises known as (name, description and/or location)

7245 Waite Drive
La Mesa, CA 91941

As more fully described in **ATTACHMENT A**

in the __SOUTHERN_____ District of ___CALIFORNIA_____ there is now concealed a certain person or property, namely (describe the person or property)

·see **ATTACHMENT B**

and other evidence and instrumentalities constituting violations of Title 18, United States Code, Sections 1001, 1425, and 1546.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above described and establish grounds for the issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before  *January 29, 2004.*
<span style="margin-left:28em">Date</span>

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to *William McCurine, JR.* as required by law.
<span style="margin-left:30em">U.S. Judge or Magistrate</span>

<u>1/20/04   1350 hrs</u>                 at   <u>San Diego, CA.</u>
Date and Time Issued                          City and State

*William McCurine Jr.*
*U.S. Magistrate Judge*
___Name and Title of Judicial Officer

*(signature)*
Signature of Judicial Officer

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

AO·93 (Rev. 5/85)  Search Warrant

# UNITED STATES DISTRICT COURT

__SOUTHERN_____ DISTRICT OF _____CALIFORNIA_____

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

7245 Waite Drive
La Mesa, CA 91941

**SEARCH WARRANT**
**CASE NUMBER:**

TO: <u>DHS/ICE Special Agent Steven W. Schultz</u> and any Authorized Officer of the
United States

Affidavit(s) having been made before me by <u>Steven W. Schultz, DHS/ICE Special</u>

<u>Agent</u> who has reason to believe that ____ on the person of or __XX__ on the

premises known as (name, description and/or location)

7245 Waite Drive
La Mesa, CA 91941

As more fully described in **ATTACHMENT A**

in the __SOUTHERN_____ District of ____CALIFORNIA_____ there is now
concealed a certain person or property, namely (describe the person or property)

see **ATTACHMENT B**

and other evidence and instrumentalities constituting violations of Title 18,
United States Code, Sections 1001, 1425 and 1546.

I am satisfied that the affidavit(s) and any recorded testimony establish
probable cause to believe that the person or property so described is now
concealed on the person or premises above described and establish grounds for the
issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before _____
                                                              Date
(not to exceed 10 days) the person or place named above for the person or
property specified, serving this warrant and making the search (in the daytime --
6:00 A.M. to 10:00 P.M.) and if the person or property be found there to seize
same, leaving a copy of this warrant and receipt for the person or property
taken, and prepare a written inventory of the person or property seized and
promptly return this warrant to _____as required
by law.                              U.S. Judge or Magistrate

_____ at _____
Date and Time Issued                   City and State

_____     _____
.ame and Title of Judicial Officer         Signature of Judicial Officer

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

1194

AO 93 (Rev. 5/85)    Search Warrant

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH. |
|---|---|---|

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the

Subscribed, sworn to, and returned before me this date

_____
U.S. Judge or Magistrate          Date

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

1195

## ATTACHMENT A

The residence of Omar Abdi MOHAMED is located at 7245 Vista Drive, La Mesa, California.  The residence is a single story building located on the southwest corner of Vista Drive and Waite Drive.  The residence has a brown shingle roof with a cream color stucco exterior.  The residence has a white wood picket fence enclosing the front yard.  The driveway entrance is located on Vista Drive.  The attached garage is located on the south side of the residence.  The entrance to the residence is located on the north side.  A white mailbox is attached to the stucco exterior located on the left of the residence entrance.

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

1196

## ATTACHMENT B

### ITEMS TO BE SEIZED:

### Evidence of violation Title 18, United States Code, Sections 1001, 1425 and 1546, but

#### not limited to:

a. Passports and any United States Government documentation relating to alienage, place of birth, marital status or paternity;

b. Travel documents and identity documents, both domestic and foreign;

c. Social security cards, state issued ID cards or drivers licenses, work permits, visas and birth records;

d. Tax returns and tax records, employment records, credit applications or bills, vehicle ownership records, telephone/address books; any accounting or other financial records which are recordings of earnings, receipts or payments, computers, compact discs, digital video discs, removable computer media, photographs, telephone toll records;

e. All records, (including those stored digitally) related to the Western Somali Relief Agency including, but not limited to bank account information, bank records, financial records, wire transfers, telephone/address books, tax returns, correspondence and all other related documents;

2. Documents and items evidencing dominion and control of the premises to be searched, including utility bills, rental agreements, photographs, keys, property acquisition records, telephone bills, canceled mail envelopes, correspondence, vehicle records, paging devices, cellular telephones, answering machine and answering machine tapes, and documents containing handwriting samples.

*1197*

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

AFFIDAVIT

UNITED STATES OF AMERICA        )
                                )
SOUTHERN DISTRICT OF CALIFORNIA )

   I, Steven W. Schultz, being duly sworn, depose and say:

   1.   I am a Special Agent with the Department of Homeland
Security, United States Immigration and Customs Enforcement.  I am
currently assigned to the Special Agent in Charge, San Diego Office.
I have been an immigration agent for twenty-three (23) years.  In the
course of my duties I investigate the importation, smuggling,
concealing and transporting of aliens who have entered and remain in
the United States illegally.  I also investigate organizations and
people that provide documents and attestations to aliens for the
purpose of fraudulently obtaining United States immigration benefits.
I investigate people who on their own behalf provide false statements
for the purpose of fraudulently obtaining United States immigration
benefits.  These benefits include, but are not limited to, non-
immigrant visas, asylum, permanent residence and citizenship.  This
affidavit is based on facts discovered during the course of this
investigation.

   2.   It is my experience, and the experience of other law
enforcement officers with whom I work, that some subjects provide
false statements and attestations for the purpose of fraudulently
obtaining United States immigration benefits.   It is also my
experience that documents and property evidencing violations of Title

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

18, United States Code, Sections 1001, 1425 and 1546, such as correspondence; financial records; photographs; common carrier tickets; money orders; foreign passports; identification records; marriage records; birth records; foreign and United States currency; telephone toll records; are commonly located at the residences of the subjects who are responsible for those violations. Subjects often hold these documents, because of their nature, long after they have entered the United States.

3.    I make this affidavit in support of search warrant for the residence of Omar Abdi MOHAMED aka Omar KHADIIB to search for and seize all documents, including but not limited to, certain financial records, identification documents, birth certificates, immigration documents, travel documents, and letters from and to Omar Abdi MOHAMED, which relate to his Application for Naturalization, nationality, and his immigration status, as more fully described in Attachment B.

4.    The residence of Omar Abdi MOHAMED is located at 7245 Waite Drive, La Mesa, California. I know that he currently resides at that residence because he has received and responded to mail sent there by the Department of Homeland Security, Citizenship and Immigration Service (DHS/CIS). DHS/CIS sent a letter directed to MOHAMED at 7245 Waite Drive on January 7, 2004. Shortly thereafter, on January 10, 2004, he told an Immigration Examiner that he had received the letter. Additionally, on January 15, 2004, DHS agents conducted a surveillance of 7245 Waite Drive and observed two vehicles registered to MOHAMED

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

1199

parked in front of that address. Finally, in all correspondence to and from the DHS/INS, and in all relevant tax returns and bank records since 1999, MOHAMED has listed the same address. I have reviewed all pertinent documents and reports relating to the Application for Naturalization case involving Omar Abdi MOHAMED, and I believe the facts as set forth herein establish probable cause that these premises contain evidence of Omar Abdi MOHAMED having provided false statements and attestations in order to obtain fraudulent INS benefits.

5.   On July 8, 1995, Omar Abdi MOHAMED, date of birth of January 1, 1960, a citizen of Somalia and resident of Canada, legally entered the United States by presenting a valid immigrant visa. The visa issued to MOHAMED accorded him the status of a religious worker immigrant. MOHAMED listed San Diego, California as his intended city address.

6.   On April 11, 2000, MOHAMED submitted Form N-400, Application for Naturalization. In the application, MOHAMED attested to the fact that he had present or past membership in or affiliation with Western Somali Relief Agency, Incorporated, 4979 University Avenue, Suite C, San Diego, California.

7.   I have reviewed bank records for the Western Somali Relief Agency, obtained by Federal Grand Jury subpoena. Those records show that between December 20, 1998, and March 14, 2001, the Western Somali Relief Agency (WSRA) received 16 checks totaling $351,036 from the Global Relief Foundation (GRF). The smallest check was for $80 while

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

the largest check was for $68,813.  WSRA received some funding from other sources (approximately $25,000), but the vast majority of their money came from the Global Relief Foundation.  A review of the checks shows that MOHAMED appears to have endorsed the checks from the Global Relief Foundation when depositing them into the Western Somali Relief Agency account The funds were deposited by MOHAMED into the Western Somali Relief, Incorporated, Bank of America account number 08637 04416.

8.    Furthermore, I have reviewed tax records showing Omar Mohamed of 7245 Waite Avenue is the listed President of the Western Somali Relief Agency and keeper of the books.

9.    On December 14, 2001, the Global Relief Foundation was subject to a financial blocking order issued by the Office of Foreign Asset Control (OFAC), Department of Treasury.  The blocking order was issued as the result of evidence indicating that the Global Relief Foundation was involved in the funding of a foreign terrorist organization.

10.    On May 9, 2002, MOHAMED appeared in person before the INS, San Diego, California.  MOHAMED was interviewed under oath regarding his application for Naturalization.  MOHAMED stated that he served as the President of Western Somali Relief, Incorporated.  When asked, MOHAMED claimed that the Western Somali Relief Agency was an organization in name only which never received any funding.  He claimed that the Agency had insufficient funds to even send two boxes

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT.

of blankets to Somalia. MOHAMED did not state that he received or deposited any funds from the Global Relief Foundation. As explained above, I know that the Western Somali Relief Agency received over $350,000 from the Global Relief Foundation. MOHAMED stated that the above statements and/or omission of statements were true and correct.

11. On December 19, 2003, a grand jury sitting in San Diego, California, issued a sealed indictment, charging MOHAMED with violations of Title 18 United States Code, Section 1425, False Statement in Matter Relating to Naturalization and Title 18 United States Code, Section 1546 - False Statement in connection with Immigration Application. A sealed warrant has been issued for his arrest.

<u>Digital Evidence</u>

12. The following information is based upon my knowledge, training, and experience, as well as the knowledge, training and experience of other agents and computer experts with whom I have consulted, including experts from the San Diego Regional Computer Forensics Laboratory (RCFL). I am informed that Computer Forensic Examiners (CFE) of the RCFL will be available during the execution of this search warrant to ensure the proper handling of any computer systems.

13. Digital evidence can be stored on a variety of systems and magnetic, optical and mechanical storage devices including, but not limited to, hard disk drives, floppy disks, CDs, DVDs, magnetic tapes, magneto optical cartridges, personal digital assistants, cellular phones, pagers and memory chips. It can be created and stored

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

utilizing a variety of different operating systems, applications, utilities, compilers, interpreters and communication programs.

14.   Searching and seizing information from computers typically requires agents to seize most or all electronic storage devices, along with related peripherals, to be imaged and searched later by a qualified computer expert in a laboratory or other controlled environment.   This is because searching computer systems is a highly technical process and because computer storage devices can store the equivalent of thousands of pages of information.

15.   Technical Requirements.   Searching computers and computer systems is a highly technical process that requires specific expertise, equipment and software and is best conducted in a controlled environment such as the RCFL.

a.   The vast array of hardware and software available today makes it difficult to know, before a search which expert is qualified to conduct the examination and which equipment is needed to conduct the examination.   In some cases, the RCFL may need to train with particular software and/or obtain additional hardware before a proper examination can be accomplished.

b.   Data search protocols are exacting scientific procedures designed to safeguard the integrity of a computer forensic examination and to locate and recover hidden, erased, compressed, password-protected and encrypted files.   An important part of the protocol is the creation of a complete, forensically sound image of the original digital evidence before an examination of the evidence is conducted.   There are numerous pitfalls, including inadequate power supply, unusual computer system architecture, and conflict with

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

specific software or file systems, that can seriously hamper the possibility and integrity of the imaging process conducted on-site, rather than in a controlled environment.

     c.    Another reason that it is sometimes impracticable to conduct an on-site image is that some operating systems, such as Linux, Unix, MAC and Novell, are hardware specific, which means that a restored image of original digital evidence may not be bootable or viewable without the actual original hardware. This would prevent the CFE from viewing the restored digital image in a manner consistent with the structure of the original digital evidence.

     d.    Additional problems are created by the growing use of destructive programs or booby traps. These programs can destroy or alter data if certain forensic procedures are not scrupulously followed. Since digital evidence is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment is essential to conducting a complete and accurate examination of any digital evidence.

     e.    Finally, there is a growing use of data security and encryption programs by consumers. The encryption programs, which are inexpensive and widely available, allow users to encrypt specific data with just a few keystrokes. Newer technologies, like steganography, which allows a user to conceal information within other files, create additional difficulties in conducting forensic examinations. A controlled environment may be necessary to obtain an accurate image of the digital evidence and to conduct an appropriate search.

    16.   The volume of evidence.  The volume of data stored on a typical computer system is so large that it is unrealistic to search

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

for specific data while conducting an on-site examination.

a. Computer storage devices, such as hard disks, tapes, diskettes, CDs and DVDs) can store the equivalent of millions of page of information. For example, a single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of storing more than 60 gigabytes of data are commonplace in new desktop computers. It may take days to weeks to examine a computer, depending on the amount of data and whether the user has taken efforts to hide, delete or encrypt the data.

b. A complete forensic search, however, is not limited to examining files normally displayed by the operating system. It also includes the expansion of compressed data and the recovery of deleted file data. It involves the areas of a computer hard drive that the computer system recognizes as being in use and those areas that the computer that the computer system deems available for use. This search may involve an examination of slack space, which is the information at the end of a sector or cluster beyond the end of the current usage. Finally, the complete examination would address orphaned data, portions of files left behind by earlier operating system activity. All of these areas require operating specific tools and techniques to access the data, which are best accomplished on a computer image in a controlled environment.

c. It is also very easy for a computer user to conceal data or other types of digital evidence through a number of methods, including the use of innocuous or misleading filenames and extensions.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

For example, files with the extension "jpg" are digital image files. A moderately sophisticated computer user, however, can easily change the .jpg file extension to "txt" or dll in order to conceal or mislead law enforcement into thinking the digital image is actually a text or system file.  While it is may be possible for a CFE to notice this during a properly controlled forensic examination, it is difficult for that same CFE to do detect this concealment during an on-site examination.

17.   For the reasons noted above, it is not appropriate to conduct any type of partial image without first creating a forensically sound full and complete image of the original digital evidence. Data can be spread throughout many portions of the original digital evidence and may be lost if a CFE attempted to just copy all images or download any E-mail.

Search Method

18.   Based upon the investigation conducted so far, I expect to find a single home computer.  Every effort will be made to image any computer system found on site.

19.   I also know that it is not always possible to conduct a proper forensic image of a computer system on site.  The following factors, if present, may require the RCFL to seize a computer system in order to conduct a forensic image at the RCFL:

a.   Hardware Compatibility Problems:   There are many different types of computers manufactured today, many of which use proprietary hardware and software during the creation of any user data.  It is impracticable for the law enforcement community to have all the proper adapters, cables, cords and other hardware devices

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

necessary to consistently link law enforcement forensic equipment with all known and unknown computer systems on an immediate basis while imaging on-site. Much of this specialized equipment is available, but may need to be acquired in order to conduct a proper forensic image.

b.   Software Compatibility Problems:  There are occasions when the specialized software used by CFEs to conduct a forensic image in the field does not work correctly.  This may be caused by a number of reasons, including unusual target system architecture or conflicts with specific software or file system installed on the targeted system.

c.   Sufficient On-Site Power Accommodations:  To make a forensically sound image of digital evidence found on-site, the CFE must ensure that there is an adequate uninterruptible power supply. Digital evidence is extremely fragile and susceptible to power interruptions and power surges.  The location of the site or the number of computers at the site may make it difficult to provide sufficient uninterruptible power supplies during the forensic imaging process.

d.   The Need To Have Access To Original Equipment:  It may be necessary for the CFE to have access to the original digital evidence during the course and scope of the forensic examination due to the type of hardware and software being utilized.

e.   Complexity Of The System Architecture:  More sophisticated computer users may be able to create proprietary computer networks that the CFE may be unfamiliar with.  This is generally noticeable during the execution of the search warrant. Moreover, if the computer user or system administrator is

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT.

1207

uncooperative in providing the relevant details of the computer system and any unfamiliar computer system architecture discovered during the execution of the search warrant, then it may be necessary to seize the systems and examine the systems, prior to imaging, in a safe and controlled environment.

20.   There may be other factors that arise on site that cannot be foreseen at the time of the preparation of this search warrant application.   If, in the opinion of the CFE, there are technical difficulties, such as noted above or otherwise arising at the time of the search, the CFE shall have the ability to forego on-site imaging and to seize any digital media for transport to a secure evidence Storage Facility or the RCFL for proper forensic imaging and examination.

21.   In the event that any computer system or digital media is seized and transported to the RCFL, the seized item will be imaged within 30 days and the original evidence will be returned.

22.   Searching the seized computers and digital evidence for the items described in Attachment B may require a range of data analysis techniques.   In some cases, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.   For example, agents may be able to execute a keyword search that searches through the files stored in a computer for special words that are likely to appear only in the materials covered by a warrant.   Similarly, agents may be able to locate the materials covered in the warrant by looking for particular directory or file names.   In other cases, however, such techniques may

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

not yield the evidence described in the warrant.   Criminals can
mislabel or hide files and directories; encode communications to avoid
using key words; attempt to delete or hide files to evade detection;
or take other steps designed to frustrate law enforcement searches for
information.   These steps may require agents to conduct more extensive
searches,   such   as   locating   and   examining   deleted   information,
examining disk space not allocated to listed files, or opening and
reviewing   every   file.      I,   therefore,   request   permission   to   use
whatever data analysis techniques appear necessary to locate and
retrieve the evidence described in Attachment B.

    Background Regarding Computers

    23.   The term "computer" as used herein is defined as set forth
in 18 U.S.C. § 1030(e)(1), and includes any electronic, magnetic,
optical, electrochemical, or other high speed data processing device
performing logical, arithmetic, or storage functions, and includes any
data storage facility or communications facility directly related to
or operating in conjunction with such device.

    24.   I have had both training and experience in the investigation
of computer-related crimes.   Based on my training, experience and
knowledge, I know the following:

        a.   The Internet is a worldwide network of computer systems
operated by governmental entities, corporations, other commercial
entities and universities.   To access the Internet, an individual
computer user must subscribe to an Internet Service Provider or ISP,
which operates a host computer system with direct access to the
Internet.   In the work environment, many governmental entities,
corporations and universities provided employees and students with

1209

access to the Internet.

b.   A device known as a modem allows any computer to communicate with another computer through the use of telephone lines or cable.  The modem may be internal or external to the computer.

c.   By connection to the Internet, either through a commercial ISP or through access provided by a private service provider such as the government, an individual with a computer can make electronic contact with millions of computers around the world.

25.  Based on training and through my personal use of computers, I have knowledge of the method by which e-mail and other files are transmitted over telephone lines or cable between computers.  Based on my training and knowledge I know the following:

a.   With the modem a computer user can transport a computer file to his own computer so that the computer file is stored in his computer.  The process of transporting a file to one's own computer from another is called "downloading."

b.   The user can then view the file on his/her computer screen (monitor) and can "save" or retain the file on his/her computer for an indefinite time period.

c.   In addition to permanently storing the file on the computer, the user may print the file.

d.   The original file that was downloaded is also maintained in the originating computer.

e.   With the modem, a computer user can send a file from the computer to another individual on the Internet.  This process of sending a file is called "uploading."

f.   The process of "uploading" is similar to the

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

"downloading" process except the user is sending the computer file to others instead of retrieving the information from another computer. As with the process of downloading, the original file is maintained on the originating computer.

g.    A user can also use an e-mail program to send files to another individual on the Internet.  Most e-mail programs allow the user to attach files to the e-mail.   The attached files may be documents or images.  Again, the original file is maintained on the originating computer.

h.    Users commonly configure their e-mail program to save a copy of all sent e-mail.  These copies will remain in the computer until they are deleted.  If the e-mail program operates from a server on which the user's files are stored and retrieved as needed, the files are likely to be archived by the system administrator on a regular basis.

<u>Request to Seal and Conclusion</u>

26.   I am requesting that this search warrant and all of its accompanying documents be sealed.  Disclosure of the warrant prior to its execution will significantly impede the investigation and could result in the destruction of pertinent evidence.

//

//

//

//

//

//

1211

27.   Based on the foregoing I believe there is probable cause to support the issuance of a search warrant for the residence located at 7245 Waite Drive, La Mesa, California, and that there is probable cause that these premises contain evidence of violations of: Title 18 United States Code, Section 1001 - False Statements, Title 18 United States Code, Section 1425 - Procurement of Citizenship or Naturalization Unlawfully and Title 18 United States Code, Section 1546 - False Application.

Further affiant sayeth not.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
STEVEN W. SCHULTZ
Special Agent
DHS/ICE

**SWORN AND SUBSCRIBED TO** before me
this day of January 2004

_____
UNITED STATES MAGISTRATE JUDGE

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

1212

**Exhibit E**

January 22, 2004 Interview of Omar Abdi Mohamed

Steve Schultz (S): "Today's date is January 22, its Thursday, and the time is approximately 7:40 in the morning.  My name is Steven Schultz and I am an officer with the Immigration Service and I will be conducting an interview of Mr. Omar Abdi Mohamed.  Ok, first of all Mr. Mohamed I need to advise you of your rights. So you understand English is that correct?"

Omar Abdi Mohamed (O): "Yeah, I understand English."

S: Ok.  "Before we ask you any questions you must understand your rights.  You have the right to remain silent and anything you say can be used against you in court or in any immigration or administrative proceeding.  You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.  If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.  Do you understand those questions?"

O: "Yeah, I understand."

S: "Are you willing to answer our questions without the presence of an attorney?"

O: "Yes (UI)."

S: "Sign this statement.  It just says you have been advised of your rights and that you want to waive them, and you are willing to answer questions.
-Pause-
Ok, if you would read that and then if you agree you can sign that there.
-Pause-
Ok, thank you. (UI).  I just had a few additional questions that I wanted to ask you regarding our application for Naturalization.  These things weren't entirely clear so before we proceed we need to ask you those questions."

O: "Ok."

S: Let me turn my phone on here.  Ok.
"Again any statements you make you need to understand that you are under oath and they need to be true and correct. So you agree to that?"

O: "Yes."

-Pause-

S: "The things that I was concerned about are:
1.) The travel that you listed here."

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

002475

O: "Ok."

S: "What was your most recent travel?  Have you done any travel
since the last time that we interviewed you?"

O: "Yep."

S: "And where did you go?"

O: "I went to Australia, I went to another travel, but I traveled
to Australia."

S: "And when was that?"

O: "Recently, last September."

S: "So, let's see so you went to Australia, and how long were you there?"

O: "I've been there three months."

S: "So, you returned in December?"

O: "December, twenty-fifth.  Yes, the twenty-six twenty-sixth."

S: "Did you go anywhere else, besides Australia?"

O: "Transit.  I was transit to Manila, cause I went through
Cheap Tickets, through Manila to Sydney.  That's it."

S: "But in those three months you never left Australia?"

O: "No, I was trying to go to Africa to visit my mom but
couldn't get the visa because I have a Somali passport
so it didn't work for me."

S: "You have a Somali passport?"

O: "Yes, and I have an American passport."

S: "Ok, the travel that you record on your Naturalization
Application indicates that in the last couple years starting
in 2001 you also visited Australia.  I believe you went there twice,
is that correct?"

O: "Yes." (UI).

S: "Ok.  One time was from July through August 2001 and the other
time was from December 2001 to...looks like February of 2002.  Does
that sound right?"

O: "I do not recall well, because it was 2000 but that's if
I put it there, yes."

S: "Ok, while you were there did you go to any other countries?"

O: "No, never."

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

S: "How about these other times when you...let's see.
In 1997 you put that you went to Kenya and Saudi Arabia."

O: "Transit, Saudi Arabia."

S: "Ok.  And you went to the United Kingdom?"

O: "Yep."

-Pause-

S: "And those were the only countries you went to, is that correct?"

O: "Yep, those were all."

S: "Ok.  Another section that we have questions on was Part 9
and it's regarding memberships and organizations.
And you put here that you work with the Somalian and
East African Youth Center from 1996 to present.
Do you still continue to work there?"

O: "No, no."

S: "When did you stop working there?"

O: "Almost a year ago...about that (UI)
and they chose another one."

S: "Ok, say 2003 or 2002?"

O: "Beginning of 2003."

S: "What was your title there?"

O: "I was a manager."

S: "Until early 2003?"

O: "Until early 2003."

S: "OK and it is a non profit agency?"

O: "Yeah, it is non profit."

S: "Where did you receive your funding from to be able
to operate that?"

O: "There was no single funder.  It was just program donations.
A few donations."

S: "So where would the donations come from?"

O: "From Somali community."

S: "And how much money do you think that was?"

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O: "I think barely.  Now they are closed because they
couldn't fund.  It was, I think generally if we make the rent and the phone.
It was on/off. I can say only the rent and the bill of the telephone."

S: "So, you would receive maybe a thousand dollars a year, a couple
thousand dollars a year?"

O: "I can say..."

S: "Just generally, I mean you know."

O: "Maybe couple of thousand."

S: "Maybe a couple thousand a year?"

O: "One, two thousand dollars, one thousand eighteen hundred dollars.
It was billed.  The rent was three hundred dollars, so it was ___."

S: "And when you say the Somali community.
You mean the local community here in San Diego?"

O: "Yeah, the local community."

S: "And how would they give you that money was in cash, or
in checks?"

O: "Generally in cash.  It was like this. When we do
translation, help them.  We do some services we
charge them generally a nominal fee.  Like if they
bring us some papers for translation... using,
immigration we like for them just give us ten
dollars something like that then we collect them and we pay
the rent and the telephone."

S: "Ok."

O: "That was generally.  Sometime we have after school
program for the students or something like that.
We donate our time.  Generally they pay some little money
five dollars, ten dollars, fifteen dollars.  We collect
them, we pay the rent.  Sometime we didn't cover the rent,
the telephone so often mostly the telephone
so we have to make with Pacific Bell say we make
arrangement of pay ___.

S: "Is it still in operation?"

O: "No, the organization exists, but the way of the Rashid
the guy who is running it.  They couldn't pay the telephone.
That was before my time, they couldn't pay the rent.
So, generally now it's out, out of business in general."

S: "It still exists?"

O: "As a non-profit it exists."

S: "And who is in charge of it now?"

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O: "Abdirashid Bashir Hassan
   -Pause-
All I know it was helping the youth, the organization,
taken off from the street so they didn't commit a crime,
and stop them become gangs because we located in the middle
of this city. So we come together in 1996 and say how can we
can help with those individuals coming here and all I did was
education of pupils and prevent them from committing crime,
gang. We have a couple of gang groups so we were scared and
our reputation as a community. So we say where are we
going to put this organization helping the community.
Bridging the gap the cultural difference. So is preventing the youth
to fall into temptation in the street because there is
gangs -- Hispanic, Asian all this and there is quite a
bit of (UI) in the school. So I have been called
many times by the principal to talk about how we can bridge
the gap and how we can address the problem in school as
well as in the street. So this was the organization."

S: "That is very good. That is very admirable."

O: "That was..."

S: "What do you do now? Where do you work now?"

O: "I work for San Diego City school."

S: "And what is your position there?"

O: "IA - Instructional Aide"

S: "Do you work there full time?"

O: "No, I do not work full time."

S: "So, what do you actually do as a ... What was your title again?"

O: "Instructional Aide. What I do was what I am doing Somali youth
bridge the gap between the population, African population,
especially the Somali in the school. The language and cultural
barrier since I recruit knowledge the two cultures the
gentlemen at the school hire me so I have to bridge the gap
for the parent conferences following sometime helping.
I go to classroom conference translation.
Like parent so that's the way I do it in the community.
I do it also in the school."

S: "Do you ... I think it is listed here somewhere, but
how many languages do you speak?"

O: "I speak English, I speak Arabic, I speak Somali,
I speak some Swahili, but not that big. Just a little thing."

S: "So, the area you are from in Somalia is by the Kenyan border?
Is it by Kenya or Ethiopia?"

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O: "No, None of it. I came from Mogadishu."

S: "Oh you did. Ok, alright. But how did you learn Swahili then?"

O: "It is the language. It is close to Arabic so I visited a couple of times. When I was visiting now I took a book from the airport. It was written it is few words. I can't speak that many, but I understand few words. You can buy the Spanish say a few words but I understand greeting and some like that things. And one word familiar I think everyone knows is Hakuna Matata.  The word they use, Hollywood."

S: "What does that mean?"

O: "Hakuna Matata, no problem.  So, you can say Hakuna Matata."

S: "Ok, so let's see.  Let me go back here.  So that is the only job you have now?"

O: "That is the main job I have now.  I am seeking a job too. Seeking now a job beside that we are doing some business. Trying to start some kind of business, I am to other people. To market African food, so we just begin now."

S: "Like a halal type market?"

O: "No, it is kind of a sambusa type business."

S: "But it is not in operation right now?"

O: "No, it is not big operation.  It is just experimental in the beginnings.  It's small."

S: "So, who are you doing that with?"

O: "I am doing it with a lady.  She is Somali also. We want to introduce as a taste, halal food so it is an idea now.  It is not operational."

S: "So, you don't have the market right now? Or a store?  Or a restaurant?"

O: "No, no."

S: "Who's the lady you are doing this with?"

O: "Her name is Miriam"

S: "Maria?

O: "Miriam.........Miriam"

S: "Miriam"
O: "Yeah, she used to have a restaurant."

S: "What's her last name?"

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O: "Suliman"

S: "And she's Somali?"

O: "Yeah."

S: "And what restaurant did she have?"

O: "She used to have a Aswan Café before."

S: "Oh yes, I know it.  That is a very nice restaurant.
She doesn't own that anymore?"

O: "Oh she has some problem with her partner before.
So now we try to make something else."

S: "And who was the other person?"

O: "Abdirashid"

S: "Abdirashid"

-Pause-

And now you listed another organization here --
The Western Somali Relief?"

O: "Yeah."

S: "Now, how long did you work there -- from 1997 until when?"

O: "1997 to 2000/2002  -pause- beginning of 02.
I'm not sure.  It is not operational for a long time."

S: "Yeah, cause when we talked to you last was in 2003
and you said that you were still working there."

O: "No no."

S: "But you worked there until around 2002?"

O: "It was long time ago.  It still exists as a
Non-profit organization.  We have no office.
We have nothing, but the main purpose of
the foundation was there was a famine that hit in Ethiopia,
where the famine is living also, the whole population who are here,
most of the came from that part."

S: "is it -- what is that area called?"

O: "It is called Ogaden.  So, we said this famine what
we can do.  So, then we organize it and we say let we collect
donations.  So, we help feeding center and some like that.
So, we contact a couple of Ethiopian organizations and we
said what will we do something.  That was the whole purpose.
How we can make relief.  How can we make impact, education wise

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

002481

as well as feeding wise?  That was the whole purpose."

S: "So it still exists just like the East African Youth Center?"

O: "It exists in name only.  But there is no office.
There is no location.  Its all just my understanding is
Franchise board they cancel out maybe
because there is not income.  Nothing."

S: "So, when you were operational you were,
must have been by 50th and University?  Right around there?"

O: "Yeah, same place."

S: "And what was your title there -- what was your job?"

O: "I was also the director."

S: "Director?"

O: "Yeah, director.  And was the reason that I become both of them
(UI) because I was experienced a long time, spending (UI) Present
the case of the Somali in famine and refugee.

S: "And where did they get their money from? Where did they get their funding
from?"

O: "It was generally donation.  They get it from the Somali members
I can't say members, but those who have their others
Generally from Minnesota people."

S: "Donations from Minnesota?"

O: "Yeah, Somalis Somalis in Minnesota"

S: "Why would they give you money? Didn't you get
money from people here?"

O: "Also from.  I mean Somalis from here.  Somalis from Minnesota,
some Somalis from Tennessee who came from that region generally.
It was that basic region in general."

S: "From the Ogoden?"

O: "Not true Ogoden, but generally they were the majority."

S: "So, how much would you say you got a month or a year?"

O: "Lots of famine.  There were a couple of
organizations others who donated. I think one organization
donated (UI) they said they wanted to start a feeding center or
something like that. I can say over all the donation was, two
hundred thirty thousand dollars for a span of of of during the
famine maybe five years.  Something like that."

S: "Over five years. From what? From '97-2002?"

MAY NOT BE REPRODUCED. IS. PROPERTY OF U.S. GOVERNMENT

O: "Not 2002, I guess it was 2000."

S: "So, that's three years."

O: "The beginning of 2000."

S: "Three years?"

O: "Yeah."

S: "So, from 1997-2000?"

O: "The time we got non-profit status, to the time.
The only major thing we did was feeding the famine.
Donating the famine didn't work so that was the guy from
here who was supervising who made pictures and all this
to make things as it is we were very, very cautious the
every dollar should go to the famine.  And they did it that way."

S: "So, did you receive any funding from any organizations?
This was pretty much it $240,000.00 from communities."

O: "Including the whole organizations, yeah."

S: "What organizations?"

O: "When things happened we went to Chicago, we contacted
large Muslim communities and there was again in I remember
2000 and we said this is the case and there was organization
that didn't. That. . .should I continue?"

S: "Yes."

O: "Ok, I thought we were disrupted.  So what happened is
we have there's one organization who donated the majority of the money."

S: "Mr. Mohamed could we stop here for a minute.
I guess I have to step out.  I'll be right back.  I'm sorry."

O: "Could you stop this."

S: "Did you want stop the camera Kurt?  Ok."

-Stop Tape-

-Back on Tape-

3rd Party: "Back on tape."

S: "From approximately 1997-2000 you got $240,000.00 in
donations from people in Minneapolis, Tennessee, and San Diego."

O: "Really, also Chicago also, and I don't know everyone
where they are, but that's the way.  We were going from
one state to state soliciting the famine problem that exists.
That is also Atlanta I  recall, because it
would be Rochester, Minnesota."

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

002483

S: "So, from all over the Unites States."

O: "So, yeah it is."

S: "So Who do you think gave you the most money?"

O: "The most money gave us an organization in Chicago.
Who went themselves.  Who enlisted themselves to make
sure that the Ethiopia agency that we are
dealing with this at this Addis Abbaba didn't steal the money.
And that organization's name was -- I just swallowed the name
I don't recall the name now."

S: "How much do you think you got from them?"

O: "I think the majority of the money they paid and th
understand by themselves was two hundred thousand dol
cause the rest of the Somali refugees they couldn't
amount of money.  But they were the ones who went
the set up of the feeding center in different
places in Ethiopia."

S: "But you can't remember their name?"

O: "I swallowed now.  I know the name.  I just      don't recall
Went out of my mind -- Global."

S: "Global?"

O: "Yeah, Global."

S: "They just called it Global?"

O: "Global Relief Agency or R                  und      d the w             ontacted
them was, there was a conference                  pre         ted           and
they contacted us and sai    we are    in  e    ted              here is a
know anyone that can fee   those du                                          huge famine in Ethiopia  in   e  me    aso             ke t
book and we send som                  here    a                 eone
they met there and sa     the   fee         a       vi     o        that."

S: "Ok.  Do you            who             t   with          hat agency?"

O: "I don't recall th    e         m   now    Bu   I remember when I
presented the   ase som       e          agenc    they also called from
different a        from          ra    he   of      Islamic world.  So we
never thought no     ne    wa    in   rested       frican poor country.
So they              hed us     d we approached them once they showed
we per  sed           and a coupl    of the other people and said listen
you ca    elp   his we don't have nothing - this is I don't recall
exa        refugee you what the name is very well, I don't recall,
but             they are from Chicago."

S: "Do you remember the title was he the president or the
director?"

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O: "I think that person should be executive level."

S: "You don't remember their exact title?"

O: "Executive Director."

S: "Was the man a Somali man?"

O: "No, he wasn't Somali man, he was an American man. My assumption
that he was some descendent from Middle East.  I'm not sure he is
Egyptian or Syrian.  I'm not sure of that."

S: "So, the person you dealt with was Egyptian or Syrian?"

O: "My understanding the way the accent that's
my feeling."

S: "But, you think he could have been Egyptian or Syrian,
but he was American?"

O: "He was American yeah. -pause- Because we contact I remember
we wrote also to most sixty different organization no provide
for different faith affiliation and few have st t resp ded
to us.  Show an interest at the time."

S: "So, this approximately $200,000.00 you got rom hem and
from other organizations would it go to u s the director?"

O: "No, it goes to the Board of Direc rs the do organ ati comes, yeah."

S: "How would that be...how did it go to ur agen
Did you have a bank account or so ething?"

O: "Yeah, we used a bank accou "

S: "And who would put the money n he ban accou "

O: "At that time I think was the o  pu i he money, yes."

S: "So, would they se it in cas chec  h w did they give you that
money?"

O: "No cash, no ca I thi fr from a check."

S: "Who else is on t Boar f ire ors t that time?"

O: "Board o rectors da al d erent people on Board of
Directors some th iv in Minn o , some of them.
I was th ly dire it was different places."

S: "B who lse was on it at that time?"

O: "as a guy, Mohamed Abdi in Minnesota.  I think most of
them t y lived in Minnesota."

S: "Was there anyone else that you can recall?"

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

1 O: "Uh, Ali Osman, Ali Osman."

2 S: "Ali Osman?"

3 O: "Abdi Ahmed, I think he is here in San Diego."

4 S: "So, did they have an office for Western Somali Relief in
5 Minnesota too?"

6 O: "The purpose was to move from Minnesota from San Diego
7 to there.  But what we found was as a non-profit organization.
8 They said lets leave the office here. The organizers said thi▨
9 Then the idea came that we could have a branch
10 but as soon as they didn't do it.  They couldn't do it becaus▨
11 of conflict with job they have, they didn't
12 have time and they left the office here at the time."

13 S: "Did you know that Global Relief was shut down?"

14 O: "I know they were shut down."

15 S: "Why were they shut down?"

16 O: "Because, it was that they were supportin▨ ▨ rr▨ists ▨d
17 that was what I heard the news.  Yeah"

18 S: "So, do you recall who you got the mon▨ ▨rom th▨▨

19 O: "I think the organization they sai▨ ▨ ▨lap▨ ng▨ ▨

20 S: "Do you remember a man named Mo▨amed th▨t worked ▨▨e▨▨

21 O: "Mohamed?"

22 S: "Mohamed that worked at T▨ ▨ ▨l ▨ ▨f in ▨ ▨ica▨ ▨"

23 O: "No, I don't recall."

24 S: "You don't recall?"

25 O: "Because I've been ▨her▨ ▨ ▨r▨ ▨ ▨ in con▨▨nce so
26 I didn't visit (UI▨ the ▨ce ▨ ▨ation▨
27 No I don't recall▨

28 S: "Ok, let me show y▨ ▨ne ▨h▨gs.
29 I have some c▨ies of s▨ne ▨hecks ▨▨e▨

30 O: "Ok."

31 S: "Fr▨m W▨ ▨ ▨ Somali ▨lief, is this your signature?"

32 O: "▨▨▨ ▨t's my signature."

33 S: "Ok ▨ts see these other ones.  This is a check from Global Relief
34 to Western Somali and it was deposited. It is kind of hard to see,
35 but is that your signature?"

MAY NOT BE REPRODUCED PROPERTY OF U. S. GOVERNMENT

O: "Yeah."

S: "These were all deposited to Bank of America."

O: "Sure."

S: "Here's some other accounts that I would just
like you to take a look at these and make sure."

O: "Ok."

S: "Again from Global Relief to Western Somali Relief."

O: "Yeah."

S: "And this is your..."

O: "It says here (UI).  This is the feeding center."

S: "I was looking for your signature.... just so you could
verify it was your signature on check.  It is kind of hard to read.
Does that look like your signature?"

-Pause-

O: "It looks like it, yeah."

S: "Ok.  So, we have you depositing money from Global Relief
into accounts at Bank of America.

O: Yep.

S: And these checks were received from different
Global Relief accounts. Is that correct?"

O: "Different relief accounts."

S: "How many accounts did you have for Western Somali Relief?"

O: "Only one."

S: "And that was where...

O: "Bank of America (UI) here.

S: "But I think that these checks, some were from Chicago
and some were from a bank in Texas. Does that sound right?"

O: "Could you repeat that again?"

S: "Some of these checks from Global Relief are from
different accounts.  One account in Illinois?"

O: "That's the only thing I know, cause I didn't,
we didn't read where it came from. We are only looking
for the name of the Global."

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

S: "And these are copies of tax records for Western Somali Relief
I just want to make sure you can confirm your signature again.
I guess that is it.  And also your title?  Could you say it for
the camera please?  Is that your signature?"

O: "This is my signature, yes."

S: "And what is your title?"

O: "Director and treasurer -- I was treasurer sometime, yeah."

S: "Have you ever traveled to the Ogoden yourself?"

O: "No, never."

S: "Have you ever traveled to Saudi Arabia for meetings?"

O: "Never, never...transit only."

S: "What would you consider transit?"

O: "Cause when I am going from here to my mom a
in the refugee camp.  The only way I can go is
Jeddeh there is no other thing."

S: "When you say transit you would just b     the     for
couple hours or?"

O: "No, just I make Umbra.  I have my
my two kids.  That is what we do."

S: "So, how long is the longest      rio    of t    e you spen
in Saudi Arabia?"

O: "Maybe four days, I'm not
days to five days."

S: "Have you ever receiv    funding
government of Saudi Ara    a

O: "Yes."

S: "And how much        at?"

O: "I don't know.  I    ust I    n'   re    ll."

S: "Just ge      ly, wa        l     e $    00        0.00,
$10.00, $1,000.    ?"

O: "I     on       ll --      t maybe, close to one hundred thousand dollars."

S:      lo       $100,000.00?"

O: "I    ot sure.  I'm not sure."

S: "That's fine.  Just a general figure is fine and
when did you receive that?"

MAY NOT BE REPRODUCED — PROPERTY OF U.S. GOVERNMENT

O: "I was religious worker."

S: "Yes."

O: "So, I thought that is known for some a long time.
So it is, it was for long time. I think since 1995 1996."

S: "So until now -- do you still receive money from them?"

O: "Yep, yep."

S: "And during that entire time you received about $100,000.00?
Somewhere around there?"

O: "I'm not sure.  I'm not sure, maybe bigger maybe
When I say bigger, I mean maybe a couple thousand."

S: "But you continue to receive money from them?"

O: "Yes, that is a religious workers."

S: "So, what is that money used for?"

O: "This is the way it is the money.  It is, you have to app
if you know some Islamic knowledge, so the test you  If you
pass the examination they hire you.  They  form, have to inform
the government of the United States.  They tell us the gonna
inform the government and then they a  exam
You guys gather that so the whole idea  the purpose was
teach the people tolerance don't propagate violence
and that is what I was doing for  long time.  Those scho   through
the Somali community and bridge  gap  p    t the
nature of Islam as you can.  T   w   h purpo  e o  it  or
a long time.  They called Da     ami   ollar, prot   t the
community from temptation, fall     be a g  d citi     protect."

S: "Where do you put tha  money?  Doe     p r     your
bank account?"

O: "Yeah."

S: "The same bank ac   nt y  put he Glo   elief?"

O: "Yeah, the same ba  k, bu  t'  my   cou  t."

S: "So, it'   r person   ac  un  ?"

O: "It is   rsonal   ount."

-Pause

S: "   much would you say you have in there now?"

O: "Uh, less than five dollar."

S: "Is it at the same location as the Western Somali account was?"

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O: "Yeah, same location, yeah."

S: "Ok.  Have you ever met with any representatives of the Saudi government over here?"

O: "No."

S: "Never?"

O: "Saudi government?"

S: "The Saudi Arabian government?

O: The one there was a office call of Islam in Washington part of the embassy he visited one time here long time ago, and that was the only time he came here.  That's what I remember. Long time ago."

S: "When would you say that was?  What year?"

O: "Maybe '96, '97, '98 I'm not sure '98, '99?  I'm not sure."

S: "Do you remember his name?"

O: "Yeah, Khalid."

S: "Khalid?  Do you remember his last name or his other name?"

O: "Ali, that's the first name I know.  Suwalim."

S: " Suwalim maybe? Is that what you said?"

O: "I'm not sure. I'm not sure. But that is the part of the cultural attachment of the Saudi. They was preaching say no violence.  Teach the people the good thing, the peaceful thing and I think concern of the terrorist was so strong among them. So, the whole purpose of his trip was I think he came from consulate in Los Angeles.  And one day I found through visiting here. Not the Saudi - I think, I not sure if he was a diplomat. I think he was a diplomat, something like that.  I'm not sure though."

S: "Where did you meet with him?"

O: "Oh, he came to our office."

S: "The Western Somali office?"

O: "No, the Somali Eastern African Youth Center."

S: "That is pretty much the same location."

O: "It is same location, yeah.  And he said what do you do?  Generally, he was checking that any Islamic preacher that they have should be on-line and they not doing something contrary to the country.  So, he was very much aware.  So, that was I think, I remember."

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

S: "When you were in Africa, or when you were in Australia, or when you were in the United Kingdom, did you ever meet with any foreign officials in any of those countries?"

O: "No, no, no.  When I went to London, I went for invitation to talk about Somali Peace Process.  It was very much Ogoden people, talking about where we will we go. Do we take the path of freedom or do just will we part of Ethiopia through democratic process.  I was one of the few people who was interested about talking just, no one listening in general because we present the idea and say that it is time for Ogoden people to forget about fighting and all this they have to be part of the democratic process.  Through that they can build school, hospitals, develop the region."

S: "Have you ever served in the military?  Either in Somalia or the United States?"

O: "No, no."

S: "Do the people from the Ogoden do they have a group or an organization that they use to try and promote their beliefs or their vision of what their area should be like?"

O: "Yeah, they have 1, 2, 3, three, because the popular organizations that they like -- they have three organizations."

S: "Is there a main one though or a larger one?"

O: "The largest one is called ONLF -- Ogoden National Liberation Front which they have president located in London.  I think its British so that is the biggest one."

S: "Before you came here you went to Canada is that right?"

O: "Yep."

S: "Did you apply for asylum in Canada?"

O: "Yep."

S: "Did you...did you put anything on your application there that you didn't tell us about here?"

O: "Oh, the punishment I went through the hand of Siad Berra Regime.  This I didn't."

S: "The punishment?"

O: "Yeah, the prison."

S: "Why were you put in prison?"

O: "Yeah, there was uprising, the regime was so dictative.  They were targeting every intellectual because of the tribal affiliation information and I was one of those targeted."

S: "And what clan are you from?"

O: "I'm from Ogoden."

S: "I thought you said you lived in Mogadishu?"

O: "But, Ogoden live also in Mogadishu."

S: "Well, I'm sure some do.  So, you've never been to the Ogoden?"

O: "No, I've never been.  Ogoden is I think geographically.
Ogoden people is around, maybe five million/eight million as the
claim.  What we claim.  I'm not sure of the number.  There is
census, but the southern tip of the Somalia.  The whole two regions
called Jublan most of them are Ogoden too.  So, this and
also inside the people travel and live anywhere they want.
I was born and raised in fact in Mogadishu."

S: "So, you were targeted because you were an intellectual?

O: "Also my tribe they were against the regime because of what
they did in southern part of Somalia.  Where they fight and the
clan will rule and the clan, who were thinking and they were
all this stuff because of the grace.  They fight the grace
and camel and cow who crossed and grabbed the city.
And all this and the government sided with the clan.  So the
people of my tribe, they went to Bised.  They were not
happy about that.  So, many people in the government they began
plan from the service.  So the government looks out anyone
in that tribe, they take them and they push them.
Whatever they can do.  So, I suffered that time.
And that was my base of political asylum in Canada.

S: "But you've never served in the military in Somalia?

O: "No, no."

S: "Any para-military?  Organization?

O: "No, the age the time that I came I was."

S: "And what happened to your claim in Canada?

O: "They put on hold.  They put on hold, they put on hold
and they didn't process.

S: "And then you, and then what happened?

O: "Then that's it.  My wife was accepted.  I have kids
there."

S: "Your wife was accepted in Canada, but you weren't."

O: "I wasn't."

S: "But she was?"

O: "But she was, yeah."

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT.

S: "Ok.  So, how did you come to the United States?"

O: "Then I got a job here to preach in Islamic Taqwa of mosque
with African Americans, and I moved here."

S: "And did you teach there?"

O: "Yeah."

S: "For how long?"

O: "From August 1 to February. August 1, 1995 to February 2, I think 1997.
I was going back and forth in Somali community as well as in the police."

S: "Have you ever heard of a group called the Al Itixaad al Islami?"

O: "Yep."

S: "And what's your association with them?"

O: "None, nothing."

S: "You've never been associated with them?"

O: "Never."

S: "Have you ever met or talked with anyone in this association?"

O: "In the Itixaad group.  They were a religious social group
in Somalia and..."

S: "What part of Somalia?"

O: "I think probably the most of them they are in the eastern part
 of Somalia. From Bossaso to (U) where they have the
grain and the power."

S: "From the Ogoden?"

O: "Ogoden?  No, no I am talking about the
the Somali side."

S: "But isn't it true that the IAI and the of their members are
from the Ogoden?"

O: "No, no that is not true. And I wish I could correct that idea.
Because the way this then movement began in Somalia and the way they
are preaching all of a sudden we had them when we migrated to the
west we had here, they became part of the bandwagon and
but in Somalia there were only preachers and
teaching in the mosque and all this.  But when the (UI)
fall then began uprising.  They a member is not only Ogoden to my
understanding.  It is not only Ogoden."

S: "But, some people are from the Ogoden."

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O: "Yeah, they also..."

S: "As a matter of fact. A lot of people in the Itixaad are from the Ogoden?"

O: "I can't say that."

S: "Do you know of any people here in San Diego that are associated with Itixaad?

O: "No, all of them.  They are against..."

S: "How about in Minnesota?"

O: "I'm not sure Minnesota.  I'm not sure.  I can't say. What I can say here because these are my family and they are against the Itixaad and ONLF both together."

S: "What about the people that run the Somali Mosque?"

O: "I have no..."

S: "At Winona?"

O: "I have no connection."

S: "Did you ever try to open your own Mosque?"

O: "Look, the beginning, the way the real came was I don't have a mosque and all this, and in the beginning, I have, and then we have disagreement, the Winona group because..."

S: "I'm sorry, but who's in charge of that group?  Who run that group?"

O: "I don't know, I have no idea."

S: "Well if you had an argument with them you would know who runs it."

O: "I have an argument, but at that time there was no leader inside them.  There was no one, because it was just group of people working, and then all of a sudden they have their own, their own vision and all these things and I don't associate."

S: "And what is their vision?"

O: "The vision.  The way I was seeing the vision was the majority of the city of Somalia they came from Ogoden and the way they are doing things to, I didn't like.  My perspective of bridging the gap of the Somali tribal community.  They were excluded Somali tribal community beside most of them was unknown to me.  I have no idea who they are, and the way they talk I become not comfortable even though I am an intellectual guy.  So, generally that was the way they treated my tribe.  That would cost me."

S: "So, they are not Ogoden?"

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

O: "I can say very much they are not Ogoden."

S: "So, do people from the Ogoden go to that Mosque?"

O: "No."

S: "Where do they go?"

O: "They go the Tabligh mosque.  The one in 50th Street."

S: "And who's in charge of that one?"

O: "I think one guy who is American.
Uniform for one time as I have is in charge."

S: "But, you don't know him?"

O: "India , Ibrahim Ibrahim"

S: Ibrahim

O: Ibrahim

S: "So, the people that go to the Winona Mosque
Where are they from?  What area of Somalia? What area?"

O: "The rest of Somalia, the rest of Somalia. It is very tribal.
Things that the people have different like Somali the rest
couldn't build a government and as tribal"

S: "Who do you think controls that mosque? Who provide
the money for that mosque?"

O: "I have no, I never pray, I never went.  So, I don't know.
I can't say."

S: "Do you know who the leader is of that mosque?"

O: "I had but I don't know. I'm not sure."

S: "Who's the Emam?"

O: "Cause they are small again. I never. So, I don't the Iman
the I think came from somewhere in northern Somalia."

S: "Is anybody ever. . .are you known by any other names?"

O: "No, nickname"

S: "Yeah nickname?"

O: "No, Omar Abdi Mohamed"

S: "Does Omar Khatiib sound familiar?"

O: "Yeah, that's me."

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

S: "Or Sheik Omar?"

O: "Shiak Omar, Omar Khatiib.  I am a very tall guy.  They all, they say the people there."

S: "Well see there is a lot of things that... when I first ask you, you don't tell me about and then later on when you know that I know about it you all of a sudden want to tell me."

O: "I'm not taking out of the context because my name is my name, Omar Abdi Mohamed, how many nicknames the people.  Knows the people, some people knows (UI) is the family I come from.
So the people give you different names.  But Sheik Omar and Omar Khatiib is well known to me."

S: "So, if you knew about any kind of radical activity here in San Diego would you tell us about it?"

O: "I have FBI, and a couple of them who visited me, ad given promised them if I saw anything I have there card If I saw anything I would report. But, let me clarify things. That the Mosque Al Ansar, I have no association, I have never prayed, not on the third, and, the difference between us is huge. And my tribe, and my family, none of them goes there. Maybe individuals, but I am not there. But, the majority, they go the other side and that was well known in Somali community."

S: "Ok, just to let you know Mr. Mohamed, I have been receiving information about you for several years.  And I believe that you committed fraud on your Naturalization Application."

O: "Fraud?"

S: "Yes, there were things that when Mr. Klingman and I interviewed you last time that you did not tell us about.  And that is fraud."

O: "What?"

S: "You received funding well over two hundred thousand dollars from Global Relief. They were shut down because they were providing aide to terrorism.  Ok, we think you are involved in that.  So, you are under arrest."

3rd Party: "Mr. Mohamed could you stand up please? Put that on the table. Stand please."

O: "Yeah but I did not, can I finish, why I didn't, I didn't you didn't ask me these questions."

3rd Party: "Would you stand please?"

O: "Yeah.  You didn't ask me these questions."

S: "Mr. Mohamed we did.  We asked you."

O: "But, I was clear and I told you everything."

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT.

S: "No, we asked you about your funding and you said you didn't receive any funding. Now when you find out that we know more, then you want to answer it. But you're still not completely honest with us."

O: "I was honest with you."

S: "We have a warrant for your arrest that has been issued by the Federal Magistrate for committing fraud on your application."

O: "I didn't. I swear to God. I didn't do it. I swear to God. I ⬛⬛⬛⬛"

S: "Well here's the deal Mr. Mohamed. You are being arrested ⬛⬛ ⬛⬛ taking you over to the federal jail. You will have the oppo⬛⬛⬛⬛⬛ ⬛⬛ talk with us and to cooperate with us, or you have an oppo⬛⬛⬛⬛⬛ ⬛⬛ try and fight your case."

O: "I didn't. I swear. I didn't hide anything. You ⬛⬛⬛⬛⬛⬛ me."

S: "Well, Mr. Mohamed we did ask you."

O: "I didn't hide anything. You just didn't ask me ⬛⬛⬛ questio⬛⬛⬛"

S: "Here's a copy of the arrest warrant. Just ⬛⬛⬛ know."

-Pause-

O: "But, I didn't. But I didn't hide any⬛⬛⬛⬛. You ⬛⬛⬛⬛"

3rd Party: "Do you have any knives on ⬛⬛⬛"

O: "No, I'm telling you guys. I swear to ⬛⬛d you ha⬛⬛⬛⬛⬛ w⬛⬛⬛ information. I'm told you. I s⬛⬛ar to god, everything⬛⬛"

S: "Mr. Mohamed you will have ⬛⬛ c⬛⬛ to ta⬛⬛ about ⬛⬛ some more but right now you are being ⬛⬛ ar⬛⬛ ⬛"

3rd Party: "What have you got in ⬛⬛⬛ ⬛cket⬛"

O: "A key"

3rd Party: "A key?"

O: "Yeah"

3rd Party: "Step up ⬛lease⬛"

O: "I told ⬛⬛ I told ⬛⬛ e⬛⬛ry⬛in⬛⬛ it is."

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

**Exhibit F**

**RETURN**

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| January 20, 2004 | January 22, 2004    08:15 a.m. PST | Haweya Yusuf Shire |

INVENTORY MADE IN THE PRESENCE OF
ecial Agent Steven W. Schultz, ICE

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

See attached FD-597, Receipt for Property Received/Returned/Released/Seized

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

**CERTIFICATION**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant

*Steven W Schultz*

Subscribed, sworn to, and returned before me this date.

*Laura Voiler*

U.S. Judge or Magistrate                    1/23/04
                                             Date

1213

FD-597 (Rev 8-11-94)                                                              Page ___1___ of ___1___

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # 199M-SD-62765 (C-3)

On (date) 01-22-2004

item(s) listed below were:
☑ Received From
☐ Returned To
☐ Released To
☐ Seized

(Name) HAWEYA YUSUF SHIRE

(Street Address) 7245 WAITE DRIVE

(City) LA MESA, CA

Description of Item(s):

1 - WESTERN DIGITAL HARD DRIVE 3892C73

2 - 17 FLOPPY DISK 3.5"

3 - SOMALI PASSPORT (Green) OMAR ____ Mohamed

4 - US DOJ Permit to Re enter US (White) OMAR ABDI Mohamed

5 - Black : Silver Address Book

6 - Kingdom of Saudi Arabia ____ to ____ Mohammed

7 - DL of Mohamed Expires ____-01-0?

8 - Travel DOC's : MISC Paperwork including Bank Statements

9 - DOC's phone #'s, misc ____ (from Kitchen)

10 - DOC's from Garage and Safe Financial DOC's : Identity DOC's

11 - Computer / Hard Drive E186AB33?? Serial # 5000 F756 00579

Received By: TODD L. ____ (Signature)

Received From: Haweya (Signature)

1214

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT.

**Exhibit G**

STEVEN SCHULTZ   3/19/04

1       A    YES.

2       Q    AND HAVE YOU REVIEWED HIS IMMIGRATION FILE IN

3    CONNECTION WITH THIS CASE?

4       A    YES, I HAVE.

5       Q    AND BASED ON YOUR REVIEW, WHAT'S YOUR

6    UNDERSTANDING OF HOW HE CAME TO BEING IN POSSESSION OF

7    THAT GREEN CARD?

8       A    HE CAME TO BE IN POSSESSION OF THAT BECAUSE IT

9    WAS ISSUED TO HIM AS THE RESULT OF HIS APPLICATION TO

10   ENTER THE UNITED STATES AS A RELIGIOUS WORKER.

11      Q    AND IS THAT WHAT WE'RE TALKING ABOUT, THE TAQWA

12   MOSQUE?

13      A    YES.  THE TAQWA MOSQUE WAS REQUIRED TO FILE

14   PAPERWORK SHOWING THAT THEY WERE A LEGITIMATE RELIGIOUS

15   ENTERPRISE, AND THERE WAS A CONTRACT WHEREBY MR. MOHAMMED

16   WOULD BE EMPLOYED BY THEM FOR A PERIOD OF ONE YEAR, THAT

17   HE WOULD TEACH ARABIC, HE WOULD INSTRUCT THE KORAN AND

18   THAT HE WOULD ALSO BE PROVIDED HOUSING BY THE MOSQUE.

19      Q    AND SO IF THAT WAS FALSE BASED ON THE INTERVIEW

20   WITH THE IMAM, THEN WOULD IT BE FAIR TO SAY THAT HE WAS

21   IN POSSESSION OF THAT CARD BY FRAUD?

22      A    YES.

23      Q    OKAY.  ALSO ON THE DAY OF HIS ARREST, WAS THERE

24   A SEARCH CONDUCTED AT HIS HOME PURSUANT TO A SEARCH

25   WARRANT?

9

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT.

Spherion Deposition Services
(800) 514-2714

03459

STEVEN SCHULTZ   3/19/04

1      A   YES.

2      Q   DID YOU SPEAK TO PEOPLE WHO WERE INVOLVED IN

3   THAT SEARCH?

4      A   YES, I DID.

5      Q   AND DID YOU REVIEW MATERIALS THAT WERE SEIZED

6   PURSUANT TO THAT SEARCH?

7      A   YES.

8      Q   DID YOU FIND ANY DOCUMENTS RELATING TO ANY

9   FOREIGN COUNTRIES?

10     A   YES.  WE FOUND DOCUMENTS ISSUED BY THE

11  GOVERNMENT OF SAUDI ARABIA.

12     Q   CAN YOU DESCRIBE FOR ME BRIEFLY, WHAT THOSE

13  WERE?

14     A   THEY CONSISTED OF DOCUMENTS NOTIFYING HIM THAT

15  HE WOULD BE PAID A MONTHLY SALARY, AND IN FACT, HE WAS

16  PAID A MONTHLY SALARY BY THE MINISTRY OF RELIGION.

17     Q   THE KINGDOM OF SAUDI ARABIA MINISTRY OF ISLAMIC

18  AFFAIRS, ENDOWMENTS DA WAH -- I GUESS THAT SHOULD BE

19  APOSTROPHE AND NOT HYPHENED -- AND GUIDANCE?

20     A   YES.

21     Q   AND TO YOUR UNDERSTANDING, IS THAT A PART OF THE

22  GOVERNMENT OF SAUDI, ARABIA?

23     A   THAT IS A BRANCH OF THE EQUIVALENT OF FEDERAL

24  GOVERNMENT OF SAUDI ARABIA, YES.

25     Q   SO YOU FOUND INFORMATION SUGGESTING THAT HE WAS

10

MAY NOT BE REPRODUCED - PROPERTY OF U.S. GOVERNMENT

0345

STEVEN SCHULTZ   3/19/04

1   GETTING PAID A MONTHLY SALARY?

2        A   YES.

3        Q   IN AMOUNTS UP TO HOW MUCH?

4        A   I BELIEVE IT WAS $1,750 A MONTH.

5        Q   AND PURSUANT TO YOUR INVESTIGATION, THE GRAND

6   JURY ISSUED A SUBPOENA FOR BANK RECORDS FOR BOTH WESTERN

7   SOMALI RELIEF AGENCY AND FOR MR. MOHAMMED'S PERSONAL

8   BANK ACCOUNT AT THE BANK OF AMERICA?

9        A   YES.

10       Q   AND DO YOU HAVE THOSE WITH YOU?

11       A   YES, I DO.

12       Q   AND PURSUANT TO THAT FINANCIAL ANALYSIS, WAS IT

13   DISCOVERED THAT HE'D RECEIVED CHECKS, AT LEAST A SALARY,

14   OR CHECKS FROM THE SAUDI GOVERNMENT FROM AT LEAST AUGUST

15   19, 1994 ALL THE WAY UP THROUGH JANUARY OF 2004?

16       A   YES.

17       Q   AND THE LARGEST AMOUNT, AND THE MOST RECENT

18   AMOUNT HE WAS RECEIVING IS $1,750?

19       A   YES.

20       Q   WHAT OTHER DOCUMENTS DID YOU LOOK AT FROM THE

21   KINGDOM OF SAUDI ARABIA INDICATING WHAT HE WAS DOING HERE

22   IN THE UNITED STATES WORKING FOR THEM?  HE'S NOT A SAUDI

23   NATIONAL, CORRECT?

24       A   CORRECT.

25       Q   HE IS SOMALI, RIGHT?

MAY NOT BE REPRODUCED — PROPERTY OF U.S. GOVERNMENT.

11

03485

**Exhibit H**

```
┌─────────────────────────┐
│      DEFENDANT'S         │
│       EXHIBIT            │
│                         │
│ CASE                    │
│ NO. 03CR3433            │
│                         │
│ EXHIBIT                 │
│ NO.      M              │
└─────────────────────────┘
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2003 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 03CR3433JAH |
| Plaintiff, | ) ) | I N D I C T M E N T (Superseding) |
| v. | ) ) | Title 18, U.S.C., Sec. 1546(a) - |
| OMAR ABDI MOHAMED, | ) ) | False Statement in Connection With Immigration Application; |
| Defendant. | ) ) | Title 18, U.S.C., Sec. 1015(a) - False Statement in Matter Relating |
| | ) ) | to Naturalization; Title 18, U.S.C., Sec. 1546 - Possession of |
| | ) ) | Entry Documents Obtained by Fraud |

The grand jury charges:

                    INTRODUCTORY ALLEGATIONS

    1.   Defendant OMAR ABDI MOHAMED is a citizen of Somalia who emigrated to the United States on a Special Religious Worker's Visa and obtained lawful permanent resident status on July 8, 1995.

    2.   On April 11, 2000, defendant OMAR ABDI MOHAMED submitted INS Form N-400 (Application for Naturalization) to the Immigration and Naturalization Service in support of his request for United States naturalization.

//

JNP:nlv:San Diego
3/25/04

3.  On December 14, 2001, the United States Treasury Department's Office of Foreign Assets Control issued an order freezing the assets of the Global Relief Foundation, a charity based in Bridgeview, Illinois.

4.  On March 11, 2002, the United States Treasury Department's Office of Foreign Assets Control designated the Bosnian and Somalian branches of the Al-Haramain Foundation a Specially Designated Global Terrorist.

5.  On May 9, 2002, defendant OMAR ABDI MOHAMED was interviewed under oath by Immigration and Customs Enforcement (ICE) District Adjudications Officer Kirt Klingerman and Senior Special Agent Steven Schultz pursuant to his naturalization request.

6.  On October 18, 2002, the Office of Foreign Assets Control designated the Global Relief Foundation a Specially Designated Global Terrorist.

7.  Between at least August 1994 and continuing through January 2004, defendant OMAR ABDI MOHAMED received a monthly salary from the Kingdom of Saudi Arabia, Ministry of Islamic Affairs, Endowments, Da'wah, and Guidance in amounts up to $1750.00.

<u>Count 1</u>

On or about May 9, 2002, in the Southern District of California, defendant OMAR ABDI MOHAMED, did knowingly make material false statements under oath to Immigration and Customs Enforcement (ICE) Senior Special Agent Steven Schultz in connection with an application required under the immigration laws, and regulations prescribed thereunder, to wit, an application for naturalization [Form N-400], in that he claimed that the Western Somali Relief Agency was an entity in name only, that it never received funds, and that the entity had

1  insufficient funds to send two boxes of blankets to Somalia; which the
2  defendant then and there knew was false, in that, in truth and in
3  fact, between December 1998 and May 2001, the Western Somali Relief
4  Agency received $326,838 from the Global Relief Foundation and $5,000
5  from the Al-Haramain Foundation; in violation of Title 18, United
6  States Code, Section 1546(a).

7                              Count 2

8      On or about May 9, 2002, within the Southern District of
9  California, defendant OMAR ABDI MOHAMED did knowingly make false
10 statements under oath in a proceeding and matter relating to
11 naturalization to Immigration and Customs Enforcement (ICE) Senior
12 Special Agent Steven Schultz in that he claimed that the Western
13 Somali Relief Agency was an entity in name only, that it never
14 received funds, and that the entity had insufficient funds to send two
15 boxes of blankets to Somalia; which the defendant then and there knew
16 was false, in that, in truth and in fact, between December 1998 and
17 May 2001, the Western Somali Relief Agency received $326,838 from the
18 Global Relief Foundation and $5,000 from the Al-Haramain Foundation;
19 in violation of Title 18, United States Code, Section 1015(a).

20                             Count 3

21     On or about May 9, 2002, in the Southern District of California,
22 defendant OMAR ABDI MOHAMED, did knowingly make material false
23 statements under oath to Immigration and Customs Enforcement (ICE)
24 Senior Special Agent Steven Schultz in connection with an application
25 required under the immigration laws, and regulations prescribed
26 thereunder, to wit, an application for naturalization [Form N-400],
27 in that, when asked about his employment history, defendant OMAR ABDI
28 MOHAMED claimed that he was only employed by Say San Diego, San Diego

                                3

City School District, and Masjidul Taqwa; which the defendant then and
there knew was false, in that, in truth and in fact, between March
1994 and January 2004, defendant OMAR ABDI MOHAMED was also employed
by the Kingdom of Saudi Arabia, Ministry of Islamic Affairs,
Endowments, Da'wah, and Guidance; in violation of Title 18, United
States Code, Section 1546(a).

### Count 4

On or about May 9, 2002, in the Southern District of California,
defendant OMAR ABDI MOHAMED did knowingly make false statements under
oath in a proceeding and matter relating to naturalization to
Immigration and Customs Enforcement (ICE) Senior Special Agent Steven
Schultz in that, when asked about his employment history, defendant
OMAR ABDI MOHAMED claimed that he was only employed by Say San Diego,
San Diego City School District, and Masjidul Taqwa; which the
defendant then and there knew was false, in that, in truth and in
fact, between March 1994 and January 2004, defendant OMAR ABDI MOHAMED
was also employed by the Kingdom of Saudi Arabia, Ministry of Islamic
Affairs, Endowments, Da'wah, and Guidance; in violation of Title 18,
United States Code, Section 1015(a).

### Count 5

On or about May 9, 2002, in the Southern District of California,
defendant OMAR ABDI MOHAMED, did knowingly make material false
statements under oath to Immigration and Customs Enforcement (ICE)
Senior Special Agent Steven Schultz in connection with an application
required under the immigration laws, and regulations prescribed
thereunder, to wit, an application for naturalization [Form N-400],
in that when asked about his employment history, defendant OMAR ABDI
MOHAMED claimed that he was employed by Masjidul Taqwa from August

4

1  1995 through February 1997; which the defendant then and there knew
2  was false, in that, in truth and in fact, defendant OMAR ABDI MOHAMED
3  was never employed by Masjidul Taqwa; in violation of Title 18, United
4  States Code, Section 1546(a).

5                              Count 6

6      On or about May 9, 2002, within the Southern District of
7  California, defendant OMAR ABDI MOHAMED did knowingly make false
8  statements under oath in a proceeding and matter relating to
9  naturalization to Immigration and Customs Enforcement (ICE) Senior
10 Special Agent Steven Schultz in that, when asked about his employment
11 history, defendant OMAR ABDI MOHAMED claimed that he was employed by
12 Masjidul Taqwa from August 1995 through February 1997; which the
13 defendant then and there knew was false, in that, in truth and in
14 fact, defendant OMAR ABDI MOHAMED was never employed by Masjidul
15 Taqwa; in violation of Title 18, United States Code, Section 1015(a).

16                             Count 7

17     On or about May 9, 2002, in the Southern District of California,
18 defendant OMAR ABDI MOHAMED, did knowingly make material false
19 statements under oath to Immigration and Customs Enforcement (ICE)
20 Senior Special Agent Steven Schultz in connection with an application
21 required under the immigration laws, and regulations prescribed
22 thereunder, to wit, an application for naturalization [Form N-400],
23 in that when asked about his children, defendant OMAR ABDI MOHAMED
24 affirmatively indicated that he had seven children; which the
25 defendant then and there knew was false, in that, in truth and in
26 fact, defendant OMAR ABDI MOHAMED had an eighth child, Zuhair Omar
27 Mohamed, born December 19, 2001 to Rosalie Douglas, in New South
28 //

1 | Wales, Australia; in violation of Title 18, United States Code,
2 | Section 1546(a).

3 | <center>Count 8</center>

4 | On or about May 9, 2002, within the Southern District of
5 | California, defendant OMAR ABDI MOHAMED did knowingly make false
6 | statements under oath in a proceeding and matter relating to
7 | naturalization to Immigration and Customs Enforcement (ICE) Senior
8 | Special Agent Steven Schultz in that, in that when asked about his
9 | children, defendant OMAR ABDI MOHAMED affirmatively indicated that he
10 | had seven children; which the defendant then and there knew was false,
11 | in that, in truth and in fact, defendant OMAR ABDI MOHAMED had an
12 | eighth child, Zuhair Omar Mohamed, born December 19, 2001 to Rosalie
13 | Douglas, in New South Wales, Australia; in violation of Title 18,
14 | United States Code, Section 1015(a).

15 | <center>Count 9</center>

16 | On or about January 22, 2004, within the Southern District of
17 | California, defendant OMAR ABDI MOHAMED knowingly possessed a document
18 | prescribed by statute and regulation for entry into and as evidence
19 | of authorized stay in the United States, to wit, a Permanent Resident
20 | Card (Form I-551), knowing it to have been procured by means of
21 | material false claims and statements and fraud; in violation of
22 | Title 18, United States Code, Section 1546.

23 | DATED: March 26, 2004.

24 | A TRUE BILL:

25 | _____
    Foreperson

26 | CAROL C. LAM
    United States Attorney

27 |

28 | By: _____
       JOHN N. PARMLEY
       Assistant U.S. Attorney

<center>6</center>

# Exhibit I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

FILED

05 APR -5 PM 3: 15

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

UNITED STATES OF AMERICA,

                              Plaintiff,

          vs.

OMAR ABDI MOHAMED,

                              Defendant.

CASE NO. 03CR3433-JAH

**JUDGMENT OF DISMISSAL**
(Rule 48, F.R.Crim.P.)

          IT APPEARING that the defendant is now entitled to be discharged
for the reason that:

____     an indictment has been filed in another case against the defendant and
         the Court has granted the motion of the Government for dismissal of
         this case, without prejudice; or

____     the Court has dismissed the case for unnecessary delay; or

____     the Court has granted the motion of the Government for dismissal; or

____     the Court has granted the motion of the defendant for a judgment of
         acquittal; or

_X__     the jury has returned its verdict, finding the defendant not guilty;

_X__ of the offense(s) of: FALSE STATEMENT IN CONNECTION WITH IMMIGRATION
         APPLICATION as charged in count one of the superseding indictment,
         and FALSE STATEMENT IN MATTER RELATING TO NATURALIZATION as charged
         in count two of the indictment.

          IT IS THEREFORE ADJUDGED that the defendant is hereby discharged
pursuant to Rule 48, Federal Rules of Criminal Procedure.

DATED: 3/30/05

John A. Houston
UNITED STATES DISTRICT JUDGE

ENTERED ON _____ APR 0 5 2005

I hereby attest and certify on  4-28-05
That the foregoing document is a full, true and correct
copy of the original on file in my office and in my legal
custody.
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____ Deputy

155

# Exhibit J

250

**U.S. Department of Justice**
Immigration and Naturalization Ser

OMB No. 1115-0145

**Application for Naturalization**

## START HERE - Please Type or Print

FOR INS USE ONLY

### Part 1.  Information about you.

| Family Name | MOHAMED | Given Name | Omar | Middle Initial | A |
|---|---|---|---|---|---|

U.S. Mailing Address - Care of:

| Street Number and Name | 7245 Waite Drive | Apt. # | |
|---|---|---|---|

| City | La Mesa | County | San Diego |
|---|---|---|---|

| State | CA | Zip Code | 91941 |
|---|---|---|---|

| Date of Birth (month/day/year) | 01/01/1960 | Country of Birth | Somalia |
|---|---|---|---|

| Social Security # | 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 | A # | 044-917-640 |
|---|---|---|---|

| Returned | Receipt |
|---|---|

Resubmitted

Reloc Sent

Reloc Rec'd

4/18/2000  WSC*000462738
W8C9000424183

### Part 2.  Basis for Eligibility  *(check one).*

a. ☒  I have been a permanent resident for at least five (5) years.

b. ☐  I have been a permanent resident for at least three (3) years and have been married to a United States Citizen for those three years.

c. ☐  I am a permanent resident child of United States citizen parent(s).

d. ☐  I am applying on the basis of qualifying military service in the Armed Forces of the U.S. and have attached completed forms N-426 and G-325B

e. ☐  Other.  (Please specify section of law)

Applicant Interviewed

At Interview
Request naturalization ceremony at court

### Part 3.  Additional Information about you.

| Date you became a permanent resident (month/day/year) | 07/08/95 | Port admitted with an immigrant visa or INS Office where granted adjustment of status. NYC |
|---|---|---|

Remarks

| Citizenship | Somali |
|---|---|

Name on alien registration card (if different than in Part 1)
n/a

Other names used since you became a permanent resident (including maiden name)
none

| Sex | ☒ Male  ☐ Female | Height | 6'3" | Marital Status | ☐ Single  ☒ Married  ☐ Divorced  ☐ Widowed |
|---|---|---|---|---|---|

Can you speak, read and write English?  ☐ No  ☒ Yes

Action

**Absences from the U.S.**

Have you been absent from the U.S. since becoming a permanent resident?  ☐ No  ☒ Yes

If you answered "Yes," complete the following. Begin with your most recent absence. If you need more room to explain the reason for an absence or to list more trips, continue on separate paper.

| Date left U.S. | Date returned | Did absence last 6 months or more? | Destination | Reason for trip |
|---|---|---|---|---|
| 08/06/97 | 08/28/97 | ☐ Yes  ☒ No | Kenya, Saudi A. | Visit family |
| 03/23/97 | 03/30/97 | ☐ Yes  ☒ No | England | Educational |
| 02/28/97 | 03/04/97 | ☐ Yes  ☒ No | Canada | Visit family |
| 12/23/96 | 12/30/96 | ☐ Yes  ☒ No | Canada | Visit family |
| few day | trips | ☐ Yes  ☒ No | Tijuana | Tourism, fix car |
|  |  | ☐ Yes  ☐ No |  |  |

To be completed by
Attorney or Representative, if any
☒ Fill in box if G-28 is attached to represent the applicant

VOLAG#

ATTY State License #

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT.

**1**

## Part 4. Information about your residences and employment.

A. List your addresses during the last five (5) years or since you became a permanent resident, whichever is less. Begin with your current address. If you need more space, continue on separate paper:

| Street Number and Name, City, State, Country, and Zip Code | | | | | | Dates (month/day/year) From | To |
|---|---|---|---|---|---|---|---|
| 7245 Waite Drive | La Mesa | CA | 91941 | USA | | 09/15/99 | present |
| 4404 Alamo Drive | San Diego | CA | | 92115 | | 03/97 | 09/15/99 |
| 4236 48th Street #6 | San Diego | CA | | 92115 | | 03/08/95 | 02/28/97 |

*(handwritten) lived one week in Minnesota one week ...*

B. List your employers during the last five (5) years. List your present or most recent employer first. If none, write "None". If you need more space, continue on separate paper. *(handwritten) San Diego City Schools 1998 To present Farb Elem School*

| Employer's Name | Employer's Address  Street Number and Name, City, State, Country, Zip Code | Dates Employed (month/day/year) From | To | Occupation/position |
|---|---|---|---|---|
| Say San Diego, Inc. | 3615 Kearny Villa Rd #101, SD, CA 92133 | 07/__ | present | Case Manager |
| Euclid Elementary School | 4166 Euclid Ave. San Diego, CA 92105 | 06/02/98 | present | Instructional Aide |
| Central Elementary School | 4063 Polk Ave. San Diego, CA 92115 | 01/28/95 | 10/01/98 | Teacher's Assistant |
| Masjidul Taqwa | 2575 Imperial Ave. San Diego, CA 92102 | 01/__/98 | __/02/__ | Outreach/Religious Work |

## Part 5. Information about your marital history.

A. Total number of times you have been married __2__. If you are now married, complete the following regarding your husband or wife.

| Family name | Given name | Middle initial |
|---|---|---|
| Shire | Haweya | Yusuf |

| Address | 7245 Waite Drive | La Mesa, CA |
|---|---|---|

| Date of birth (month/day/year) | 12/25/65 | Country of birth  Somalia | Citizenship  Somali |
|---|---|---|---|

| Social Security# | 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 | A# (if applicable)  045-667-148 | Immigration Status (if not U.S. citizen)  LPR |
|---|---|---|---|

| Naturalization (if applicable) (month/day/year) | n/a | Place (City, State)  n/a |
|---|---|---|

If you have ever previously been married or if your current spouse has been previously married, please provide the following on separate paper: Name of prior spouse, date of marriage, date marriage ended, how marriage ended, and immigration status of prior spouse.

## Part 6. Information about your children.

B. Total number of Children __7__. Complete the following for each of your children. If the child lives with you, state "with me" in the address column; otherwise give the city/state/country of the child's current residence. If deceased, write "deceased" in the address column. If you need more space, continue on separate paper.

| Full name of child | Date of birth | Country of birth | Citizenship | A - Number | Address |
|---|---|---|---|---|---|
| Mohamed, Abdirahman Omar | 07/11/90 | Canada | Canadian | 045-667-149 | with me |
| Mohamed, Mariam Omar | 08/04/93 | Canada | Canadian | 045-667-151 | with me |
| Mohamed, Hafsa Omar | 12/26/91 | Canada | Canadian | 045-667-150 | with me |
| Mohamed, Khalid Omar | 04/22/95 | Canada | Canadian | 045-667-152 | with me |
| Mohamed, Fatima Omar | 03/06/98 | U.S. | U.S.A. | n/a | with me |
| Mohamed, Zubeir Omar | 08/08/99 | U.S. | U.S.A. | n/a | with me |
| Mohamed, Abdullahi Omar | 04/12/85 | Somali | Somali | n/a | Kenya |

Form N-400 (Rev. 07/17/91)N                    Continued on next page

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT.

*Continued on back*

## Part 7.   Additional eligibility factors.

Please answer each of the following questions.  If your answer is "Yes", explain on a separate paper.

Have you ever:
a: Registered to vote in the United States? ☐ yes ☒ no   b.  Voted in an election in the United States? ☐ ☒

1.  Are you now or have you ever been a member of, or in any way connected or associated with the Communist Party, or ever knowingly aided or supported the communist party directly, or indirectly through another organization, group, or person, or ever advocated, taught, believed in, or knowingly supported or furthered the interests of communism?   ☐ Yes ☒ No

2.  During the period March 23, 1933 to May 8, 1945, did you serve in, or were you in any way affiliated with, either directly or indirectly, any military unit, paramilitary unit, police unit, self-defense unit, vigilante unit, citizen unit of the Nazi party of SS, government agency or office, extermination camp, concentration camp, prisoner of war camp, prison, labor camp, detention camp or transit camp, under the control or affiliated with:

    a.   The Nazi Government of Germany   ☐ Yes ☒ No

    b.   Any government in any area occupied by, allied with, or established with the assistance or cooperation of, the Nazi Government of Germany?   ☐ Yes ☒ No

3.  Have you at any time, anywhere, ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion?   ☐ Yes ☒ No

4.  Have you ever left the United States to avoid being drafted into the U.S. Armed Forces   ☐ Yes ☒ No

5.  Have you ever failed to comply with Selective Service laws?   ☐ Yes ☒ No
If you have registered under Selective Service laws, complete the following information:
    Selective Service Number:_____ Date Registered:_____
If you registered before 1978, also provide the following:
    Local Board Number:_____ Classification:_____

6.  Did you ever apply for exemption from military service because of alienage, conscientious objections, or other reasons?   ☐ Yes ☒ No

7.  Have you ever deserted from the military, air or naval forces of the United States?   ☐ Yes ☒ No

8.  Since becoming a permanent resident, have you ever failed to file a federal income tax return?   ☐ Yes ☒ No

9.  Since becoming a permanent resident, have you filed an income tax return as a nonresident or failed to file a federal return because you considered yourself to be a nonresident?   ☐ Yes ☒ No

10.  Are deportation proceedings pending against you, or have you ever been deported, or ordered deported, or have you ever applied for suspension of deportation?   ☐ Yes ☒ No

11.  Have you ever claimed in writing, or in any way, to be a United States citizen?   ☐ Yes ☒ No

12.  Have you ever:

    a.   been a habitual drunkard?   ☐ Yes ☒ No

    b.   advocated or practiced polygamy?   ☐ Yes ☒ No

    c.   been a prostitute or procured anyone for prostitution?   ☐ Yes ☒ No

    d.   knowingly and for gain helped any alien to enter the U.S. illegally?   ☐ Yes ☒ No

    e.   been an illicit trafficker in narcotic drugs or marijuana?   ☐ Yes ☒ No

    f.   received income from illegal gambling?   ☐ Yes ☒ No

    g.   given false testimony for the purpose of obtaining any immigration benefit?   ☐ Yes ☒ No

13.  Have you ever been declared legally incompetent or have you ever been confined as a patient in a mental institution?   ☐ Yes ☒ No

14.  Were you born with, or have you acquired in some way, any title or order of nobility in any foreign State?   ☐ Yes ☒ No

15.  Have you ever:

    a.   knowingly committed any crime for which you have not been arrested?   ☐ Yes ☒ No

    b.   been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any law or ordinance excluding traffic regulations?   ☐ Yes ☒ No

(If you answer yes to 15, in your explanation give the following information for each incident or occurrence: the city, state, and country, where the offense took place, the date and nature of the offense, and the outcome or disposition of the case).

## Part 8.   Allegiance to the U.S.

If your answer to any of the following questions is "NO", attach a full explanation:

1.  Do you believe in the Constitution and form of government of the U.S.?   ☒ Yes ☐ No
2.  Are you willing to take the full Oath of Allegiance to the U.S. (see instructions)?   ☒ Yes ☐ No
3.  If the law requires it, are you willing to bear arms on behalf of the U.S.?   ☒ Yes ☐ No
4.  If the law requires it, are you willing to perform noncombatant services in the Armed Forces of the U.S.?   ☒ Yes ☐ No
5.  If the law requires it, are you willing to perform work of national importance under civilian direction?   ☒ Yes ☐ No

**3**

NOT TO BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

## Part 9.  Memberships and Organizations

1.  List your present and past membership in or affiliation with every organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place.  Include any military service in this part.  If none, write "none".  Include the name of organization, location, dates of membership and nature of the organization.  If additional space is needed, use separate paper.

| | | | |
|---|---|---|---|
| ✓ Somali and East African Youth Center | Inc., (Non-profit Community Service) | 1996 | to present |
| 4979 University Ave. #D, San Diego, CA | 92105 | | |
| ✓ Western Somali Relief Agency, Inc., | (Non-profit Community Service) | 1997 | to present |
| 4979 University Ave. #C, San Diego, CA | 92105 | -- | |

## Part 10.  Complete only if you checked block " C " in Part 2.

How many of your parents are U.S. citizens?  ☐ One  ☐ Both  (Give the following about one U.S. citizen parent:)

| Family Name | Given Name | Middle Initial |
|---|---|---|
| Address | | |

Basis of citizenship:
☐ Birth
☐ Naturalization Cert. No.

Relationship to you (check one:):  ☐ natural parent   ☐ adoptive parent
☐ parent of child born ... after birth

If adopted or legitimated after birth, give date of adoption, or, legitimation: (month/day/year)

Does this parent have legal custody of you?  ☐ Yes  ☐ No

*(Attach a copy of relating evidence to establish that you are the child of the U.S. citizen, and evidence of this parent's citizenship.)*

## Part 11.  Signature  (Read the information on the penalties in the instructions before completing this section).

I certify, or, if outside the United States, I swear or affirm, under penalty of perjury under the laws of the United States of America that this application, and the evidence submitted with it, is all true and correct.  I authorize the release of any information from my records which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

Signature

Date  4/11/00

Please Note:  If you do not completely fill out this form, or fail to submit the required documents listed in the instructions, you may not be found eligible for naturalization and this application may be denied.

## Part 12.  Signature of person preparing form if other than above.  *(Sign below)*

I declare that I prepared this application at the request of the above person and it is based on all information of which I have knowledge.

Signature

Print your Name  Kristy Cabral

Date  4/11/00

Firm Name and Address  International Rescue Committee
4535 30th St. #110, San Diego, CA 92116

### DO NOT COMPLETE THE FOLLOWING UNTIL INSTRUCTED TO DO SO AT THE INTERVIEW

I swear that I know the contents of this application, and supplemental pages, 1 through _____, and that the corrections, numbered 1 through _____, were made at my request and that this amended application, is true to the best of my knowledge and belief.

x  Omar Abdi Mohamed
(Complete and true signature of applicant)

Subscribed and sworn to before me by the applicant.

_____          5-06-02
(Examiner's Signature)                Date

R-S Project
History Research
20 22. 25  56 57 98 04 65 53 52      X   I live in San Diego, California

CAN NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT.

**4**

**End of Exhibits**